1  Marc J. Randazza, NV Bar # 12265
2  Ronald D. Green NV Bar # 7360
   LaTeigra C. Cahill, NV Bar # 14352
3  RANDAZZA LEGAL GROUP, PLLC
   2764 Lake Sahara Drive, Suite 109
4  Las Vegas, NV 89117
   Telephone: 702-420-2001
5  ecf@randazza.com
6  Attorneys for Plaintiffs
7  Dennis Hof and Cherry Patch LLC

8                   **UNITED STATES DISTRICT COURT**
9                        **DISTRICT OF NEVADA**
10

11 **DENNIS HOF**, an individual; **CHERRY**      Case No. 2:18-cv-01492
12 **PATCH LLC**, a Nevada limited liability      _____
   company,
13                                                 **MOTION FOR A TEMPORARY**
14          Plaintiffs,                            **RESTRAINING ORDER**
15          vs.
16
17 **NYE COUNTY**; **NYE COUNTY LICENSING**
   **BOARD**; **DAN SCHINHOFEN** (in his
18 personal and official capacity as a
   member of the Nye County Licensing
19 Board); **ANDREW BORASKY** (in his
   personal and official capacity as
20 Commissioner of District 4 of Nye
   County); **JANE DOE**; and **JOHN ROE**,
21
22          Defendants.
23
24
25
26
27

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## MOTION FOR A TEMPORARY RESTRAINING ORDER

Pursuant to Fed. R. Civ. P. 65, Plaintiffs Dennis Hof and Cherry Patch, LLC, a Nevada limited liability company ("Plaintiffs") hereby submit their Motion for a Temporary Restraining Order (the "Motion"), an injunction directing the Defendants to refrain from enforcing the August 8, 2018 Board decision not to renew Plaintiff's brothel license pending the outcome of the litigation.

This Motion is made pursuant to Fed. R. Civ. P. 65 with the following Memorandum of Points and Authorities, the supporting exhibits attached hereto, the papers and pleadings on file herein, and any oral argument that this Court may allow.

Dated: August 10, 2018.          Respectfully Submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza, NV Bar # 12265
Ronald D. Green NV Bar # 7360
LaTeigra C. Cahill, NV Bar # 14352
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

Attorneys for Plaintiffs
Dennis Hof and Cherry Patch LLC

## TABLE OF CONTENTS

1.0    Introduction and Facts    1

2.0    Standards for Obtaining Injunctive Relief    9

3.0    Argument    9

    3.1    Plaintiffs Have a Probability of Success on the Merits    9

        3.1.1  Due Process Claim    9

        3.1.2  Plaintiff has a Property Interest In Its License    9

        3.1.3  The Board's Actions Deprived Plaintiff of Its Property Interest    10

        3.1.4  Defendants Failed to Provide Plaintiffs with Due Process    10

        3.1.5  The County Created Conditions That Caused Plaintiff's Renewal to Be Late    10

        3.1.6  The Licensing Board Failed to Follow Revocation Procedures Requiring Notice and Hearing Prior to Revocation    12

        3.1.7  Commissioners' Recusal/Failure to Recuse Was Fundamentally Unfair to Plaintiffs    12

    3.2    First Amendment Retaliation Claim    14

3.3   Plaintiffs Are Likely to Suffer Irreparable Harm in the
      Absence of Preliminary Relief                          15

      3.3.1  Loss of Association                              15

      3.3.2  Loss of Workers                                 16

      3.3.3  Loss of Reputation                              16

3.4   The Balance of Hardships Weighs Heavily in Plaintiff's
      Favor                                                  16

3.5   Public Interests Weighs in Favor of Issuing the
      Requested Relief                                       17

4.0   Conclusion                                             17

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## 1.0   INTRODUCTION AND FACTS

3       Plaintiff Dennis Hof ("Mr. Hof") is a brothel owner and is currently the

4   Republican candidate for rural Assembly District 36 seat in the Nevada State

5   Assembly covering Nye County, Lincoln County, and part of Clark County.  (*See*

6   Declaration of Dennis Hof ("Hof Decl.") at ¶ 6.)  Mr. Hof is the Manager of Cherry

7   Patch LLC, a limited liability company that does business as The Love Ranch South,

8   located at 300 Appaloosa Lane in Crystal, Nevada.  Hof Decl. at ¶ 4.  Mr. Hof has

9   owned and managed Cherry Patch LLC since 2010.  Hof Decl. at ¶ 7.  Cherry

10   Patch LLC has operated the Love Ranch South since 2010.  Hof Decl. at ¶ 7.

11   Mr. Hof prides himself on being a law-abiding citizen and has always actively

12   worked with law enforcement and government officials to ensure that his brothels

13   are operated in accordance with the law.  Hof Decl. at ¶ 8.

14       Mr. Hof has operated multiple brothels since 1992 and had no significant

15   issues with Nye County regarding license renewals or code enforcement until he

16   entered the world of politics.  Hof Decl. at ¶ 9.  Given the stigma concerning

17   recreational and commercial sex, the Love Ranch relies heavily on having a stellar

18   reputation.  Hof Decl. at ¶ 10.  Mr. Hof currently has two civil rights lawsuits in this

19   Court pending against Nye County and various Nye County Officials, including

20   Sheriff Wehrly and Commissioner Dan Schinhofen.  Hof Decl. at ¶ 11.  Mr. Hof also

21   has a defamation case pending against Commissioner Andrew "Butch" Borasky.

22   Hof Decl. at ¶ 12.  Sheriff Wehrly and Commissioners Schinhofen and Borasky all

23   make decisions regarding brothel license renewals in Nye County because of

24   their positions in Nye County government.

25       Mr. Hof has owned the Love Ranch South for eight years.  Hof Decl. at ¶ 13.

26   Pursuant to Nye County Code 9.20.140(G), Mr. Hof has to renew the brothel

27   license quarterly.  The procedure for the renewal is outlined as follows:

7. Thirty (30) days before the expiration date of any license, licensees shall apply to the Sheriff on the form provided for renewal;

8. Failure of any licensee to apply for a renewal, as required in subsection C7 of this section, shall result in an automatic revocation of the license on the expiration date thereof. Any license thus revoked may be reinstated only upon compliance by the licensee with the requirements of this chapter relating to original license application and issuance;

*See* Nye County Code § 9.20.110.

For at least the past eight years, the County has apparently been conflating submitting a renewal form with paying fees.  For the past eight years, the Love Ranch South has paid the fees that the Sheriff's office bills every quarter.  Hof Decl. at ¶ 14.  The statute does not note anything about payment of fees; it only instructs applicants to submit a renewal form provided by the Sheriff.

Mr. Hof has complied with the County's billing requirement.  Hof Decl. at ¶ 14.  The Sheriff's Office sends what has always appeared to be an invoice for the amount due to the Love Ranch South, as shown in **Exhibit 1**, and the Love Ranch South remits payment.  Hof Decl. at ¶ 15.  Given that renewal fees change periodically, the Love Ranch South waits for the bill before submitting the payment.  *See* Hof Declaration at ¶ 16.  After all, it would not make sense for the Love Ranch South to pay a bill before it knows how much it owes.  Hof Decl. at ¶ 17.  The Sheriff's Office rarely, if ever, remits the invoice prior to the 30 days noted in the code.  The invoice notes the due date for payment and does not note any other conspicuous requirements.  Hof Decl. at ¶ 18.

As shown in **Exhibit 1**, the invoice, referred to herein as the "Form," since the Defendants will likely argue this is their renewal form, does not state that the Form must be remitted with payment.  There is no application portion of the Form, meaning there is nothing for the Plaintiffs to fill out, with the sole exception of the bottom of the Form, shown below in Figure 1:

**Figure 1:**



As far as Mr. Hof knows, over the past eight years, no representative of the Love Ranch South has ever signed this Form, or returned this Form to the Sheriff's office, when it remitted payment.  *See* Hof Decl. at ¶ 19.  Upon information and belief, other brothels do not return this form with payment either.  *Id*. at ¶ 20.  Given that the check box underneath the bold line says, "I am no longer conducting business in the city as of _____ date", immediately followed by, "I certify the above information is correct," a reasonable person looking at this form would most likely interpret the certification to only be necessary if the box above the certification is checked.  No one at the Love Ranch South understood that the Sheriff expected this form to be signed and remitted to the Sheriff's office for as long as the Love Ranch South was operating in Nye County.  *Id*. at ¶ 21.  In fact, over the past eight years, the Sheriff has never required that the Form be signed and returned prior to submitting a recommendation to the Commission regarding whether a brothel license should be renewed.  Hof Decl. at ¶ 22.

On August 8, 2018, the Sheriff's office submitted a recommendation to the Nye County Commission that the Love Ranch South's license be renewed.  (*See* recommendation, attached as **Exhibit 2**.)  The recommendation says that: "Per Ordinance 5.04.190 we have present (sic) a list of applicants and show their fees collected during the previous fiscal year." *Id*.  Chapter 5 of the Nye County Code appears to apply to liquor licenses, but it appears that Nye County uses the same procedure for brothel renewals, according to the Sheriff's report.  Nye County Code 5.04.190 says:

Notwithstanding any other provisions of this chapter, the procedures set forth in this chapter for the application and issuance of liquor licenses shall not apply to the renewal of licenses previously issued to the same applicant. With respect to such renewal of licenses, no formal application procedure shall be required, and the sheriff shall cause the reissuance or cancellation of such license renewals in the manner following:

1. At the first meeting of the board of each fiscal year, the sheriff shall present a list of applicants for renewal, together with fees collected during the previous fiscal year, and present his recommendations for or against the renewal of each such license over the next fiscal year.

*See* Nye County Code §§ 5.04.190(B) and 5.04.190(B)(1).

The Nye County Commission (the "Commission") conducted a Nye County Liquor and License Board meeting on August 8, 2018.  (*See* Video of Meeting, attached as **Exhibit 6**.)  The Nye County Commissioners present at the meeting were: Lorinda Wichman, John Koenig, Donna Cox, Andrew "Butch" Borasky, and Dan Schinhofen.  Sheriff Sharon Wehrly is also a voting member and was present at the meeting.  Dennis Hof's attorney who represents him before the Commission, Marc Risman, was not at the meeting because he is out of state receiving medical care.  *See* Hof Decl. at ¶ 24.  As noted by Commissioner Donna Cox at the meeting, the Commission knew that Mr. Risman was out of state seeking medical care.  (*See* truncated version of full video referring to renewal, attached as **Exhibit** 3, at 01:18:44-01:18:54.)

At the meeting, the Commission discussed Sheriff Wehrly's report on fees and recommendations regarding brothels in Nye County.  The Commission decided to have an extended conversation about two brothels: Sheri's Ranch and the Love Ranch South.  The Sheriff noted that Sheri's Ranch had not turned in certain required information required for its business license renewal.  The Commission made a motion at the meeting to give Sheri's Ranch a temporary 30-day license, to give Sheri's Ranch time to turn in the required information.  Specifically, the Commission stated they would set a show cause hearing if Sheri's

1   Ranch did not turn in the required information, and at no time said that the license
2   would automatically be revoked before holding a hearing. (*See* truncated
3   version of full video referring to Sheri's Ranch, attached as **Exhibit 5**.)

4       Next, Commissioner Wichman discussed the Love Ranch South. Wichman
5   said that there had been show cause hearings in the past, insinuating that having
6   a hearing in and of itself is cause for denying a renewal. Wichman also stated
7   that the Love Ranch turned in the above-noted Renewal Form late and cited the
8   above statute as grounds for automatically refusing to renew the license without
9   a hearing and without setting a show cause hearing. However, Commissioner
10  Wichman asked the Commission to propose a motion to revoke the license
11  immediately without having a hearing. Upon information and belief, other
12  brothels in Nye County also did not submit the renewal form.

13      Commissioner Donna Cox pointed out that Mr. Hof and his attorney were
14  not present, given the fact that the Sheriff presented a favorable report and that
15  Mr. Hof's attorney was out of state seeking medical care on Doctor's orders
16  Commissioner Cox suggested holding the item until the August meeting so that
17  Mr. Hof and his attorney could speak to the issue. Commissioner Wichman
18  rebuffed this assertion, and said she was not seeking a show cause hearing, and
19  did not need to hear from Mr. Hof or his attorney, because his renewal should be
20  automatically denied.

21      The Commissioner solicited board members to make a motion, but none
22  were forthcoming. In order to circumvent procedures preventing the Chair from
23  making motions, Commissioner Wichman turned the gavel over to the Vice-Chair.
24  She then moved to not renew the license. Both Dan Schinhofen and Andrew
25  "Butch" Borasky voted to deny the renewal. The Sheriff originally voted against
26  the motion, given that she recommended that the license be renewed. Instead
27  of taking a tally of the votes, Wichman questioned the Sheriff about her vote. The

Sheriff asked for a break so that she could speak to her attorney, but Wichman refused. The Sheriff then abstained from voting, citing a conflict of interest due to the above noted pending lawsuits and her lack of an opportunity to consult with her attorney.  The final vote not to renew the license was 3-2 with one abstaining, without the Sheriff's vote.

Pursuant to NRS 281A.420:

A public officer ***shall not*** approve, disapprove, vote, abstain from voting or otherwise act upon a matter if it involves a conflict of *interest without disclosing the interest*. ***Disclosure must be made at the time the matter is considered.***

(emphasis added).

Here, neither Schinhofen nor Borasky disclosed the conflict, the fact that they are both defendants in lawsuits filed by Mr. Hof, as required by the statute. Earlier this year, on February 20, 2018, Schinhofen recused himself from participating in a show cause hearing against the Love Ranch South.  (*See* transcript of February 20, 2018 hearing, attached as **Exhibit 4**.)  On the record, Schinhofen said:

NRS 281.420) filed lawsuit against me in my personal capacity …. I take my obligations as a public officer very seriously, and I believe that I could vote without being materially affected by the lawsuit. However, I believe that the public perception could be that my vote would be materially affected by this lawsuit.  I do not believe it's in the best interest of Nye County for me to vote on this Order to Show Cause and I will abstain from voting on this matter …

*See* **Exbibit 4** at 4-5.  As far as Mr. Hof knows, Commissioner Borasky has always acknowledged a conflict before voting or abstaining on issues related to Mr. Hof and the Love Ranch South.  Hof Decl. at ¶ 25.

Schinhofen admitted that he had a perceived conflict, and yet decided not to disclose the conflict at the August 8, 2018 meeting, even though the statute required him to, and in fact proceeded to vote.  Schinhofen lost his election, and

will not be a Commissioner in a few months: he has since ranted about his hatred of both Mr. Hof and the voters in other public meetings;[1] he even wrote a song about how much he despised both Mr. Hof and Nye County voters and sang it on the radio.[2]  Schinhofen even exposed his bias and hatred of Mr. Hof on a "hot mic" at the end of the public meeting.  *See* **Exhibit 3** at 01:53:44- 01:54:56.

Schinhofen's off-the-record statements, caught by the hot mic at the meeting, occur at the end of the meeting, when a microphone picked up a conversation between Schinhofen and another board member.  Schinhofen says that they were just planning on making Mr. Hof come in for a show cause hearing before they realized that the code provision gave them the right to terminate him immediately.  The other Commissioner states that he wishes they'd done the show cause hearing because he knows Mr. Hof will sue the County and the show-cause hearing would have given them better evidence to show the Court.  At that point, Wichman realized the microphones were on and instructed the Commissioners to turn off the microphones.  Schinhofen's statements show that he did not act in good faith and intended to deprive Mr. Hof of due process.  The Defendants' wishes to avoid allowing Mr. Hof to exercise his due process rights are especially egregious and must be addressed by this Court.

Immediately after the meeting, according to Commissioner Wichman's instruction to the Sheriff to shut the brothel down immediately, the Sheriff enforced the Commissioner's order and shut the brothel down immediately after the meeting.  *See* **Exhibit 3** at 01:23:00 – 01:23:53.

---

[1]    See the video clip of the August 8, 2018 meeting, attached as **Exhibit 6,** the full video of the August 8, 2018 board meeting is available at: http://nyecounty.granicus.com/MediaPlayer.php?view_id=4&clip_id=1216.

[2]    A clip of the song is available at: <https://knpr.org/knpr/2018-06/brothel-owners-election-win-sparks-protest-song-discord-and-frets> (last accessed Aug. 9, 2018).

Sex workers employed at the Love Ranch also live there and have licenses that are tied to the brothel. *See* Declaration of Sonja Bandolik ("Bandolik Decl.") at ¶ 3. Pursuant to Nye County Code 9.20.150, workers at the brothel literally function as a family; they lend each other money and help each other with errands. *See* Bandolik Declaration at ¶ 6. Most importantly, workers at the brothel develop strong personal bonds. *See* Bandolik Declaration at ¶ 7. The success of the Love Ranch relies almost exclusively on the personalities of the sex workers. *See* Bandolik Declaration at ¶ 8. Many customers travel from around the world to specifically visit the Love Ranch. *See* Bandolik Declaration at ¶ 9. If the brothel closes for even a short period of time, the workers will have no choice but to leave their homes and find other work. *See* Bandolik Declaration at ¶ 10. It could take years to rebuild the staff if the brothel re-opens too far in the future. *See* Bandolik Declaration at ¶ 11.

Closure of the brothel means that the group will be disbanded, and many of the workers will need to find new work, homes, and new family and friends. *See* Bandolik Declaration at ¶ 12. Closure of the brothel came as a complete shock to both the sex workers who live and work at the Love Ranch South and Plaintiffs, given that there was no hearing and that the Sheriff had already recommended renewal of the business license. *See* Hof Decl. at ¶ 23 and Bandolik Declaration at ¶ 13. If a show-cause hearing had been scheduled, Mr. Hof, and other workers and residents of the Love Ranch, would have been able to speak up about the issues that the Commissioners discussed at the meeting. *See* Hof Declaration at ¶ 26 and Bandolik Declaration at ¶ 15. However, since the Sheriff recommended the Love Ranch be renewed because the Love Ranch paid its quarterly fees, no one at the Love Ranch had any kind of notice that the Commission would make a motion not to renew the license. *See* Hof Declaration at ¶ 27 and Bandolik Declaration at ¶ 14.

**2.0    STANDARDS FOR OBTAINING INJUNCTIVE RELIEF**

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 374 (2008) 408 F.3d 1113, 1120 (9th Cir. 2005).

Under any of these standards, a preliminary injunction should issue here.

**3.0    ARGUMENT**

Plaintiffs meet the requirements for obtaining preliminary relief either in the form of a temporary restraining order or a preliminary injunction.

**3.1    Plaintiffs Have A Probability of Success on the Merits**

**3.1.1    Due Process Claim**

The Due Process Clause of the Fourteenth Amendment forbids states from "depriv[ing] any person of life, liberty, or property without due process of law…" U.S. Const., Amend. XIV. Plaintiffs properly assert all three elements.  Plaintiffs properly assert all three elements.

**3.1.2    Plaintiff has a Property Interest in Its License.**

A protected property interest exists when an individual has a reasonable expectation of entitlement derived from "existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972), 93 Nev. 36, 42, 559 P.2d 830, 834 (1977) t]he legislature carefully has distinguished between persons who have been licensed and those who never have been licensed.  In the former case judicial review of disciplinary action is provided; in the latter instance, it is not.  This is a reasonable distinction since licensees possess property interests which those who have never been licensed do not have.").

Moreover, Plaintiff has a property interest in the continued use of his brothel license to the extent he can expect the Nye County License Board to follow its own regulations before revoking his license. *See Young v. United States*, 498 F.2d 1211, 1219 (5th Cir. 1974) (B)(1-6). Accordingly, Plaintiff holds a property interest in its brothel license.). Accordingly, Plaintiff holds a property interest in its brothel license.

### 3.1.2.1   The Board's Actions Deprived Plaintiff of Its Property Interest.

The Board's actions deprived Plaintiff of its property interest in its brothel license. Plaintiff Love Ranch was required to turn over its license and can no longer operate.

### 3.1.2.2   Defendants Failed to Provide Plaintiffs with Due Process.

The Due Process Clause of the Fourteenth Amendment forbids arbitrary deprivations of liberty. *Goss v. Lopez*, 419 U.S. 565 (1975). Here, Due Process was denied in numerous ways, each of which standing alone would constitute a denial of Due Process.

### 3.1.2.3   The County Created Conditions That Caused Plaintiff's Renewal to Be Late.

Pursuant to Nye County Code 9.20.110. "Failure of any licensee to apply for a renewal, as required in subsection C7 of this section, shall result in an automatic revocation of the license on the expiration date thereof."

Each quarter, the Nye County Sheriff's Department mails a Renewal Form to licensees. The form contains information about the Licensee, including its address, the number of prostitutes working at the location, and the amount due. There is a section that allows for information about contacts for the licensee and a section with a check box to be marked if the licensee is "no longer conducting business in the city." Plaintiff believes, and past practice indicates, that this is the only form ever provided in connection with the renewal process. In practice, the

Sheriff, the Board, Plaintiff, and presumably other licensees have treated Renewal Notice as an invoice. Licensees simply mail the required funds.  Plaintiff has never signed the Renewal Notice or returned it with the license fees. The Love Ranch has followed this procedure since its opening in 2010.

Obviously, a licensee cannot apply for renewal on a "form provided" until the form *is* provided.  Therefore, through its own actions, Nye County prevented Love Ranch from completing and returning a signed renewal form prior to the deadline.

Plaintiff's license was due for routine renewal on June 30, 2018.  Under the code, Plaintiff is required to return the completed and signed Renewal Notice thirty days prior to the June 30 expiration date. Nye County Code 20.110.  But the Nye County Sheriff's Department did not mail the Renewal Notice until approximately June 14, 2018 – fourteen days after the renewal notice was due under the statute.  Because the form was not provided until after the date it was due, it was impossible for Plaintiff to comply with the statutory deadline.

Moreover, the Sheriff and the Board have never enforced the requirement that a Renewal Notice or any other form be submitted.  Rather, the Sheriff's Department and the License Board has consistently but incorrectly conflated payment of licensing fees with applying for renewal.  However, the date for submitting fees is not set by statute and there is no provision in the code for automatically revoking a license for failure to pay a fee on time.  The Renewal Notice indicated that fees were due on July 1, 2018 and the Plaintiffs paid the fee on or around the due date.  Regardless, the Sheriff considered the payment timely and recommended that the license be renewed.

The law does not abide imposing deadlines that are impossible to meet. *See Thomas v. Hickman*, No. CV F 06-0215 AWI SMS, 2006 U.S. Dist. LEXIS 72988, at *27 (E.D. Cal. Oct. 5, 2006) a deprivation of the petitioner's interest in filing the

appeal and therefore violates the essential standard of fairness under the Due Process Clause).

It was a violation of Due Process to require Plaintiff to return an application to renew its brothel license before it received the required form to do so.

### 3.1.2.4   The Licensing Board Failed to Follow Revocation Procedures Requiring Notice and Hearing prior to Revocation.

"Failure of any licensee to apply for a renewal, as required in subsection C7 of this section, shall result in an automatic *revocation* of the license on the expiration date thereof."   Nye County Code 9.20.110.   Thus, the denial of a renewal application is a form of revocation of the license.

Nye County Code 9.20.170.   The Board failed to follow any of these procedures.

Section 9.20.180 regulates the conduct at a hearing, providing for oral testimony, the examination of witnesses, the introduction of documentary evidence, etc.  Since there was no notice and hearing, these provisions were not followed.  The action revoking Plaintiff's license occurred at a regularly scheduled meeting of the Nye County Licensing Board, not at a noticed hearing.

Moreover, the Agenda Information Form submitted by the Nye County Sheriff's Office and published in advance of the meeting of the Nye County Licensing Board indicated that Plaintiff had complied with all requirements and recommended that the license be renewed and issued.  Therefore, Plaintiff had no indication that the Board would take any action adverse to Plaintiff's license.

### 3.1.2.5   Commissioners' Recusal/Failure to Recuse Was Fundamentally Unfair to Plaintiffs.

Pursuant to NRS 281A.420, "[A] public officer or employee shall not approve, disapprove, vote, abstain from voting or otherwise act upon a matter … [I]n which the public officer or employee has a significant pecuniary interest."  NRS 281A.420.

Mr. Hof has previously sued Commissioner Schinhofen, Commissioner Borasky and Sheriff Wehrly in their personal capacities for defamation (Borasky) and civil rights violations (Schinhofen and Wehrly).  By denying Hof his livelihood and cutting off his income, Schinhofen and Borasky make it more financially difficult for Hof to pursue those lawsuits.  At the lowest threshold, Schinhofen should have disclosed this potential conflict pursuant to Nevada law, as he had previously done before he lost his primary.  Further, Borasky also did not disclose his potential conflict, given that Mr. Hof has sued him for defamation.

In *Tumey v. Ohio*, the U.S. Supreme Court found that, "[t]he possibility of a mayor receiving $12 as costs for conviction of one accused of violating the liquor law, and whose emoluments from such source amount to about $100 per month, in addition to his salary, is not an interest so minute, remote, trifling, or insignificant that his sitting as judge in the case will not deprive accused of due process of law." *Tumey v. Ohio*, 273 U.S. 510 (1927).

Here, cutting off Mr. Hof's ability to pay for civil rights lawsuits filed against Schinhofen in his personal capacity and against Borasky for defamation would certainly be perceived by the public as a pecuniary interest.  Since it gives Schinhofen a perceived litigation advantage, the interest is certainly not "so minute, remote, trifling, or insignificant" as opined upon in *Tumey*.

Given that Schinhofen previously admitted that the public would perceive he had a conflict given the lawsuits filed against him, Schinhofen equally had a duty to disclose the conflict prior to announcing whether he would vote or abstain on the motion.  Pursuant to the Statute, Schinhofen's previous disclosure does not apply here, because he did not make the disclosure at the time the matter was considered.  Thus, given that neither Borasky nor Schinhofen disclosed their perceived conflicts, it should be presumed that they acted unethically and deprived the Plaintiffs of due process.

But it is worse than that.  Sherriff Wehrly initially voted against revocation. *See* **EXHIBIT 3** at time stamp 01:21:24 – 01:21:53.  However, she then apparently remembered that because she had been named in Hof's lawsuits, she should recuse herself from the vote on his license renewal.  Had she voted, the vote would have resulted in a 3 to 3 tie and the motion to revoke would have failed.  It is fundamentally unfair for the individual who would have voted in favor of Plaintiffs to recuse herself, while the two individuals who voted against Plaintiff's interests did not recuse themselves, given that the circumstances for the Sheriff's recusal applied equally to Schinhofen and Borasky.

### 3.2   First Amendment Retaliation Claim

It is clear that "state action designed to retaliate against and chill political expression strikes at the heart of the First Amendment." *Gibson v. United States*, 781 F.2d 1334, 1314 (9th Cir. 1986), cert. denied, 479 U.S. 1054 (1987), *Inc.*, 390 P.3d 657 (Nev. 2017).  At a minimum, Commissioners Borasky and Schinhofen voted to revoke Plaintiff's brothel permit to retaliate against him for naming them in law suits in their individual and official capacities.

On January 15, 2018, Hof brought an action in state court alleging defamation against Commissioner Borasky in connection with statements he made during a Nye County Commission Hearing.

On February 5, 2018, Hof and Cherry Patch, LLC filed suit against Nye County and the Nye County Board of Commissioners seeking an injunction and damages arising from threats to censor various brothel signs.  *See Hoff v. Nye County*, 2:18-cv-211, D. Nev.  The Complaint alleged that Schinhofen directed Sheriff Wehrly to instruct Plaintiffs to remove the signs.  Accordingly, Plaintiffs named Schinhofen and Wehrly individually in that suit.

While that matter was pending, on or around Thursday, June 7, 2018, Mr. Hof received a phone call from District Attorney Angela Bello.  She alleged that a

mobile sign he had placed on his property, that was critical of Schinhofen, violated Nye County Code.  Shortly thereafter, late on a Friday night, the Nye County Sheriff's Department towed the mobile sign off Mr. Hof's private property. Hof immediately filed a complaint and an emergency TRO, which the Court granted, ruling that Hof was likely to succeed on the merits because the Defendants failed to provide notice and a pre-deprivation hearing prior to seizing his property.  *See Hof v. Nye County II*, 2:18-cv-01050, D. Nev.  Again, Hof named Schinhofen and Wehrly in their official and personal capacities.

Schinhofen is so obsessed with Hof that he wrote a song about him. Comments made between Commissioner's Schinhofen and Borasky that were recorded on a "hot mic" indicated that they both have a vendetta against him.

As discussed *supra*, there was no legitimate violation of any licensing requirements, since Defendants did not provide Plaintiffs with the necessary forms required to submit a renewal.  Moreover, the evidence shows that the Licensing Board was willing to grant extensions to brothel operators at the same meeting. It is clear that Schinhofen and Borasky's votes to revoke the Love Ranch Brothel license was not for failing to follow renewal procedures, but to retaliate against Hof for his public criticism about them and for his petitioning of the government for redress in which he named them personally.

### 3.3    Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief

#### 3.3.1    Loss of association

The environment of a brothel is unique to other work environments.  The employees literally function as a family. They live together, eat together, and otherwise share their lives. They lend each other money and help each other with errands. Most importantly, they develop strong personal bonds.

In the few days that have passed since the brothel license was revoked employees have become stressed and are panicking about whether they will lose not only their livelihood, but their home and their adopted family and friends.

### 3.3.2    Loss of workers

A successful brothel like the Love Ranch relies heavily, in fact almost exclusively, on the unique personalities of the prostitutes who work there.  Love Ranch has spent eight years developing a staff that works well together and who customers enjoy visiting.  But the business is competitive.  Other brothels constantly try to hire workers away.  If the Brothel closes for more than a short time, workers will leave for other businesses.  Once that occurs it will take years to rebuild a proper staff.

### 3.3.3    Loss of reputation

More than any other business, brothels rely on their business reputation. Largely because of stigma concerning recreational and commercial sex, customers are reluctant to visit a brothel unless it has a stellar reputation, like Love Ranch.   Many customers travel great distances because they know the reputation of Love Ranch and they know they will have a safe and enjoyable visit. They understand why Love Ranch is known as the classiest brothel in Nevada.  If government action shuts down the business for a significant period of time, it will necessarily diminish the good will and reputation of the business in ways that would be impossible to calculate or to recover from.

### 3.4    The Balance of Hardships Weighs Heavily in Plaintiff's Favor

By moving *sua sponte* to provide Sheri's Ranch a 30-day extension for completing the renewal process, Defendants have demonstrated that Nye County will suffer little harm by permitting a Brothel to operate for some time, even when its renewal application is incomplete.   If there were significant harm, Defendants would not have provided the extension.  Since Plaintiff finished the

application process even before the board meeting, the County will suffer even less harm if the Court grants Plaintiffs' requested relief and allows it to continue to operate during the pendency of this litigation.

In contrast, Plaintiff will suffer significant harm if it is not permitted to operate, including the irreparable harm described above.

### 3.5    Public Interests Weighs in Favor of Issuing the Requested Relief

The State of Nevada and Nye County have determined that there is a benefit to permitting legal prostitution to occur.  These benefits include providing a safe environment for prostitution, protecting customers and workers, collecting tax revenue, and creating jobs.  Closing a legal brothel, for returning a form a few days late, when that form was not provided prior to the deadline for return, serves no public interest. Further, there is a great public interest in allowing sex workers to keep their home. Thus, public interest weighs heavily in favor of granting the requested relief.

### 4.0    CONCLUSION

For the foregoing reasons Plaintiffs respectfully requests that the Court enter a temporary restraining order enjoining Defendants from enforcing an injunction directing the Defendants to refrain from enforcing the August 8, 2018 Board decision not to renew Plaintiff's brothel license pending the outcome of the litigation.

Dated: August 10, 2018.

Respectfully Submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza

Marc J. Randazza, NV Bar # 12265
Ronald D. Green NV Bar # 7360
LaTeigra C. Cahill, NV Bar # 14352
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117

Attorneys for Plaintiffs
Dennis Hof and Cherry Patch LLC

# EXHIBITS TO COMPLAINT

(Exhibits 3, 5 and 6 manually filed)

# EXHIBIT 1



Office of the
**Nye County Sheriff**
Nye County Courthouse
Post Office Box 831
Tonopah, Nevada 89049

# Renewal Notice

| License No. | License Description | | Expiration Date | Activity No. |
|---|---|---|---|---|
| BR10-000605 | Brothel License | | 06/30/2018 | 00005701 |

**Payment Due Date :** 7/1/2018
**Total Due :** 4,375.00
**Cust No :** 00001164

LOVE RANCH BROTHEL
162 GARNET CIR
CARSON CITY, NV 89706

**Please update information that has changed**

Primary Address: APPALOOSA LN, CRYSTAL, NV 89402      Phone Number: (775) 372-5251

Mailing Address: 162 GARNET CIR, CARSON CITY, NV 89706

**SUPPLEMENTAL INFORMATION:**

| | |
|---|---|
| 6 to 10 Prostitutes | : Y |
| 11 to 25 Prostitutes | : N |

**CONTACTS**

| Name: | Role / Title: | Address: | Phone: |
|---|---|---|---|
| | | | |
| | | | |

**IMPORTANT - PLEASE READ AND SIGN BELOW**

☐   I am no longer conducting business in the city as of _____

                                                       Date

I certify the above information is correct:

Signature: _____      Officer / Title: _____

# EXHIBIT 2

## NYE COUNTY AGENDA INFORMATION FORM

☒ Action   ☐ Presentation   ☐ Presentation & Action

| Department: Nye County Sheriff's Office | Agenda Date: |
| --- | --- |
| Category:  Regular Agenda Item | August 7, 2018 |

| Contact:  Janice Maurizio | Phone: 775 751-4255 | Continued from meeting of: |
| --- | --- | --- |
| Return to: Janice Maurizio | Location: Nye County Sheriff office | Phone: |

**Action requested:**  (Include what, with whom, when, where, why, how much ($) and terms)

Discussion and deliberation regarding approval of Brothel License renewals and fees collected for Fiscal Year 2018-2019

**Complete description of requested action:**  (Include, if applicable, background, impact, long-term commitment, existing county policy, future goals, obtained by competitive bid, accountability measures)

Attached, please find the list of existing Brothel Renewals for 2018/2019 fiscal year along with the fees collected from them during the previous fiscal year.

Per Ordinance 5.04.190 we have present a list of applicants and show their fees collected during the previous fiscal year.

These facilities have been inspected and are in compliance with the Nye County Codes.

It is the recommendation of the NCSO staff, that these licenses be renewed, and issued to the applicants.

Any information provided after the agenda is published or during the meeting of the Commissioners will require you to provide 20 copies: one for each Commissioner, one for the Clerk, one for the District Attorney, one for the Public and two for the County Manager. Contracts or documents requiring signature must be submitted with three original copies.

☐ No financial impact

### Routing & Approval   (Sign & Date)

| | Date | | Date |
| --- | --- | --- | --- |
| 1. Dept | | 6. | |
| 2. | | 7. HR | |
| 3. | | 8. Legal | |
| 4. | | 9. Finance | |
| 5. | | 10. County Manager   Place on Agenda | |

ITEM # _11_

## NYE COUNTY LICENSING BOARD

### FOLLOWING IS A LIST OF BROTHEL APPLICANTS FOR RENEWAL FOR THE 2018/2019 RENEWAL YEAR, TOGETHER WITH FEES COLLECTED FROM THEM DURING THE PREVIOUS FISCAL YEAR

********

**WESTERN BEST LTD, A NEVADA LIMITED PARTNERSHIP dba**   $ 32,500.00
**CHICKEN RANCH**

**PAHRUMP HOMESTEAD PARTNERS, LLC dba SHERI'S**     $ 37,500.00

**CHERRY PATCH LLC dba LOVE RANCH BROTHEL**     $ 17,500.00

**SKY SERVICES INC. dba  ALIEN CATHOUSE**     $  9,375.00
**(This one is a new brothel owner business opened as of 5/15/18- the fee consists of $4375.00 for brothel payment and $5000.00 for background fee)**

     **( 4 )**      **2018/2019**     **TOTAL**     **$    96,875.00**

It is hereby certified that the above BROTHEL LICENSE APPLICATIONS for renewal of the 2018/2019 fiscal year, were approved by the NYE COUNTY LICENSING BOARD at its regular meeting held at 101 Radar Road in Tonopah, Nevada on August 7, 2018.

           **NYE COUNTY LICENSING BOARD**

_____
**Commissioner**

_____
**Sheriff**

## 5.04.190: RENEWAL PROCEDURE:

A. Application for renewal of licenses shall be made by petition to the sheriff by filing the same with the sheriff, together with all fees and with such information as may be required for investigation of suitability of the applicant. Applications for renewal shall be made at least ten (10) days before the end of the calendar quarter in which the license expires.

B. Notwithstanding any other provisions of this chapter, the procedures set forth in this chapter for the application and issuance of liquor licenses shall not apply to the renewal of licenses previously issued to the same applicant. With respect to such renewal of licenses, no formal application procedure shall be required, and the sheriff shall cause the reissuance or cancellation of such license renewals in the manner following:

1. At the first meeting of the board of each fiscal year, the sheriff shall present a list of applicants for renewal, together with fees collected during the previous fiscal year, and present his recommendations for or against the renewal of each such license over the next fiscal year.

2 . Any licensee whose license renewal has been disapproved by the board shall be notified of such in writing, in the manner provided in this chapter. The licensee may avail himself of the procedures set forth in this chapter.

3. Renewal of licenses under this chapter must be for a minimum of one calendar quarter but may be made for no more than four (4) calendar quarters within the current fiscal year.

# EXHIBIT 3

(MANUALLY FILED)

# EXHIBIT 4

1
2
3
4
5
6
7
8        NYE COUNTY BOARD OF COMMISSIONERS
9              JOINT MEETING
10            FEBRUARY 20, 2018
11
12
13      SITTING AS THE NYE COUNTY LICENSING
14            AND LIQUOR BOARD
15
16            RECORDED DISCUSSION
17
18
19
20
21
22
23
24
25

TRANSCRIPTION BY: PAM SIMON

(775) 530-5251



ORIGINAL
DEF-0111

1
2                                     **APPEARANCES**
3
4        Lorinda Wichman, District 1   . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Madam Chair
5        Dan Schinhofen, District 5   . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Vice-Chair
6        John Koenig, District 2   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Commissioner
7        Donna Cox, District 3   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Commissioner
8        Andrew "Butch" Borasky, District 4   . . . . . . . . . . . . . . . . . . . .   Commissioner
9        Darrell Lacy   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   NWRPO Staff
10
11       Rebecca Bruch, counsel
12       Angela Bello, Deputy District Attorney
13       Mark Risman, counsel for Dennis Hof
14       Zachary Hames, Executive Assistant for Dennis Hof
15
16
17
18
19
20
21
22
23
24
25       TRANSCRIPTION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Pam Simon

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -2-

**DEF-0112**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**NYE COUNTY BOARD OF COMMISSIONERS**

**JOINT MEETING**

**FEBRUARY 20, 2018**

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**

-3-

DEF-0113

1   **RECORDED DISCUSSION**

2   **NYE COUNTY LICENSING AND LIQUOR BOARD**

3   **PAHRUMP, NEVADA**

4   - -oOo- -

5

6        CHAIR:     We are now going to recess from the Board of County

7   Commissioners to the Nye County Licensing and Liquor Board.  It's all

8   yours, Madam.

9        MADAM CHAIR:        Thank you, Mr. Chairman.

10       Sitting as the Nye County Liquor and Licensing Board, our

11  first item is a 10:00 timed item, and this is a disciplinary hearing, discussion

12  and deliberation pursuant to Nye County Code 9.20.170, and as described in

13  the Notice of Hearing dated and served on January 26th, to determine

14  whether the Nye County Licensing and Liquor Board shall impose possible

15  sanctions against Privilege License No. BR10-000605 for the Cherry Patch,

16  LLC, doing business as Love Ranch Brothel.

17       I would like to first look to the DA to guide us in this

18  proceeding.  You have some opening remarks?

19       MS. BELLO:       Yes, thank you.

20       Due to ongoing lawsuits filed by Mr. Hof against the County,

21  our insurance counsel has requested to participate in the Order to Show

22  Cause, so I will turn it over to Becky Bruch.

23       MADAM CHAIR:        Thank you.

24       CHAIR:     Madam Chair, if I may, there may be a conflict of

25  interest on one of these for my part so NRS 281.420 requires me to disclose

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -4-

1    a conflict of interest and an Order to Show Cause has been scheduled

2    regarding precarious violations of the County Ordinances that come to my

3    attention that Mr. Hof and other individuals (inaudible) filed lawsuit against

4    me in my personal capacity.  The lawsuit has not been served, but I am

5    aware of its content and deny any of those allegations.

6              I take my allegations as a public officer very seriously and I

7    believe that I could vote without being materially affected by the lawsuit.

8    However, I believe that the public perception could be that my vote would

9    be maternally affected by this lawsuit.

10             I do not believe it's in the best interest of Nye County for me

11   to vote on this Order to Show Cause and I will abstain from voting on this

12   matter, and I also would leave the room.

13        MADAM CHAIR:          Thank you, sir.

14        NYE COUNTY SHERIFF:        Nye County Sheriff.

15             I, too, Madam Chair, under NRS 281(a).420, it requires me to

16   disclose a conflict of interest, and the matter before this body affects my

17   interest.

18             A few days before this Order to Show Cause was scheduled to

19   occur on February 6th, Mr. Hof filed a lawsuit against Nye County, as well as

20   myself, although not in my personal capacity, and I too, deny every

21   allegation made against me in either my personal ... well, not in my personal

22   capacity, or in my official capacity, and believe this will be borne out by the

23   litigation.

24             I take my obligations as a public officer very seriously, and I

25   believe that I could vote without being materially affected by the lawsuit.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -5-

**DEF-0115**

1    But regrettably, I believe that public perception could be that my vote here

2    today might affect the litigation.

3              I do believe that it's in the best interest of Nye County for me

4    to vote on this Order to Show Cause.  I will not be voting, and as such, I'm

5    abstaining, and I too, am going to leave the room.

6              MADAM CHAIR:          Thank you.  Ms. Bruch?

7              MS. BRUCH:          (Inaudible).  Usually, as attorneys, we don't need

8    that, you know.  We got lots of things to say in a loud voice.

9              Anyway, I'm with Erickson, Thorpe & Swainston and I'm one

10   of the panel counsel for the Nevada Public Agency Insurance Pool, and have

11   ... have been assigned by The Pool to participate in this, as well as the

12   lawsuits that have been filed.

13             So that's what brings me to Pahrump today, which is much

14   warmer than it was in Reno yesterday.

15             So what I want to point out to you is that ... and this is part of

16   your packet that is ... this is part of the packet that was presented to you

17   when this Order to Show Cause was originally scheduled for, I believe, it

18   was February 6th.

19             Under your Code, and it's Chapter 9.20.170, there are

20   procedural requirements.  Once an Order to Show Cause is presented or is

21   noticed, the responding party needs to provide a written statement and then

22   they need to appear before the Commission or the Board to present whatever

23   evidence that they want to present.

24             There was no written statement that was provided by Mr. Hof

25   or any of his attorneys, and as such, if you look at the ... you all can read and

1     I don't need to read this to you, but when you look at Section 2 ... and this is

2     on page 2 of the packet and under the section that's entitled "Notice of

3     Hearing," if you want to go to that to follow along, but it talks about the

4     answer ... what the written answer must say and there's A, B, C, D, and it's

5     very specifically laid out, and then appear for the hearing.

6          There has been no written statement that has been provided by

7     Mr. Hof or his attorneys and as such it constitutes an admission by the

8     Respondent of all facts alleged in the charging instrument.

9          So they've provided no response, and under your rules, under

10    your ordinances, the allegations are deemed an admission.

11         The next thing, that if you choose to comply with or follow

12    along with your ordinance, the next thing that would happen is for you to

13    consider the sanctions.  What kind of sanctions are you going to bring

14    against Mr. Hof based on his deemed admitted ... that the allegation is being

15    deemed admitted, and he would ... and I would recommend that you allow

16    them an opportunity ... him an opportunity to present whatever he may want

17    to present in response to whatever it is that you may want to consider.

18         Mr. Risman is here on behalf of Mr. Hof, and it's my

19    understanding that ... I had requested with him a stipulation and he's not

20    willing to do that ... a stipulation that these are deemed admitted.

21      MR. RISMAN:      My only thing addressing what was just said ...

22      MADAM CHAIR:      Just one minute.  Do I need to open a

23    public hearing before we start this?  Thank you.

24         I'll open a public hearing on this disciplinary item and go

25    ahead.  Please state your name, spell your last name for the record, and you

1    don't have to stand.

2        MR. RISMAN:        Mark Risman, here on behalf of my client,

3    Dennis Hof.

4        MADAM CHAIR:        Spell your last name.

5        MR. RISMAN:        R-I-S-M-A-N. Nevada State Bar No. 002455.

6            I just first want the remaining members of the Commission to

7    know I was neither the drafter, filer or attorney of record on any of the

8    subject suits, but I have a little bit different interpretation of the statute than

9    learned counsel from Reno has, and I think it's deemed admitted if there is

10    neither a written response or an appearance.

11            I think what has happened, and I'll be very brief now since it's

12    preliminary, is at the time these were filed, and for a period of 10 days

13    thereafter, the allegations were accurate as they were drafted.  However,

14    with cooperation with the Sheriff's Office, as time advanced until this

15    hearing, you will find that remedial steps have been taken, and in at least one

16    incident completed, that makes these matters moot.

17            For example, on the BLM application, or the BLM violation,

18    Mr. Hof has since obtained a lease from the BLM for that particular piece of

19    land ...

20        MS. BRUCH:        If I may just ...

21        MR. RISMAN:        And I can save that for later.

22        MADAM CHAIR:        Hold on just a moment, please.

23        MS. BRUCH:        I was just going to say, if I may interrupt, this is

24    ... this is the time for you all to address whether you are going to deem these

25    admitted or not, and then whatever kind of information that Mr. Hof may

**TRANSCRIPTION BY: PAM SIMON**

DEF-0118

1    want to present, he can go ahead and do that.

2         MR. RISMAN:        And my intention is ...

3         MADAM CHAIR:          For mitigation measures only, yeah.

4         MR. RISMAN:        My contention is that they were accurate at the

5    time, however, actions and the part of Mr. Hof, the applicant, has since made

6    them, in my opinion, and it's up to your decision, no longer to be of concern

7    to be in violation as of today.

8         MS. BRUCH:        And if ... oh, I'm sorry.  Go ahead.

9         MADAM CHAIR:          Actually, sorry, Mr. Risman, but I too

10   don't agree with this because some of the actions that needed to be taken

11   would have had to have come back before the Board of County

12   Commissioners and it hasn't done that.

13            So following your recommendation, the only thing that we will

14   be hearing about is possible mitigation measures or whatever the Board ...

15   whatever the Board chooses to do for sanctions, and then an opportunity to

16   talk about those sanctions, okay?

17        MR. RISMAN:        Very good.  Thank you.

18        MADAM CHAIR:          Okay.

19        MS. BRUCH:        And if I may just make a record, Madam

20   Chairman, that because you've had two ... this is a 6-person Board and

21   because you've had two people recuse, it becomes a 4-person Board.  Mr.

22   Schinhofen is not here, but because he's not recused or abstained, it remains

23   a 4-person Board.

24        MADAM CHAIR:          Okay.  Thank you for that.

25            Well, it's very hard to have a conversation about mitigation

**TRANSCRIPTION BY: PAM SIMON**

DEF-0119

1   measures if we don't know what the pleasure of the Board is.  So if there's

2   no one else who wants to ... well, there's nothing to speak about because it

3   has been admitted.

4          So I'm going to close the public hearing.  No.  Leave the

5   public hearing open and I'll entertain a motion from my Board.

6          MR. KOENIG:       Mr. Chairman, Mrs. Chairman ... I'm never sure

7   how that works, but I would like to make a motion to suspend the license

8   until he is in complete compliance with everything we've said in this ...

9          MS. BRUCH:        Mr. Koenig, I would suggest that before a

10  motion is made that they ... that witnesses be allowed, and that you all need

11  to address, discuss these various sanctions, the facts that have been

12  presented to you, and allow Mr. Hof an opportunity to respond to what he

13  thinks the sanctions may be.

14         So you need to take ... I would suggest that you need to take

15  some testimony before a motion is made.

16         MADAM CHAIR:        That's my fault then because I asked for a

17  motion.  I'm sorry, would you like to withdraw that motion?

18         MR. KOENIG:     I'll withdraw the motion.

19         MADAM CHAIR:        Mr. Hof, would you like to talk about

20  what you believe should be done?

21         MR. HOF:    Good morning.  Good morning.  My name is Dennis

22  Hof.

23         MS. BRUCH:        Madam Chair, they need to be sworn ... the

24  witnesses.

25         MR. HOF:    H-O-F.

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251                              -10-

**DEF-0120**

| | |
|---|---|
| 1 | MS. BRUCH:        Sorry to interrupt. |
| 2 | MADAM CHAIR:        And who is going to swear them in? |
| 3 | MS. BRUCH:        The Clerk. |
| 4 | MADAM CHAIR:        Why don't you both stand?  One at a time |
| 5 | with the Clerk, please. |
| 6 | (Wherein witnesses duly sworn) |
| 7 | MR. HOF:        Good morning.  Good morning. |
| 8 | MADAM CHAIR:        Good morning. |
| 9 | MR. HOF:        Let's talk about these allegations, and as you ... |
| 10 | MADAM CHAIR:        No, no.  We're going to talk about |
| 11 | mitigation measures.  If there are things you would like to suggest as a way |
| 12 | to fix this going forward.  We have already established that you have |
| 13 | admitted guilt by not responding, and that is also the belief of our counsel, |
| 14 | and our insurance company counsel, which is important to us. |
| 15 | MR. HOF:        I don't agree with that, but that's fine. |
| 16 | So the issues are two issues.  One, signs on the corner of |
| 17 | Ranch and Appaloosa.  These signs have nothing to do with the Love Ranch. |
| 18 | The Love Ranch should not be brought into this at all.  There's no reason. |
| 19 | They don't say Love Ranch.  They don't say anything about the Love Ranch. |
| 20 | These three signs which are on BLM property are about the |
| 21 | closed brothel on the corner that I revoked ... turned in the license for.  It's |
| 22 | going to be the brothel museum.  That's it.  They have nothing to do with the |
| 23 | Love Ranch. |
| 24 | MADAM CHAIR:        So how are you mitigating? |
| 25 | MR. HOF:        Well, there's two things. |

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251                                    -11-

**DEF-0121**

1       First of all, it shouldn't be on the agenda.  And second of all,

2   we went to ... we went to the BLM and they said there's been a lease on this.

3   You just didn't renew it.  We renewed it for 10 years, but it's still got

4   nothing to do with the Love Ranch business at all.  It's got something to do

5   with the Cherry Patch on the corner of Appaloosa and Ranch Road only, and

6   the BLM has given us a 10 year lease on that property.

7       MADAM CHAIR:       Mr. Hof, once again, you've already

8   admitted to the items that are in the Show Cause Hearing, and that was one

9   of them, that you had signs and trespass.

10      If you have since cleared that up, that's fine.  But let's talk

11  about the mitigation of the violations.

12      So if you have a suggestion on whether you will ... you know,

13  whether you think it would be great and wonderful to have a suspension and

14  get this fixed, or if you want it revoked and come back to us in six months

15  once everything's fixed, or if you just simply want us to forget it and we'll

16  all go away and play nice.

17      Just make your suggestions on what you would like us to do as

18  a mitigating factor in this.

19      MR. HOF:    The mitigating factor to me is that it shouldn't have

20  been on there to start with and it has nothing to do with the Love Ranch.

21  These signs have nothing to do with the Love Ranch.  I ...

22      MS. BRUCH:       Madam Chairman, Mr. Hof continues to address

23  the allegations as opposed to what you've requested for him to respond to.

24  What should the sanctions be?

25      MADAM CHAIR:       Here's my options, Mr. Hof.

**DEF-0122**

1    MR. HOF:    Pardon me?

2    MADAM CHAIR:    Here are my options.

3    MR. HOF:    Okay.

4    MADAM CHAIR:    This Board has the opportunity, or has the

5    obligation, to revoke your license.

6    MR. HOF:    Okay.

7    MADAM CHAIR:    Number two, suspend your license with

8    other conditions attached to that; or number three, we can give you time to

9    clear up all the violations.

10    But those are what we are ... we can work within those three

11    things.

12    MR. HOF:    Thank you.

13    MADAM CHAIR:    But that's what we're required to do at

14    this point of the game.

15    So whether or not you like the fact that the Show Cause packet

16    is in there, whether you agree with it or not, you have admitted that those

17    items do stand.  You've admitted them.

18    So now, we are talking about simply mitigation measures, and

19    those are the three things that we can work with.

20    UNKNOWN MALE:    And Madam Chair, just to get things back

21    on the track that you're intending, on the issue of the signs which were ... I

22    think Mr. Hof's point is that they didn't have anything to do with the ...

23    MADAM CHAIR:    Which doesn't matter.

24    UNKNOWN MALE:    If that doesn't matter, what does matter

25    and should matter is the violation was that they are on BLM land without

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -13-

**DEF-0123**

1    authority.

2        MADAM CHAIR:        Which doesn't matter.  The lack of

3    response ...

4        UNKNOWN MALE:        But at the time and within the 10 day

5    period, that was true.  Since then, it has been mitigated ...

6        MADAM CHAIR:        There you go.  Now you're talking my

7    language.

8        UNKNOWN MALE:        Exactly.  It has been mitigated ...

9        MADAM CHAIR:        So go on (inaudible) things.

10        UNKNOWN MALE:        ... and remedied by the lease with the

11    BLM which is my understanding was submitted to the Sheriff as soon as it

12    was obtained, and I will let the witness's (inaudible).

13        MR. HAMES:        Zachary Hames.  Dennis Hof's Chief of ...

14        MADAM CHAIR:        Just one minute, Zachary.  Go ahead.

15        MR. KOENIG:        I hear what you're saying.  And if you listen to

16    my initial proposal, that's fine.  So we take the signs.  They're done.

17        Alright.  Now, let's move onto the next one.  When that's

18    done, we'll move onto the next one until they're all cleared up.  Forget the

19    signs.

20        MR. HOF:        Very good.

21        MR. KOENIG:        Let's take the whole package ... let's fix the

22    whole thing.

23        MR. HAMES:        Okay.  Thank you, Mr. Koenig.

24        My name is Zachary Hames.  I'm Dennis Hof's Chief

25    Executive Assistant.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -14-

**DEF-0124**

1    MADAM CHAIR:          Spell your last name for the record.

2    MR. HAMES:       H-A-M-E-S.

3            So what you're asking is what we would like to have done

4    with the situation.  So what I would like to ask is that we have time to ... for

5    Civilwise to give you guys the information that has been given to you.  I

6    don't know why it wasn't ... didn't make it on the agenda this time, to

7    eliminate the right-of-way; merge the two property lines so that the property

8    line wasn't an issue; to do a conditional renewal on the brothel license, until

9    that comes before you guys to merge the property lines.

10           And those two are the only two that I was aware that were

11   served on the Show Cause Hearing were the property line mergers and the

12   signs on the corner of Ranch and Appaloosa.

13   MADAM CHAIR:          And one other.  You have one more.

14   MR. HOF:    The ...

15   MR. HAMES:       Hold on, she's talking.

16   MADAM CHAIR:          You have one more item in there on the

17   Show Cause, I think ... (inaudible) remove it.  Yeah, the stickers.  Everybody

18   is kind of getting stuck on the stickers.

19   MR. HAMES:       Okay, so ...

20   MADAM CHAIR:          Because they don't seem to ...

21   MR. HAMES:       I apologize.

22   MADAM CHAIR:          Because they do not seem to understand

23   what the stickers signify.

24   MR. HAMES:       Stop.  I've got it.

25   MADAM CHAIR:          But the stickers ... in order to get a

**DEF-0125**

1   sticker, it means you have a Certificate of Occupancy that protects the

2   health, welfare and safety of the people.  Without that sticker, you do not

3   have buildings that are considered safe for the public.

4         MR. HAMES:     So in response to that, we ... when we first got

5   the information that Commissioner Schinhofen had said about the stickers,

6   we went directly to Manufactured Housing.  Talked to the Director of

7   Manufactured Housing with the State of Nevada and asked her what had to

8   be done, and she said, "Well, what they're asking for or what they're saying

9   is a HUD compliance sticker."  And because it is for commercial use, it is

10   not a HUD compliance sticker.

11         So I asked her who is in charge of that, and that would be the

12   State Fire Marshal.  We went directly to the State Fire Marshal's Office, and

13   when we purchased the building and everything was done, they did a sign

14   off with the State Fire Marshal's Office and he gave us a seal of approval

15   and said that everything was fine.

16         And that has been ... that was sent in to you guys.  I sent an

17   email to all of the Commissioners.  I don't know if ... you guys never

18   responded to it, saying that you guys got it.

19         MADAM CHAIR:     Never received.

20         MR. HAMES:     That was done when we purchased the building

21   seven years ago.

22         The State Fire Marshal's Office said that they didn't see

23   anything that was an issue because there was no new construction.  There

24   was nothing done inside the building.  The only thing that we did was put in

25   new flooring, paint, and stuff like that.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**        -16-

**DEF-0126**

1   MADAM CHAIR:        And you still don't have a current sticker

2   or current certificate.

3   MR. HAMES:        The State Fire Marshal's Office does not put

4   stickers.  That comes from Manufactured Housing and they are two separate

5   divisions for the State.

6   MR. HOF:    Let me go back 40 years ago.

7   MADAM CHAIR:        No.  I don't want to go back ...

8   MR. HOF:    These were inspected by the Sheriff at that time.

9   MADAM CHAIR:        ... 40 years ago.  Mr. Hof, what we have

10  to deal with right now is just simply figuring out what sanctions are to be

11  placed on you for failing to have these things handled, and for not

12  responding, in which you admitted that, "Yes, we agree.  All these things are

13  wrong."

14  Here's what we can do, and I've told you this already, but I'll

15  do it again.  In order for you to do what you want to do with merging the

16  properties, you're going to have to have at least 120 days to do that should

17  this Board decide that they want to give you time to figure that out.

18  If you can't understand what the Code is telling you to do on

19  the stickers and what the importance and the significance are of those

20  stickers for the safety of the public through Code compliance, I have no idea

21  how long it will take you to figure that out.

22  If it was me, if I was not in the situation of being the Chairman

23  of this Board, I would be making a motion to just revoke your license and

24  you can reapply in six months.  Six months should give you enough time to

25  take care of all of those issues, and then come back with a cleaned up

**TRANSCRIPTION BY: PAM SIMON**

DEF-0127

1  business to move forward with to protect the health, welfare and safety of

2  the people.

3      MR. HAMES:        So Commissioner ...

4      MS. BRUCH:        Madam Chairman, what I would offer is that

5  when Mr. Hof was given an opportunity to provide a written statement that

6  he could have provided something, then from ... for instance, the Fire

7  Marshal saying it's not necessary ... an email to you which I ...

8      MADAM CHAIR:        Seven years ago?

9      MS. BRUCH:        Yeah.  So, you know, if he can provide ... if he

10  could provide if, for instance, he were to ask for more time and to provide

11  something from the Fire Marshal saying that stickers are not necessary, then

12  that's something that you could take into consideration.

13      MADAM CHAIR:        Code compliance could ...

14      MS. BRUCH:        Yes.

15      MADAM CHAIR:        (Inaudible).

16      MR. HOF:        I'd like to have time to do whatever you think needs to

17  be done, but we feel like we've done everything.

18      MR. HAMES:        It doesn't matter.  Just ask for (inaudible).

19      MR. HOF:        We'd like to have time.  We've done everything civil-

20  wise.  They've got everything in the system, and of course, it does take time,

21  but we were just notified on this on the 2nd of February, and we went right to

22  work to do what you asked to do.

23      UNKNOWN MALE:        Madam Chairwoman, one thing very

24  briefly.

25          It seems that on several of these issues, particularly issue 2 and

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -18-

DEF-0128

1   3 ... issue #1 hopefully has been mitigated to the satisfaction of this Board.

2   But the other problems date back to prior licensing from maybe less diligent

3   Boards that allowed this to continue.

4       MADAM CHAIR:      The reason it's before the Board of

5   County Commissioners today, we must act once we become aware of

6   something.  I don't care what happened 40 years ago because we can't do

7   anything about it.

8       UNKNOWN MALE:      Then I ask that you ... what's good for the

9   goose is good for the gander because the main purpose of privileged license

10   vetting is to make sure the Board or the licensing body knows and

11   understands who was receiving proceeds from these special privileged

12   businesses.

13           And it's my understanding that there are ... that there's

14   currently under consideration by this Board or recent action by this Board

15   to ...

16       MADAM CHAIR:      I'm not following.  I'm sorry.

17       UNKNOWN MALE:      ... to forgive past lapses by prior Boards

18   where there have been non applicants who actually own equity interests in

19   other privileged licenses.

20       MR. KOENIG:      How is this relevant to what we're supposed to

21   be talking about?  (Inaudible).

22       UNKNOWN MALE:      Well, the reason I say it's relevant,

23   Commissioner Koenig, is if we're talking about conditions that existed for

24   40 years and some are being overlooked or grandfathered in, all I'm

25   requesting, and I think what my client's requesting, and what Mr. Hames has

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                              -19-

**DEF-0129**

1  suggested, is that we be given a little time to continue operating, as have

2  other restricted licenses in the County.

3        MR. KOENIG:     Can I say something here?

4        UNKNOWN MALE:    Of course, sir.

5        MADAM CHAIR:    Go ahead, please.

6        MR. KOENIG:     I mean, Madam Chairman ... but months ago, I

7  held out an olive branch to the same people that are sitting here.  I said,

8  "Call me and we'll go through this and we'll figure out what had to be

9  done."

10        I think we could have solved the whole problem back then.

11  Nobody called me, alright.

12        MADAM CHAIR:    Oh, you weren't there?  You don't

13  want ...

14        UNKNOWN MALE:    I spoke (inaudible) ...

15        MADAM CHAIR:    But he's telling you.

16        MR. KOENIG:     The reason they did call me, yeah.

17        But the people that had to do something, contact Civilwise, or

18  sit down with me and fill out a couple pieces of paper, no one ever called

19  me, alright.

20        So here we are months later.  Nothing has been done.

21  Civilwise was contacted at the end of January.  We knew about this months

22  ago.  How long do I have to keep waiting until we get it done?

23        As the Chairman said ... I have an ethical problem once I find

24  out that there could be a problem that endangers other people's lives when

25  they're in your facility.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -20-

1          If I don't know about that and the place burns down, I feel

2   bad.  Once I'm informed that there's a possibility there could be safety or

3   (inaudible) other people, and if something happens, I have to live with that

4   the rest of my life, alright.

5          It's part of my job as a County Commissioner, once I know

6   about it, to make sure it doesn't happen.  I have to do something.  I can't sit

7   here week after week, month after month, and listen to, "We're going to do

8   something.  We're going to do something."

9       MR. HOF:     Well, Mr. Koenig, thank you, and I appreciate that.  But

10   we did.  We got the notice on the 2nd of February that this was a problem

11   with the right-of-way going through the property, that there's an

12   encroachment on the two properties, and we did ... we did what we needed

13   to do and it's in the process.

14          But it's been like that for 40 years and it wasn't a problem.

15   And it was like that seven years ago when I bought the place and it was

16   inspected, and nobody cared then.

17          We've done everything we can do with Civilwise.  It's in the

18   hands of the County.  It will go through and we will remove the right-of-

19   way.  We will remove the property line so it's one big piece of property

20   rather than two.  I think we've done everything we could.

21       MR. KOENIG:     I know that.

22       MR. HOF:     In regards to those signs on the corner, they have

23   nothing to do with the Love Ranch at all, sir.

24       MR. KOENIG:     Forget the signs, please.

25       MADAM CHAIR:     Mr. Hof.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                        -21-

DEF-0131

1    MR. KOENIG:    Wait a minute.  Wipe the signs from memory,

2    alright.

3    MR. HOF:    Thank you.

4    MR. KOENIG:    The signs are not an issue.

5    MR. HOF:    I'm sorry.  I thought they were when we came in here.

6    MR. KOENIG:    So did we until Mr. Resmin said that's been

7    taken care of.

8    MR. HAMES:    Okay.  So coming back, Commissioner McMinn.

9    MADAM CHAIR:    Oh, just a second because I have to clear

10   something up because you continue to say that you were not notified of this

11   until February 2nd ... or February 2nd?

12   MR. HOF:    Whatever the date was prior to the last Commissioner's

13   Meeting (inaudible).

14   MADAM CHAIR:    I have your statement on your water rights

15   dated October 17th of 2017, that specifically states in here, in your words,

16   that you are aware of the two parcels and the road right-of-way from the

17   past.  So this is the problem that we have, Dennis ...

18   MR. HOF:    We're definitely aware of the problem, but we didn't

19   think it was a problem because it's been okay for 40 years as joint

20   ownership.  Same ownership of both pieces of property.

21   MADAM CHAIR:    It doesn't matter.

22   I've asked you repeatedly during these meetings if you would

23   please read the Code.  Make sure you know the Code that is dictating how

24   you keep and hold your privilege license.  I've asked you that repeatedly all

25   through 2017.

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251                                    -22-

DEF-0132

1    It's apparent to me that you simply ignore us until you are

2   called on something or there is a threat that you're losing something or you

3   don't have your full privileges allotted to you quietly.  So it's ... (inaudible).

4   Okay.

5    Are you with us, Dan?

6   MR. SCHINHOFEN:    I'm here.

7   MADAM CHAIR:    You can hear us okay?  We're in the

8   middle of the proceeding, so I'm not going to try to catch you up.  You're

9   just going to have to quietly listen for the moment.

10   MR. SCHINHOFEN:    Okay.  Can I recuse myself?

11   MADAM CHAIR:    Yes, absolutely.

12   MR. SCHINHOFEN:    Okay.  Tell them I want to make my

13   recusal statement.

14   MADAM CHAIR:    Okay.  Please go ahead.  We'll let you do

15   that now.

16   MR. SCHINHOFEN:    Thank you.

17    Because Mr. Hof is suing me personally in a lawsuit and

18   because to withstand any kind of future lawsuits that would be used to say

19   that I'm prejudiced, even through I voted for his renewal last meeting, I will

20   recuse myself from this meeting.

21   MR. KOENIG:    That brings us down to a three person Board.

22   MADAM CHAIR:    Is that it, Dan?

23   MR. SCHINHOFEN:    I believe ... is that sufficient for our

24   lawyers for recusal since I was (inaudible)?

25   MADAM CHAIR:    Yes, it is.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                    -23-

**DEF-0133**

| 1 | MR. SCHINHOFEN: | Yes, it is. |

1     MR. SCHINHOFEN:     Yes, it is.

2     MADAM CHAIR:     Take care of yourself, okay.

3     MR. SCHINHOFEN:     Thank you.  I'm going back under

4     doctor's orders.  Thank you.

5     MADAM CHAIR:     Okay, thank you.

6     MR. SCHINHOFEN:     Bye.

7     MADAM CHAIR:     Bye.

8     MS. BRUCH:     Sorry.  I'm not competent to push the button.

9     That now makes this a three member Board.

10     MADAM CHAIR:     Okay.  Thank you.

11     So I'm not going to go back to where I was.  I was getting a

12     little irritated with how this goes, too.

13     MS. BRUCH:     If I may add one comment.

14     It's my understanding that the issue about the stickers has also

15     been going on since at least August, last August, there have been

16     discussions.

17     MADAM CHAIR:     Yes.

18     MS. BRUCH:     So the idea that they didn't know until February

19     the 2nd that these were going to be an issue, I think, is not necessarily

20     accurate as reflected by the record.

21     MADAM CHAIR:     Right.  And the point about all of that,

22     Dennis and Zach and Mr. Risner, what bothers me about that is since we do

23     have documentation and evidence that you were told in August, and we had

24     this disciplinary hearing set up for February 2nd, and you did not retain the

25     services of Civilwise until the 31st of January, that is typical of everything

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251          -24-

DEF-0134

1   we've been  going through with you on these privileged licenses.

2            I have asked you to please read ... please read the Code.  I can

3   read it.  I understand it.  It's written for the common folk.  It's not written by

4   a lawyer.

5            So please make sure that you understand the Code.

6        MR. HOF:    Okay, thank you.

7        MR. HAMES:       So can I come back to what we were originally

8   discussing asking for a provisional renewal ... suggestion.  My suggestion

9   would be a provisional renewal so that we can ... so I can have the time to

10  come back and be sure ... and I'll hand deliver them to every one of you

11  guys, if I have to, the information that we have from the State Fire Marshal's

12  Office, the correspondence I've had with Manufactured Housing, and both

13  ... and the Fire Marshal's Office on the sticker issue, as well as letting

14  Civilwise do what they did.  They did their ... they went out and surveyed,

15  drew up maps, did all that stuff, and then submitted it to the Board.

16           I don't know how long that process takes.  I only know what

17  they have told me of how long it takes.  They said that they sent it to you

18  guys and that they said it shouldn't take longer than a few weeks.  You're

19  telling me it's 120 days.

20       MADAM CHAIR:       Simply for a revisionary map that you're

21  talking about for putting the parcels together.  Has to go through all the

22  processes with Code Compliance and Planning.

23       MR. HAMES:      Okay.

24       MADAM CHAIR:       The other issue that you're talking about

25  with the stickers, you don't need to be bringing that to us.  You also need to

**DEF-0135**

1    be taking that to Code Compliance and Planning.

2         MR. HAMES:        Okay.

3         MADAM CHAIR:           And they will help you through that

4    process.  But here's what I have a problem with.

5         MR. HAMES:        Okay.

6         MADAM CHAIR:           Allowing you to continue to operate while

7    you're in the process of getting those fixed means that we are putting the

8    public in danger as far as what we're supposed to be doing legally.

9         MR. HAMES:        So, can I ask you a question?  Or can I make a

10   statement?

11            In my opinion, we've rectified these.  I would just like to give

12   you guys the proof that we have them and then that's why I'm asking you for

13   the provisional renewal to give us the time to give you ... that what you're

14   saying is the fire and life safety issue, to give that to Code Compliance,

15   which I'm assuming would be him.  I've talked to him a couple times.

16        MADAM CHAIR:        He has access, yes.

17        MR. HAMES:        Absolutely.  And then giving ... and then like I

18   said, I would forward it on to you guys so you guys are well aware of it as

19   well.

20        MADAM CHAIR:        Okay.

21        MR. HAMES:        I have zero problem following the letter of the

22   law and I am trying to do everything that I possibly can to make sure that it

23   happens.

24        MADAM CHAIR:        I get it, Zach.

25        MR. HAMES:        And I will do it.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                                -26-

DEF-0136

1     MADAM CHAIR:    I understand what you're trying to do, and

2 I appreciate that.

3     But unfortunately, as the Board of County Commissioners, I

4 don't see that we have any leeway to allow the business to continue as long

5 as there's a health, welfare and safety issue with the public.

6     MR. HAMES:    So if I could get the State Fire Marshal's Office

7 on the phone right now to talk to you guys and say that he had no issue with

8 it?

9     MADAM CHAIR:    There's a process you have to go through

10 with Code Compliance.

11     MR. HAMES:    And Lorinda, that's why I'm asking that we get

12 that provisional renewal so that I can take it, and I'll go right after this

13 meeting down to his office, and I will give him everything that I have if

14 that's what needs to be done, and that's why I'm asking for the provisional

15 renewal.

16     MADAM CHAIR:    I have a tendency to trust you, Zach.

17     Unfortunately, as a County Commissioner, we cannot, in good

18 conscience, allow you to continue your business operations while you're

19 going through that process now that we know there is a problem.

20     UNKNOWN MALE:    Commissioner ...

21     MADAM CHAIR:    Yes, ma'am.  I'm sorry, I heard one of

22 them over here.

23     UNKNOWN MALE:    It's alright.

24     From what I understand, Commissioner Koenig, you have

25 concerns for the public safety regarding the stickers.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**    -27-

DEF-0137

1   MADAM CHAIR:        No.  Stickers don't protect people.  It's

2   the process that gets the stickers.

3   UNKNOWN MALE:        Understood.

4   MADAM CHAIR:        Okay.

5   UNKNOWN MALE:        I respect that and understand that.

6           We acknowledge that the condition other than the safety issue,

7   the land joinder ...

8   MADAM CHAIR:        That's a time ... that's all.

9   UNKNOWN MALE:        Agreed.  And in the interest of preserving

10  businesses, taxes, etc., working opportunities in Nye County, I'm just going

11  to address that second issue, not of the safety, but of the land rezoning ... or

12  not rezoning, but I would ask that that not be ... the completion of that

13  process which we know at least on January 31 and in earnest ...

14  MR. KOENIG:        Not an issue.

15  UNKNOWN MALE:        Okay, perfect.  Then my question is ...

16  Zach, how long do you think ... or Dennis, how long do you think before we

17  could get those stickers?

18  MR. HAMES:        I could have everything from the State Fire

19  Marshal's Office the moment I walk out of here and give them a call.  I

20  could literally have that stuff.

21  MADAM CHAIR:        You might be able to get a statement from

22  the Fire Marshal's Office, but that statement has to go to Code Compliance,

23  and Code Compliance has to follow up with the inspections on your places

24  to make sure that they can issue the Certificate of Occupancy.

25  MR. HAMES:        Okay. So that's what I'm asking is if that part ...

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -28-

**DEF-0138**

1    that part there is where I'm asking if we can get that conditional renewal so

2    that I can get that part going, and however ... I don't know if he can weigh in

3    and tell us exactly how long it takes, if it's 15 days, 30 days.

4       MADAM CHAIR:        No, nobody can.

5       MR. HOF:    Let me ask you this, please, because I'm confused.

6              Because I was told that when we came in here today, the two

7    issues was the signs down on the BLM property that have nothing to do with

8    the Love Ranch, and the map revision and right-a-ways that Civilwise is

9    working for.

10             Was there a third item on there that I didn't now about?

11      MADAM CHAIR:        Yes.  The most important item on there.

12             You have several trailers out there that you are using.

13      MR. HOF:    That was on the Show Cause Hearing?

14      MADAM CHAIR:        Yes.

15      MR. HOF:    Because I was never served with anything about the

16   stickers.

17      MADAM CHAIR:        I have a copy of what you were served

18   and it does talk about the stickers.  It has everything to do with the

19   inspections and they are not meeting Code because they have not had a fire

20   ... they have not had the fire inspection, they have not had a Certificate of

21   Occupancy issued to them, which puts the public and your employees in

22   jeopardy.

23      UNKNOWN MALE:        Commissioner Wichman, if Zach, or a

24   representative of the Applicant, is able to submit to Planning everything that

25   needs to be done by the close of business tomorrow, and therefore, is in the

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -29-

**DEF-0139**

1    hands of the County to complete the inspection work, would you consider

2    allowing, at least on a provisional basis, as Zach said, pending the inspection

3    that needs to be scheduled by the Planning Commission, if he gets

4    everything in to you by the close of business tomorrow, would you consider,

5    please, allowing the business to remain open?

6                    And if he doesn't submit everything that needs to be submitted

7    by the close of business tomorrow, then you have ... I'd imagine you have a

8    motion what to do, but ...

9            MADAM CHAIR:        The way I see it ... I understand exactly

10    what you're asking for and what that tells me is please let the ... what was it?

11    It was a nightclub.  Let the nightclub go ahead and operate with the doors

12    locked while we have a pyrotechnic display.  Do you remember that deal?

13            UNKNOWN MALE:        I do.

14            MADAM CHAIR:        Okay.  That's what you're asking us to

15    approve.  No, we can't do it in all consciousness ... we cannot say yes.

16                    Now that we're aware that there is a safety issue, without those

17    stickers, we have not had the expertise that tell us everything is safe.  We

18    have not had the experts out there to look at it, and the inspections done, that

19    tells us, that assures us, everything is safe so we can license it, we can give

20    you a privileged license.

21                    We don't have that.  So you're asking us to stick our neck out

22    so that Dennis can go back to work with his girls?  I'm not willing to.

23            UNKNOWN MALE:        My concern is we do not have, as a

24    business, Dennis does not have as a business, the ability to control the timing

25    of what Planning does once they have everything proper.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -30-

DEF-0140

1       MADAM CHAIR:    You're absolutely right, and I agree with

2   that. That's why it seems that the only people here who have an opportunity

3   to do anything about this issue is now the three of us that sit as a Board for

4   the Liquor and Licensing.

5       MR. HOF:   This has not been a problem.

6       Seven years ago when I bought the place, they inspected it. It

7   was not a problem. Those stickers get covered up. People put siding on.

8   There's lots of different things.

9       And I think I should at least have the time to get the State Fire

10  Marshal and request them to come down here and look at this and

11  understand it because they are the ultimate authority when it comes to fire,

12  life and safety.

13      MADAM CHAIR:    You're right. And you've owned the

14  place since 2010?

15      MR. HOF:   That's right. And there was not any problems because

16  Nye County inspected it and there was not any problems at all and nothing's

17  been changed. There's no construction that has been done.

18      MADAM CHAIR:    I hate to put you on the spot, Daryl, but

19  have you any knowledge of (inaudible).

20      (Whereupon witness duly sworn)

21      MADAM CHAIR:    I hate to put you on the spot, but since

22  Code Compliance has been under Planning for all these years, and I realize

23  that we've been without a Code Compliance Officer for some of those years,

24  and now we have someone on board, Mr. Hof is saying that in 2010, you

25  inspected that place and gave him a Certificate of Occupancy on those

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251        -31-

DEF-0141

1   trailers.

2               Could you please tell us if that is accurate or not?

3       MR. LACY:        I'm not sure what happened in 2010 because I

4   was not involved in Planning at that time.

5       MADAM CHAIR:        Okay.

6       MR. HAMES:        Can I speak on that because I (inaudible).  I have

7   it.

8       MADAM CHAIR:        You can't interrupt.  Just a moment.

9       MR. LACY:        The first I had involvement with it was last

10  August and the trailers, some of which are decades old, none of which

11  appear to have had ever stickers in there, our review with the State

12  Manufactured Housing Division indicates that those were never stickered in

13  this location.

14      MADAM CHAIR:        They were moved so that's the issue.

15      MR. LACY:        They've been moved and installed here and I

16  don't think they ever have been permitted by anyone, is my opinion.  I was

17  not here prior to ... in 2010.

18      MR. HOF:    And the ex-owner would disagree with that because he

19  said when they put them all in there that the Sheriff's Office came out and

20  inspected them because it was done under Motor Vehicles at the time.  It

21  wasn't ...

22      MADAM CHAIR:        Oh, my God.  Do you think somebody

23  lied to you?

24      MR. HOF:    Well, I think a lot of people lie to me.  Exactly.

25      MADAM CHAIR:        Now you know how we feel.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -32-

DEF-0142

1    MR. HOF:    I understand that. But I ...

2    MADAM CHAIR:        Zach has something.

3    MR. HOF:    ... I can say that this was under the control of the Motor

4    Vehicle Department and the Sheriff's Office inspected it for Mr. Richards,

5    who would gladly come in here and testify to that.

6    MADAM CHAIR:        Oh, I'm sure you could speak for Mr.

7    Richards, but while we have real people here ...

8    MR. HAMES:        I also ... I have information that's actually in my

9    briefcase that's actually at Love Ranch that when we did purchase it that

10    there was an inspection done by the County, and each ... every individual

11    single trailer and the certificate that was had for that one, I have the

12    inspections that were done by the County when they purchased the building.

13    We had it ... actually had it in our files. But I do have that.

14    MADAM CHAIR:        Do you see why it's going to take some

15    time to flush this stuff out?

16    MR. HOF:    But in the meantime, you want to put a bunch of people

17    out of work? A whole lot of employees and put them out of work? I don't

18    think that's right.

19    MADAM CHAIR:        Oh ...

20    MR. HOF:    You've given people months and months when they

21    don't even ... you don't even know who owns these brothels.

22    MADAM CHAIR:        Dennis ...

23    MR. HOF:    Now you've found out that (inaudible) owns some of

24    them and you give them the opportunity.

25    MADAM CHAIR:        Dennis, you are asking me to approve

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                    -33-

**DEF-0143**

1   letting you put people to work in a situation that may be unsafe.

2        MR. HOF:    And it is not unsafe.

3        MADAM CHAIR:        You can't tell me that because you're not

4   the expert and you're not where the stickers come from.

5        MR. HAMES:       So Lorinda, coming back to this, that's why I'm

6   asking, all I have to do is go out and grab my briefcase that is at the Love

7   Ranch, and give you guys the inspections that were done by the County and

8   given them to him.

9        MADAM CHAIR:        And go through the process of getting the

10   inspections after that.

11       MR. HAMES:       And I understand that.  And that is why I'm

12   coming to the Board of County Commissioners now, or the Liquor and

13   Licensing Board, to ask them for this provisional license so that I have the

14   three hours it will take me to go grab this stuff and take it to his office and

15   give it to him and begin this process because this is the first time that I was

16   aware that I had to go through them.

17           I went directly to the State Fire Marshal's Office because I

18   went to the top dog, asked them, and I said, "What do I do?" and I went off

19   of what the State Fire Marshal and his Lieutenant told me to do.

20           So I apologize that I was not educated enough on knowing I

21   needed to go to Code Compliance here in Nye County, and now I can start

22   that process now knowing that's exactly what has to be done.

23           So that is why I'm asking the Board of County Commissioners

24   whether ... if you guys would give me this provisional license, like Mark

25   said, until close of business tomorrow to get this stuff in, give you the

**TRANSCRIPTION BY: PAM SIMON**

DEF-0144

1    inspection that was done when we purchased the building, and then start this

2    process with Code Compliance here.

3                I will do everything in my power to expedite it, do anything

4    that I possibly can, make sure that I'm there for them to come do these

5    inspections, schedule any appointments I have to, and be there myself.

6          MADAM CHAIR:          Okay.  Alright.  Let me try.

7          UNKNOWN MALE:          One thing I would like to add.

8                If he does have these inspections from 2010, and I'm taking

9    him at his word, I believe your Code talks about requiring new certificates of

10   some type, if those trailers are relocated, moved or improved upon.

11         MADAM CHAIR:          Absolutely.

12         UNKNOWN MALE:          And it's my understanding, and I could be

13   wrong, but the Applicant is here, and I want ... if I'm wrong, Dennis, please

14   correct me, but I don't think any of those have been moved or altered since

15   2010.

16         MADAM CHAIR:          I think the photographs, the aerial

17   photographs, would show that that's not accurate.

18         MR. HAMES:      So I can reply to that one.

19                There is one that ... when we purchased the building, Joe

20   Richards took his private home off of the property, and Dennis brought his

21   private home on the property, which is stickered, and has every bit of

22   information on the window right as you walk into the front door of that one.

23         MADAM CHAIR:          Oh, he knew he had to get that?

24         MR. HAMES:      But that's his private home.

25         MADAM CHAIR:          But he knew he had to get that after he

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                          -35-

**DEF-0145**

1   moved it.

2       MR. HAMES:       That was done by Trish Ripee (phonetic).  We

3   had nothing to do with it.

4       UNKNOWN MALE:       What I think we're saying is that the other

5   modular homes, trailers (inaudible) ...

6       MR. HAMES:       Nothing else was moved.

7       UNKNOWN MALE:       ... has been moved which would trigger it.

8           Now, I think Zach has indicated, even though there hasn't

9   been a triggering event, that we're willing to resubmit.

10      MR. HAMES:       Oh, absolutely.

11      MADAM CHAIR:       That's wonderful and I really appreciate

12  that.

13      UNKNOWN MALE:       But if there hasn't been a triggering

14  move, if the ...

15      MADAM CHAIR:       The triggering move, not the move of the

16  trailer, but the triggering move that has put this in front of us today is that

17  the Board of County Commissioners and the Liquor and Licensing Board

18  cannot issue a privilege license for a commercial operation that does not

19  have a Certificate of Occupancy.

20          Now, if we can't do that in the first place, I find it a really big

21  stretch to think that we can offer you a provisional license to go ahead and

22  operate assuming ... we have to assume the worst in order to do our job.

23      UNKNOWN MALE:       I understand.

24      MADAM CHAIR:       So we can issue you a provisional license

25  and then you go home and somebody burns up in there?  No.  We can't do

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251                                    -36-

DEF-0146

1   that.

2                   It's unethical.  It's immoral.  It's probably illegal.  And I know

3   damned sure it's unsafe.

4           UNKNOWN MALE:       Then let me ask you this because I see the

5   direction at least your vote is going, is whatever suspension action you're

6   considering or contemplating, could that period of suspension terminate a

7   time that Zach, given the requisite ...

8           MADAM CHAIR:        Everything, yes.

9           UNKNOWN MALE:        ... Planning Commission.

10          MADAM CHAIR:        Yes.  Once everything is approved, yes.

11          MR. HAMES:       So you're saying I'm at the mercy of Planning?

12   I'm at the mercy of the timing of Planning.  That's why I'm asking you for

13   that provisional license to give you guys the information.

14          MADAM CHAIR:        Just like every other business in Nye

15   County.

16          UNKNOWN MALE:       Now, if there was a Certificate of

17   Occupancy issued in 2010, is that what you think, Zach?

18          MR. HAMES:       It's right after they bought the building, right

19   before they opened.

20          UNKNOWN MALE:       ... a Certificate of Occupancy?

21          MR. HAMES:       Yes.

22          MR. HOF:    We went through all the inspections needed at the time.

23          UNKNOWN MALE:       Dennis, if there was a Certificate of

24   Occupancy properly issued by the appropriate agency in 2010, and those

25   trailers or manufactured homes have not been moved, then there should not

**DEF-0147**

1   be a triggering event at this time that would cause suspension of the license.

2       MR. KOENIG:    Mr. Lacy, assuming he can go down there, get

3   his briefcase, bring it back to your office, how long will it take you to

4   determine that if, in fact, there is a C of O, is valid?

5       MR. LACY:    I would say he could give it to this gentleman

6   here from Planning.

7       MADAM CHAIR:    He wasn't asking you.

8       MR. LACY:    Oh, I'm sorry.

9       MR. KOENIG:    I'm asking the gentleman from Planning.

10       UNKNOWN MALE:    We're using the Certificate of Occupancy.

11   It's actually Certificate of Compliance with the Fire Code is what's utilized

12   there as the more appropriate term.

13       MADAM CHAIR:    Yeah, sorry.

14       UNKNOWN MALE:    But if they are all compliant and properly

15   signed and whatever, we could do it in just ... if we start within 24 hours, I

16   would think we could get through the process.  But I'm not certain that ... I

17   don't see how they can have appropriate Certificates, but ...

18       MR. HOF:    Because you guys signed off on it when I bought the

19   place seven years ... I couldn't have opened ... I couldn't have opened the

20   place at all without these approvals.

21       The Sheriff's Department will not ... I can't get a license and

22   take over a place without those approvals (inaudible).

23       MADAM CHAIR:    And you have no problem providing them

24   to Mr. Lacy's office?

25       MR. HAMES:    (Inaudible) going and doing it.

**DEF-0148**

1       MS. BRUCH:    The fact that they were in compliance seven

2    years ago doesn't mean ...

3       MADAM CHAIR:    Doesn't make a difference.

4       MS. BRUCH:    Doesn't mean that they are in compliance today.

5       MADAM CHAIR:    Yes.

6       MS. BRUCH:    So ...

7       MR. HOF:    But there's been no triggering action to change that.

8       Typically, if there's a fire or you go in and get a building

9    permit to add things, that's when the State Fire Marshal comes in and you

10   upgrade the codes at that point.

11      MADAM CHAIR:    No codes have changed.

12      MS. BRUCH:    Madam Chairperson, as you've pointed out, this

13   is up to Code Compliance to determine whether they are in compliance with

14   whatever it is, and if they are, then so be it.  And if they aren't, then they

15   need to address that.

16      MADAM CHAIR:    But the problem is, is that Code

17   Compliance would still have to make their recommendations to us at one of

18   our regular meetings.

19      So regardless of what you do today and the next 24 hours,

20   you're still two weeks out even if Code Compliance was able to get it on the

21   agenda for today because this is the deadline for the next meeting.

22      MR. HAMES:    So that's why I'm asking if we could ... that's

23   why ... once again, I'm going to reiterate asking for that conditional renewal.

24      MADAM CHAIR:    A conditional renewal means we're

25   allowing you to put your business in a situation where we don't have any

**DEF-0149**

1   proof that it is safe.  And every other person in here who has a business has

2   had to go through the same thing.

3       UNKNOWN MALE:      And the only thing I'll address is my

4   reading of the Code, and my reading of the Order to Show Cause, indicates

5   that the new sticker or new certificate is required if one of these mobile units

6   is relocated, moved or altered.  That is my reading of our Ordinance.

7       MADAM CHAIR:        And that's where Code Compliance will

8   look at that.  They'll look at the aerial photographs.  They can determine

9   that.

10       MR. HAMES:      So even though you guys have had these aerial

11   photographs and the only one that's changed is the private home of Joe

12   Richards and the private home of Dennis Hof, and you guys ... every one of

13   you Board of County Commissioners and Planning, because I got it from

14   you guys when I did the show ...

15       MADAM CHAIR:        Put the mic up.

16       MR. HAMES:        ... so you guys have all of that information.  You

17   guys can see that the aerial thing ... nothing has changed but the private

18   home of Joe Richards and Dennis Hof.

19           Nothing on the brothel has changed since the buildings were

20   put there in '86.

21       MADAM CHAIR:        There's nothing on those photographs to

22   identify for me what a private home is or what the business is so I have no

23   way of knowing.

24       MR. HOF:    By the way, the home is not on the brothel property.

25   The home is on a separate piece of property.

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251                                    -40-

**DEF-0150**

1   MADAM CHAIR:        That's the other issue.

2   MR. HOF:   It's not an issue.

3   MR. HAMES:        The brothel property itself ... the brothel itself,

4   nothing has changed in those and it's very evident on the aerial that nothing

5   has happened.

6        The only thing that is back on that ... or that's on property over

7   there does have a sticker and that's because Trish Ripee said this is exactly

8   what has to happen because the mobile home was moved from where we

9   purchased it here in the town of Pahrump and taken out to Crystal, Nevada.

10  And it is done.  It has it's sticker.  And that is the only thing that has been

11  put back on that property.

12       So I am ... I don't understand.  So if you can please educate me

13  and help me understand how that warrants that they're going to take our

14  license away because nothing has changed.  Nothing warrants ... there's no

15  ... there's no construction.  Nothing has been altered.  And it's evident on

16  that aerial view.

17  MADAM CHAIR:        Zach.

18  MR. HAMES:        The one that was taken in 2007, and the one that

19  was taken six months ago.

20  MADAM CHAIR:        There's no way for me as a County

21  Commissioner to look at those aerial photographs and know what piece of ...

22  what trailer is being used for what purpose.

23       Our concern is not your private homes.  Our concern is what's

24  being accessed by the public and by your employees because you are holding

25  a commercial privileged license.

**TRANSCRIPTION BY: PAM SIMON**

DEF-0151

1          I can't tell one from the other.  I don't know looking at an

2   aerial.  You can't ... all I know is something's changed.

3          MR. HOF:    Nothing's changed.

4          MADAM CHAIR:        That's why you need to go through this

5   process with Code Compliance and Planning to make sure you have the

6   Certificate of Compliance with Fire Marshal criteria.

7          UNKNOWN MALE:        Certificate of Compliance to fire code.

8          MADAM CHAIR:        Yeah.

9          UNKNOWN FEMALE:        Commissioner, just to clarify, there was a

10  statement that it would have to come back before the Board after it went

11  through Code Compliance, and you can certainly require that.

12          However, I would just point out that you could turn it over to

13  Code Compliance who have the authority to issue citations ... misdemeanor

14  citations, and go through the criminal process.

15          MADAM CHAIR:        You certainly could.

16          UNKNOWN FEMALE:        If you chose to do that.  I just ...

17          MADAM CHAIR:        You certainly could.

18          But as a County Commissioner, I can't sit here and say based

19  on everything that's in front of me today, your acceptance of the violations is

20  accurate, and the arguments for what we do to mitigate the whole measure,

21  the one thing you're wanting is allow us to keep working, allow us to keep

22  our employees in these commercial businesses, in these commercial spots,

23  allow us to bring the public in to work in these areas, when we have nothing

24  in front of us that tells us they're safe, and you have a Certificate of

25  Compliance with the fire codes.  Can't do it.  I can't do it.

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251                                    -42-

**DEF-0152**

1      UNKNOWN MALE:        Commissioner Wichman, let me just

2    address one, and very quickly.

3             We are ... if I'm reading the Codes correctly and the violation

4    is set forth in the Order to Show Cause, it is because the trailers have been

5    removed or relocated, the ones that are in question, without the proper

6    stickers.

7      MADAM CHAIR:        It has to do with they do not have a

8    Certificate of Compliance with the Fire Marshal's Code.

9      UNKNOWN MALE:        And I'm reading what the ordinance is,

10   the Order to Show Cause, and I believe from what I've read in this packet,

11   the triggering event is a moving or remodeling or ... I'm just saying what's

12   in the Order to Show Cause.

13     MADAM CHAIR:        Okay.

14     UNKNOWN MALE:        We can leave that ... you've got two very

15   competent counsel here.

16     MADAM CHAIR:        That's legal stuff.

17     UNKNOWN MALE:        I understand the concern about the safety.

18     MADAM CHAIR:        That's the triggering event.

19     UNKNOWN MALE:        I agree.  But if this action is going to be

20   based on not believing the Applicant that the trailers have not been moved,

21   and an inability to read aerial maps and interpret them, I would ... I strongly

22   urge the direction that Commissioner Koenig was going, is for Planning and

23   Zach to at least come together, have a meeting, and tomorrow be an

24   opportunity for Planning to advise this Board whether there's compliance,

25   whether there's not compliance, or advise the Applicant how long it would

**DEF-0153**

1    take to conduct whatever is lacking.

2         MADAM CHAIR:          We can absolutely do that.

3         MR. HOF:     And I'd like to see you invite the State Fire Marshal to

4    get involved in this because we're concerned.

5         MADAM CHAIR:          Oh, he will be, Dennis.

6         MR. HOF:     I hope so.  Thank you.

7         MADAM CHAIR:          Definitely will be.  Unless you just walk

8    away and decide you don't want to do anything with it.

9         MR. HOF:     Not going to do that.

10        MADAM CHAIR:          Definitely the Fire Marshal would like …

11   will be involved.

12        MR. HOF:     Please do.

13        MADAM CHAIR:          And I understand what our DA is saying.

14   We can absolutely put that in the hands of Code Compliance to determine.

15             What I am so trying to pound into everyone here, we cannot, in

16   good conscience, provide any kind of a provisional license to operate a

17   commercial business for your employees and for the public without the

18   assurances that it has the safety measures in place.

19        MR. HOF:     And you got those seven years ago when you inspected

20   the property.

21        MADAM CHAIR:          Too bad.  I don't have them now.

22        UNKNOWN MALE:          Can we listen to what Commissioner

23   Koenig …

24        MADAM CHAIR:          If the three of you are done arguing with

25   me, yes, I'd love to hear from my Board.  Okay, Board?

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -44-

**DEF-0154**

1    UNKNOWN FEMALE:    Okay.  I will say that to sit here and say

2    that Mr. Hof has not done anything is not fair.  He has done a lot of things.

3    I've been pretty much following this very closely from the

4    time there became an issue.  I have talked with Public Works in regards to

5    the boundary lines.  Got that straightened out.  Got that rolling.

6    I know he was taking care of that before this was filed with

7    Civilwise.  As a matter of fact, he didn't know where to start.

8    He is a business man.  He owns a brothel.  He doesn't know

9    about the Codes and all the permits and etc.  Not everybody does those

10   things when they buy a business.  They do the best they can with what is

11   represented to them which I believe he has done.

12   It was represented to him that everything was legal when he

13   bought it.  He saw the paperwork.  He thought that was it.  Didn't realize

14   that maybe 10 years down the road he would have to do something else.

15   I did take an inspection of the premises and I might have a

16   couple of questions for Zach on this one.

17   They have a bar and lounge, restaurant, kitchen type of

18   situation, and I believe that was 2x4 and stucco structure?

19   MR. HAMES:    Correct.  It is stick built.

20   UNKNOWN FEMALE:    Okay.  Thank you.  That's the word I was

21   looking for.

22   Then there was what appeared to be a trailer.  Is that a

23   manufactured trailer?  Or is that one of the older trailers you're talking

24   about?

25   MR. HAMES:    It's a manufactured home.  It's a modular.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                          -45-

DEF-0155

1     UNKNOWN FEMALE:     I'm talking about the next step where you

2     go from the bar and lounge area down to where Dennis' personal residence

3     is.  There's a long hallway there.

4          MR. HAMES:       That's stick built.

5          UNKNOWN FEMALE:     That is stick built?  It's not ...

6          MR. HAMES:       It's not modular.  That's stick built.  That's his

7     corridor that you're talking about?

8          UNKNOWN FEMALE:     Yes.

9          MR. HAMES:       Yeah, it's stick built, and it's locked ... dead

10    bolted and locked.

11         UNKNOWN FEMALE:     Okay.  And there were some rooms along

12    there, if I remember right, and those are all stick built rooms also?

13         MR. HAMES:       The front of the building ... half of the front of

14    the building is stick built.  The other half of our building is modulars.

15         UNKNOWN FEMALE:     Okay.  So we're not talking about

16    trailers?

17         MR. HAMES:       No.

18         UNKNOWN FEMALE:     Talking about modulars?

19         MR. HAMES:       Manufactured homes.

20         UNKNOWN FEMALE:     Okay.  And then, of course, I saw the

21    residence, and it was an up-to-date modular.  It didn't appear ... nothing out

22    there appeared shabby.  I can tell you that right now.

23         I don't know if any of the rest of the Board has taken a tour or

24    not, but nothing appeared shabby.

25         It sounds to me like the way things are coming across is that

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -46-

1   we're referring to a bunch of old dilapidated trailers.  I did not see that.  I

2   saw everything that was clean, neat, up to par.

3       Each room had a window, an escape window, in case of fire.

4   There is a window.

5     MADAM CHAIR:  I don't believe you heard anybody here

6   say anything about dilapidated trailers.

7     UNKNOWN FEMALE: No.  It's the impression that when you're

8   talking about trailers, it comes across that way because we live in Pahrump,

9   and that's the way a lot of them appear to be.

10     MADAM CHAIR:  Well, don't put words in our mouths, but I

11   understand.

12     UNKNOWN FEMALE: It's my turn now.

13       This is not ... I'm not referring ... there's a difference in

14   manufactured homes and trailers.  These are manufactured homes.  That's

15   the point I'm trying to get across.  I'm not trying to say that ...

16     MADAM CHAIR:  No.  If they come in on wheels, they have

17   to go through the same process.

18     UNKNOWN FEMALE: Please, please.  I didn't interrupt you.

19     MADAM CHAIR:  Listen to our DA.

20     UNKNOWN FEMALE: Okay.  I will listen to her.

21     MS. BELLO:  Correct me if I'm wrong.  It's my

22   understanding a modular home is a mobile home.

23     MADAM CHAIR:  Yes.

24     MS. BELLO:  And the same thing as a trailer.  You can

25   call it all three things.  Isn't that correct, Darrell?  Or do I have them

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**    -47-

DEF-0157

1      backwards?

2            MR. LACY:          There are actually different gradients of ... as a

3      matter of fact, mobile home, manufactured home, modular homes, they all

4      have slightly different definitions and slightly different methods of

5      construction.

6            So actually, there are no interchangeable words.

7            MADAM CHAIR:          But do they have to go through the same

8      process?

9            UNKNOWN FEMALE:      It's my understanding a modular home is

10     the same as ... I'm sorry, we can take a break for a minute if we want to get

11     to that, but it's my understanding a modular home is equated to a mobile

12     home and they both need stickers; where a manufactured home does not

13     need a sticker.  It goes through building inspection.  Is that correct?

14           MR. LACY:          No.  They all are managed through State

15     Manufactured Housing and they all need an installation sticker.

16           MADAM CHAIR:          There.  That's the point.

17           MS. BRUCH:      Under the Nevada Administrative Code and that

18     has been ... that's part of the Notice, NAC 489.405, no manufactured home,

19     mobile home or commercial coach that is moved from one location to

20     another may be occupied as a dwelling unit or otherwise unless a Certificate

21     of Installation and a matching label has been issued.

22           MADAM CHAIR:          Yes.

23           UNKNOWN MALE:      Well, that's where we have that move

24     from one place to another.

25           MR. HOF:          Nothing's been moved.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                    -48-

DEF-0158

1    UNKNOWN FEMALE:    And I agree with what's being said by the

2    attorneys, and that wasn't really the issue.  I was just trying to get to the fire

3    safety issue part of it as to what the structure is.  In other words, it's not ... I

4    think the premonition (sic) that's given here is that it's a fire trap.

5        I did not see that when I did the inspection the other day when

6    I walked through it with you and a couple of other people.

7        And a modular has ... is stick built and has sheet rock and

8    stucco.  A trailer is a trailer.  It has paneling.  It has usually siding, old ... or I

9    should say, most of them had aluminum siding on them.

10       So I'm trying to draw a picture here for the people that have

11   not seen it.

12   MR. HOF:    Everything is drywall there.

13   UNKNOWN FEMALE:    Okay.  Everything is drywall.  Everything

14   is stucco, right?

15   MR. HOF:    If that helps.

16   UNKNOWN FEMALE:    With the exception of whatever is on your

17   private home?

18   MR. HOF:    It's drywall also.

19   UNKNOWN FEMALE:    I mean on the outside.

20   MR. HOF:    It's a T1-11.

21   UNKNOWN FEMALE:    Yeah.  That's what ... I thought it was

22   some type of siding.

23   MR. HOF:    Yes.

24   UNKNOWN FEMALE:    Okay.  Now, I hope you're getting a little

25   better picture of what we're dealing with here.  We're not dealing with a

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251                                          -49-

**DEF-0159**

1    bunch of trailer houses that are just put together like the problems we have

2    in Pahrump.  We have a lot of those in Pahrump, and yes they are ... can be

3    fire traps.

4                    Each individual room had a window.  I did observe that.

5                    Now, I'd like to make a statement here because I have a letter

6    here that was in our backup that needs to be addressed, and it was from the

7    Zoning Inspector, Amanda Vanhouten, where she had went out and done an

8    inspection and apparently given you time to address these issues, and you

9    had addressed the issues that she had.

10                    And it says here, this is back in December, and it relates to

11   August, so it has not just been ignored.  It says, "On December the 28th of

12   2017, a reinspection at the direction of the County Board of Commissioners

13   of the above-mentioned property was conducted as follow up on the

14   previous inspections that was conducted on August the 28th, 2017, in

15   response.  Present for the inspection conducted on December the 28th, was

16   Amanda Vanhouten, the Nye County Code Enforcer; Brent Waggoner,

17   Assistant Director Nye County Planning; Chris Sehnert, I hope I'm

18   pronouncing that right, Nye County Sheriff's Detective; Rodney Camacho

19   represented Love Ranch, and Dennis Hof, owner of the Love Ranch.  The

20   following previous noted conditions are now corrected."

21                    And then we have a whole bunch of conditions that apparently

22   you went through with them, and I don't know if ... and this is in

23   everybody's bags so you can see those, and all of those were corrected.

24                    Most of them were minor.  Some of them were a little more

25   important than others.

**TRANSCRIPTION BY: PAM SIMON**

DEF-0160

1    And then you go over to the next page and it says, "The

2 following previous noted conditions are still outstanding and are in

3 violation." And then it has fire sprinklers which I believe is not an issue of

4 this?

5    UNKNOWN FEMALE:    Yes. That's off the topic of this Order to

6 Show Cause. None of those issues on that report are before us today.

7    UNKNOWN FEMALE:    Okay. So then you're not concerned with

8 these, but somebody is concerned with a Certificate of Occupancy based on

9 the fact that there could be a fire?

10    So I understand that you're looking for a Certificate of

11 Occupancy, but for what reason then? Other than you want to have a fire

12 inspection.

13    Well, it states here that everything is okay except for sprinklers

14 which apparently are not an issue, I hear. I believe that any of the other

15 requirements that are on here also then would not be an issue, and there's

16 very few of them.

17    Do you want me to say No. 5? Yeah. That's what we're

18 looking at, but she just said nothing on this list is an issue. It says No. 5 is

19 most manufactured buildings are not tagged as required by the Nevada State

20 Manufacturing Housing Division.

21    So actually, we're not even discussing fire issues or anything

22 else. We're just looking to get those tagged.

23    UNKNOWN FEMALE:    And I just don't want to be misunderstood

24 if that came off not an issue. I didn't mean that no one cares about them. I

25 just meant that they're not a part of this Order to Show Cause. They are

1   being dealt with through Planning.

2          They were noticed so they can't be discussed or he can't be

3   sanctioned or anything for those on that list because he wasn't properly

4   noticed of them.

5          UNKNOWN FEMALE:    So we as Commissioners are not looking

6   at those because Planning ... the Planning Department is already taking care

7   of that, right?  And if they're not up to code or whatever, they can actually

8   be issued a citation and have to go to Court on those, so that's not an issue

9   here.

10          And it says here, "Additional conditions.  The wet room is

11   required to have a GFI outlet."  And they did put that in.  I was a witness to

12   that.  He did show me that they had done that.

13          And they also took us down and showed us the tanning and the

14   massage room where it had some exposed electrical and that's all been

15   corrected, right?

16          So I just wanted to bring to light that no, they have not been

17   ignoring this situation.

18          I did go address this with Tim Dahl and looked at the map so I

19   would have a better understanding of where the BLM property was and

20   where the dividing line was.

21          And so I spoke with Mr. Hof about it and told him what really

22   needed to be done and he went right straight over and took care of it, and

23   this letter is a result of that.  He did not ignore what I said to him, okay.

24          UNKNOWN FEMALE:    And Commissioner Cox, I'm sorry.  I did

25   want to correct ... I asked if I had them backwards, and I did.  So it's a

**TRANSCRIPTION BY: PAM SIMON**

**DEF-0162**

1    manufactured home is what most people would think of as a mobile home,

2    and I said it was a modular home that most people think is a mobile home.  I

3    had them reversed.

4           COMMISSIONER COX:          Yeah.  The point is, I don't see

5    where this is an emergency.  It's been operating forever.  Everything is sheet

6    rocked.  Everything is stucco or has adequate up-to-date T11 siding upon it.

7           Mr. Hof lives at the facility also, although he lives in a

8    different section and it's private.  He lives on the property, I should say,

9    partially on the property, in his own individual home which is actually

10   connected through a breeze way to the other parts of the home.

11          It says here that, "A brothel.  Any structure or premises having

12   a source of income derived from the practice of prostitution as defined in

13   this section where any person engages in or carries on sex for hire services

14   or any associated activities allowed or approved under this chapter."

15          So the only portion of that is the portion where there's actual

16   prostitution going on that is to be considered part of the brothel.  The rest of

17   it is not a brothel.

18          So I think that that eliminates the majority of the building

19   except for the part where there's actual prostitution going on.  So we're kind

20   of split there.

21          I don't see anything wrong with ... I would like to do this as

22   soon as possible also, Zach.  It's not a problem.

23          I don't see anything wrong with you taking a few hours, going

24   and getting the information they're asking you for.  Once that's presented, I

25   think that we could come back at the request of the Planning Commission,

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                                      -53-

**DEF-0163**

1   when they're ready, and have a special meeting.

2        If they think they can do it in two days, why can't we just have

3   a special meeting?  Why do we have to shut down a business that has been

4   going on for many, many years and it has not been proven to me that it is

5   some kind of a safety hazard?

6        I do not believe in all good conscience that Mr. Hof or any of

7   these gentlemen would want you to approve something where they thought it

8   was going to damage anybody's safety or welfare.  I mean, I believe that

9   they would be the first ones to say, "Hey, you can't do business.  You can't

10   be in that part of the building.  We're going to remodel it."  Whatever.

11        I saw no reason to close them down, and I would suggest that

12   anybody else on this Board that is not convinced, that you meet with Mr.

13   Hof and take your own personal tour.

14        Right now, that's basically all I have to say.  I would like to

15   make a motion at some point to ...

16       MADAM CHAIR:     I believe John was ahead of you on the

17   motion portion.

18       COMMISSIONER COX:     Well, I think he jumped the gun.

19       MADAM CHAIR:  Go ahead.  If you're ready, go ahead.

20       COMMISSIONER COX:     After hearing all the things that

21   have been said, after the things I've seen, I mean, the most you can do is

22   vote against the motion, but I would like to make a motion to allow them ...

23   allow ... what are we talking about?  The Love Ranch here, I guess, Mr. Hof

24   and the Love Ranch, to stay in operation and give them some time to finish

25   what they have spoken about and turn in the paperwork they have to the

**TRANSCRIPTION BY: PAM SIMON**

(775) 530-5251        -54-

**DEF-0164**

1   Planning Department.

2               Maybe I could ask one question before I finish this of Mr.

3   Lacy?  Darrell, how much time would you think that you would need at the

4   most to look at this and get us back onto a special meeting so that we don't

5   have to close any doors?

6       MR. LACY:        If everything is compliant, it shouldn't take that

7   long.  As I said, 24 hours and I should be able to review it.

8               I have a difficult time saying that this is going to have

9   everything compliant is part of my concern.

10      COMMISSIONER COX:         Okay.  So then maybe we should

11  go back and give them the 120 days we had talked about, which is only 4

12  months.  I mean, this has already been an issue that they've been trying to

13  address and they've been trying to take care of, and it's not like they've been

14  sitting dormant.  I mean, it's very obvious from the packet that's in our

15  backup.

16              So I would like to shoot for ... do you think you could do it all

17  ... have it all together in 90 days?

18      MR. HAMES:        Absolutely.

19      MR. HOF:    I'd like to see the State Fire Marshal here.  That's going

20  to change everything.

21      MR. HAMES:        (Inaudible).

22      MADAM CHAIR:        Hold on.  There's a motion (inaudible).

23      MR. HOF:    Yes.  120 days would be better to give the State Fire

24  Marshal time to get down here.

25      MADAM CHAIR:        Dennis, hold on.  If I understand, are you

**DEF-0165**

1   making a motion?

2       COMMISSIONER COX:    Yes, I'm trying to make a motion.

3       MADAM CHAIR:    Let me see if I understand your motion so

4   I can repeat it for the record.

5       MS. BRUCH:    Madam Chairperson, before a motion is placed

6   on the floor, I would recommend that you ask Mr. Hof if he wants to present

7   anything else.

8       MADAM CHAIR:    Is there anything else?

9       MR. HOF:    Is there anything I'd like to present?  Is that what you're

10   saying?

11       MADAM CHAIR:    Yes.

12       MR. HOF:    No.

13       MS. BRUCH:    Okay.

14       MADAM CHAIR:    Donna, let me see if I can repeat your

15   motion, see if I understand it.

16       You want to make a motion that allows them to continue

17   operation and they have 120 days to clear up all the violations while they're

18   in operation?

19       COMMISSIONER COX:    Yes, but I was thinking more in the

20   line of 90 days.

21       MADAM CHAIR:    90 days, okay.

22       COMMISSIONER COX:    And that's only based on the fact

23   that I wanted to give Darrell time to be able to go through things, and maybe

24   the Fire Marshal on top of that, rather than ... and I think 90 days or 3

25   months is adequate.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**    -56-

**DEF-0166**

1          And then they could come back and ask for more time if it's

2   not resolved, only if it's not resolved because of the Fire Department or the

3   Planning Department.

4          MR. HAMES:         I don't foresee an issue with the 90 days at all.

5          MADAM CHAIR:        We're trying to get a motion on the floor.

6          COMMISSIONER COX:        Okay, so I'd like to ... you had a

7   good start there if you could change that to 90 days.

8          MADAM CHAIR:        So for the clerk and for the record, your

9   motion is to allow them to remain in operation and to clear up all the

10  violations within 90 days?

11         COMMISSIONER COX:        Yes.

12         MADAM CHAIR:        Is that accurate?

13         COMMISSIONER COX:        Yes.

14         UNKNOWN FEMALE:        And then can you just clarify because

15  there was a little more to that?  So there was consequences which was they

16  get to come back, or is it going to be automatically ...

17         MADAM CHAIR:        I believe that what Donna was saying was

18  that it would automatically suspend if they did not clear it up within 90 days,

19  right?

20         COMMISSIONER COX:        Well, I said I would like them to

21  come back in 90 days.

22         UNKNOWN FEMALE:        Excuse me, Chairman.

23         MADAM CHAIR:        Who am I speaking to?  Who's speaking?

24         KELLY:        Excuse me.  This is Kelly up in Tonopah.  Would you

25  like me to read back the motion?

1    MADAM CHAIR:          Oh, if you could, that would save me a

2    bunch.  Go ahead.

3    KELLY:      Okay.  She moved to allow Mr. Hof and the Love

4    Ranch to stay in operation and give them some time to finish what they

5    spoke about and turn in the paperwork that they have to the Planning

6    Department, and give them 90 days to comply at which point they could ask

7    for more time if it was not resolved due to the Fire Department or the

8    Planning Department.

9        That's about the best I got out of that.

10    COMMISSIONER COX:          Yes.

11    MADAM CHAIR:          Okay.  Does that stand as a motion?

12    COMMISSIONER COX:          At this point, I think I've covered

13    everything.

14        I do have one quick question though if I could ask Angela?

15    MADAM CHAIR:          Well, there's a motion on the floor.  Do

16    you want me to see if you could get a second or do you ...

17    COMMISSIONER COX:          Well, I was just wondering if we

18    have a quorum?  Are we considered a quorum at this point?

19    MADAM CHAIR:          Yes.  We have a three member board.

20    COMMISSIONER COX:          Okay.  Well, that's 50% of a six

21    member board so I wasn't ...

22    MADAM CHAIR:          Doesn't matter.  They recused

23    themselves.  That's what he asked for.

24    COMMISSIONER COX:          Okay.  So that's the way it stands.

25    Thank you.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                    -58-

DEF-0168

1      MADAM CHAIR:        I have a motion on the floor.  Do I have a

2      second?  (No second provided).

3              Just to be clear, I'm going to ask one more time.  I have a

4      motion on the floor.  Do I have a second?  (No second provided).

5              Without a second, that motion dies.  I will entertain another

6      motion.

7      MR. KOENIG:        First, I'm going to make a comment, a couple of

8      comments.

9              The first comment is the letter that Code Compliance wrote,

10     No. 5, is the most egregious problem that we're addressing here, that they

11     don't have the stickers, alright.

12             The building being on two parcels.  I've seen the paperwork.  I

13     know the process that that has to go through.  That will get done with

14     Planning then it will go to the RPC and I see no problem with that.

15             So to me, that's over here.  According to Mr. Risman, the

16     signs are over here.

17             I've seen the paperwork and I've had comments from the Road

18     Department on the easement going though.  They don't have a problem with

19     that, so I don't see a problem with that, so I can say that's over here.

20             That leaves me with the stickers, alright.  And I'll go back to

21     my original comment before about if I allow you to continue and the place

22     burns down, I live with that for the rest of my life, alright.  And I can't live

23     with that for the rest of my life.

24             My motion is going to be ... I hope you have a very fast car,

25     Zach.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                                                    -59-

**DEF-0169**

1    MR. HAMES:        I drive a Mercedes.

2    MR. KOENIG:       Well, that doesn't matter.  Some of them are 4-

3    cylinders.  Mr. Hof's is super charged.

4            My motion is going to be to allow you until ... I want you to go

5    get the paperwork you have.  Bring it to Mr. Lacy.  I'll give you until ... I'll

6    give him until 3:00 tomorrow to get back to us whether that paperwork is

7    sufficient.  If it's not, your license is automatically suspended until we get

8    everything that we need to get stickers on the building.

9            So you prove to me that it was done 10 years ago or whatever,

10   as you say you can, or else it's suspended until you prove you can ... until

11   you get it stickered.  That's my motion.

12   MADAM CHAIR:           Kelly, could you please read that one

13   back?

14   KELLY:      Yes, ma'am.

15           He moved to allow them to get the paperwork and bring it to

16   Mr. Lacy and then Mr. Lacy has until 3:00 tomorrow to let the Board know

17   if the paperwork was sufficient.  If not, the license is automatically

18   suspended until everything needed was done.

19   MADAM CHAIR:           Okay.  Only ... just for clarification.  With

20   the motion, the way I heard it, it means it's in a suspended state until

21   whenever.

22   MR. KOENIG:       (Inaudible).

23   MADAM CHAIR:           Okay.  But if you specifically revoke,

24   then they can come back in six months and reapply.  I don't ... if you don't

25   want to change that, that's fine.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                    -60-

DEF-0170

1    Actually, I'll give you a second on that.  I'll second that

2    motion.

3    MR. KOENIG:     I don't see a difference between suspending or

4    revoking because ...

5    MADAM CHAIR:     Okay.  I don't think it makes a difference

6    either.

7    MR. KOENIG:     I don't either.

8    MADAM CHAIR:     The suspension is ... if they fulfilled

9    everything within six months, it's the same thing.

10   MR. KOENIG:     Suspension sounds nicer than revoking.

11   MADAM CHAIR:     Okay.  I'll second that motion.

12   UNKNOWN MALE:     Madam Chair?

13   MADAM CHAIR:     Yes.

14   UNKNOWN MALE:     Just a quick clarification.

15   So the Order to Show ... as Commissioner Koenig pointed out,

16   the Order ... or the Notice of Violation that went through the four alleged

17   violations that have now been deemed admitted, we talked a lot about #4

18   which is the stickering issue.

19   Mr. Koenig, you had mentioned that you weren't particularly

20   concerned about the other ones, but they still are hanging out there as

21   violations.  Did you want those addressed at all?  I realize not for suspension

22   purposes, but they still are hanging out there as violations.

23   MR. KOENIG:     My problem with those is I know they're being

24   addressed, and I know where they are in our system, and I know our system.

25   Right now, I can probably, with some sort of certainty, say the

**TRANSCRIPTION BY: PAM SIMON**

DEF-0171

1    County is holding those up.  So I have a problem holding him responsible

2    for that.

3           They've done their part of it.  It's in our Bailiwick now.  I see

4    no reason that the RPC would turn those down.  It's his property.  If he

5    wants to merge it into one big piece, it's his right.

6           And building ... the Road Department has assured me they see

7    no problem with making that easement go away.  So I don't see those as

8    being a problem except for the County getting through the paperwork, etc.

9    UNKNOWN MALE:       Okay.  So you didn't want to include any

10   kind of a time line or anything?

11   MR. KOENIG:       No, not really.

12   UNKNOWN MALE:       Okay.

13   MR. KOENIG:       I'm hoping that counsel doesn't have a problem

14   with that.

15   MS. BRUCH:       Well, it causes me some concern, pause for

16   thought, that you are suggesting that they've been complied with or that

17   you're not putting any kind of a time line on them to prove.

18          It's the honor system.  You're taking them at their word.  We

19   know that they're working on them, but have they resolved?  Is that parcel

20   merger going to be ... is that actually going to happen?

21          Is the issue with the trespass, the signs ... they represent to you

22   that there's a ...

23   MR. KOENIG:       Okay, I hear you.  I'm going to amend my

24   motion.

25   MADAM CHAIR:       I'll withdraw my second.

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                          -62-

1    MR. KOENIG:      Thank you.  And give you 90 days to do the

2    mapping, the revision, and the signs.

3    MADAM CHAIR:        And that's in addition to the original?

4    MR. KOENIG:      That's in addition to the original.  That should

5    take care of all four issues.

6    MADAM CHAIR:        Okay.  Kelly, just to make sure, do you

7    have that motion now?

8    KELLY:    Yes (inaudible).

9    MS. BRUCH:      So to clarify then, you're leaving the ... until

10   3:00 tomorrow to address the sticker issue, but the others are 90 days?

11   MR. KOENIG:      Yes, correct.  Because I believe they can be

12   easily done within 90 days.

13   MS. BRUCH:      Okay.

14   MR. KOENIG:      It could have been done by now if you guys had

15   made a phone call months ago.

16   UNKNOWN MALE:        Let me ask just two questions on this

17   because I'm a little unclear.

18           Assuming that all the paperwork has been submitted for the

19   reapportionment of the land and there is a lease with the BLM, that's not

20   going to be an issue obviously.  But if it takes the County longer than 90

21   days to act on the application, does that mean again the license is subject to

22   suspension if it's been in the County's hands for more than 90 days?

23   MS. BRUCH:      May I respond?

24   MADAM CHAIR:        Please.

25   MS. BRUCH:      My answer to that would be if it's getting close

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                          -63-

**DEF-0173**

1   to 90 days and you're not there, then come back and ask for an extension.

2         MADAM CHAIR:        And also, the suspension is ... and if I

3   understood that correctly, the suspension starts tomorrow at 3:00 if it is not

4   ... if there isn't a situation where a Certificate of Compliance can be issued.

5         UNKNOWN MALE:        Then the next question, for clarification

6   and understanding the autonomy that Planning has, if it ... let's say Zach's

7   paperwork is insufficient for argument, hypothetically, but all the other

8   processes are being undergone to work with Planning to get the stickers or

9   whoever issues the stickers, expedited at our cost, and it's successfully done,

10  does the suspension then get lifted either through a special meeting or by

11  way of your motion?

12        MADAM CHAIR:        Do you want me to try?  Or do you want

13  to do that?

14        MR. KOENIG:        I would ... my personal opinion is I would think

15  we would have a special meeting once they inform us that everything's been

16  done.  I have no problem having a special meeting.

17        UNKNOWN MALE:        I agree.  I think it should be a special

18  meeting.  After Zach gets all the paperwork in, Mr. Lacy looks at, and you

19  come back and talk to you guys.

20        MADAM CHAIR:        That's not what was said, no.  Because it

21  is ...

22        MR. KOENIG:        If you guys get ... the way that it sits right now,

23  Zach gets the paperwork to Planning and Planning agrees that the paperwork

24  is correct, you're good to go.

25        MADAM CHAIR:        For 90 days.

1    MR. KOENIG:       For 90 days.

2    MADAM CHAIR:       To clear up ...

3    MR. KOENIG:       All the rest of the stuff that's not an issue.  If the

4    paperwork is not correct because you guys told me it is correct, then you're

5    going to get suspended until you get correct paperwork.

6    MADAM CHAIR:       As of 3:00 tomorrow.

7    MR. KOENIG:       As of 3:00 tomorrow because I was assured that

8    the paperwork was correct.  So here we go.

9    UNKNOWN MALE:       And the paperwork we're looking for is to

10   show that it was inspected in 2010?

11   MADAM CHAIR:       No.  It's paperwork showing that you

12   have a certificate saying you're in compliance with the Fire Marshal's

13   requirements on those trailers.

14   MR. KOENIG:       Like I said, I'm assured you guys have the

15   proper paperwork.  That's why I made the motion the way I did.  So we go.

16   MADAM CHAIR:       Okay.  And if you don't ... if you need it

17   read back to you or whatever, you can look it up on the video, you know,

18   listen to it again or what have you.

19   I have a motion on the floor and I have seconded it myself.  So

20   all of those in favor, please say aye.

21   ALL IN FAVOR:    Aye.

22   MADAM CHAIR:       All of those opposed?  Hearing none, that

23   passes 3-0.  (Inaudible – cross talking).  I'm going to recess back to Board of

24   County Commissioners.  Thank you.

25   **(Whereupon meeting in recess)**

**TRANSCRIPTION BY: PAM SIMON**

**(775) 530-5251**                                           -65-

**DEF-0175**

1    STATE OF NEVADA        )
                            ) SS:
2    COUNTY OF WASHOE       )

3

4         I, PAMELA D. SIMON, in and for the County of Washoe, State of

5    Nevada, do hereby certify:

6         That I was provided a CD of the discussion above-referenced, and

7    that said transcript, which appears hereinbefore was transcribed verbatim

8    into typewriting as herein appears to the best of my knowledge, skill, and

9    ability and is a true and correct record thereof.

10        DATED this ____ day of March, 2018.

11

12

13                                          _____
                                            PAMELA D. SIMON
14

15

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPTION BY: PAM SIMON**

                    **(775) 530-5251**                          -66-

# EXHIBIT 5

(MANUALLY FILED)

# EXHIBIT 6

(MANUALLY FILED)