1               UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3

4  DENNIS HOF, an individual;    )
    CHERRY PATCH LLC, a Nevada     )
5  limited liability company,    )  **CERTIFIED COPY**
                          )
6              Plaintiffs,   )
                          )
7   vs.                  )Case No.
                          )2:18-cv-01492-GMN-NJK
8  NYE COUNTY; NYE COUNTY BOARD OF )
    COUNTY COMMISSIONERS; DAN      )
9  SCHINHOFEN (in his personal and )
    official capacity as an employee)
10 of Nye County); ANDREW BORASKY  )
    (in his personal and official  )
11 capacity as Commissioner of    )
    District 4 of Nye County);     )
12 JANE DOE; and JOHN ROE,       )
                          )
13             Defendants.   )
   _____)
14

15

16   DEPOSITION OF PERSON MOST KNOWLEDGEABLE, CALLIE STARK

17

18 Taken at the Offices of the Board of County Commissioners

19         2100 Walt Williams Drive, Suite 100

20              Pahrump, Nevada

21

22          On Tuesday, August 21, 2018

23              At 2:52 p.m.

24

25     Reported by:  Deborah Ann Hines, CCR #473, RPR

Page 2

1   Appearances:
2   For the Plaintiffs:
3       MARC J. RANDAZZA, ESQ.
        - and -
4       LATEIGRA C. CAHILL, Esq.
        Randazza Legal Group
5       2764 Lake Sahara Drive
        Suite 109
6       Las Vegas, NV 89117
        (702)420-2001
7       ecf@randazza.com
8
9   For the Defendants:

        REBECCA BRUCH, ESQ.
10      Erickson, Thorpe & Swainston
        99 W. Arroyo Street
11      Reno, NV 89509
        (775)786-3930
12      rbruch@etsreno.com
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   WITNESS                                      PAGE
2   CALLIE STARK
3   Examination By Ms. Cahill                     4
4   Examination By Mr. Randazza                  61
5   Further Examination By Ms. Cahill            83
6   Examination By Ms. Bruch                     92
7   Further Examination By Mr. Randazza          93
8
9
10
11
12              E X H I B I T S
13
14  NUMBER          DESCRIPTION              PAGE
15  Plaintiff's
16    A     Letter Dated 8-17-18               18
17    B     Renewal Notice                     47
18    C     Nye County Agenda Information Form  56
19    D     Love Ranch Documents               62
20    E     Copy of Checks                     67
21    F     Chicken Ranch Documents            89
22    G     Sheri's Documents                  91
23    H     Alien Cathouse Documents           91
24    I     Copy of Checks                     92
25

Page 4

1       (Prior to the commencement of the deposition
2       proceedings, a discussion was held off the
3       record among the reporter and counsel
4       wherein counsel stipulated to waive the
5       reporter requirements under Rule 30(b)(5).)
6   Thereupon--
7               CALLIE STARK
8   was called as a witness by the Plaintiffs, and having
9   been first duly sworn, testified as follows:
10              EXAMINATION
11  BY MS. CAHILL:
12      Q.   My name is LaTeigra Cahill.  I'm an attorney
13  with Randazza Legal Group.  I represent the plaintiff
14  Dennis Hof and Cherry Patch in this case.  Sitting
15  next to me is Marc Randazza.  He's also an attorney
16  representing Dennis Hof.
17           Would you go ahead and state your name for
18  the record.
19      A.   It's Callie Stark.
20      Q.   Callie Stark.
21           MS. BRUCH:  So, LaTeigra, before we move
22  forward, what I would like to do is make a record of
23  what it is that I provided to you, so if you're okay
24  with that.
25           MS. CAHILL:  Thank you.  Go ahead.

Page 5

1           MS. BRUCH:  Okay.  So this morning as I was
2   on the plane backing away, I got -- I saw the court
3   order for this.  And Callie lives in Tonopah, which
4   is, what, two hours, two and a half hours away.  She
5   had already left this morning when I forwarded this
6   to her so she had a heads up about it.
7           What we provided to you is, I'd like to just
8   go through it real quick to make a record of what
9   they are so that we just, you know, if we need to
10  talk to the judge about it.
11          MS. CAHILL:  It is my intention to go
12  through everything --
13          MS. BRUCH:  Okay.
14          MS. CAHILL:  -- during the deposition, so
15  maybe you can, if there's something that you think I
16  missed, you can bring that up on cross.
17          MS. BRUCH:  Okay.  Yeah, just if you'll make
18  it real clear because I want to distinguish between
19  what you were given that we --
20          MS. CAHILL:  Yes.
21          MS. BRUCH:  -- sent you as a result of the
22  public records request and now pursuant to the court
23  order what we've provided.
24          MS. CAHILL:  Absolutely.  I know that you
25  probably don't want to run too late, but it is my

1  intention to go through what you guys provided, at
2  least on --
3          MS. BRUCH:  Sure.
4          MS. CAHILL:  -- a short-term basis.
5          MS. BRUCH:  Okay.
6  BY MR. RANDAZZA:
7      Q.  Okay.  Great.
8          I just want to give you -- is this the first
9  time that you've ever done a deposition?
10     A.  In a long time.  I've done one before, but
11 it was 20 years ago.
12     Q.  Okay.  Well, I'll just walk you through some
13 basics.  So if there's any reason why you can't give
14 full and complete -- is there any reason why you
15 can't give full and complete and accurate testimony
16 today?
17     A.  No.
18     Q.  No?  We ask that question just in case,
19 like, you didn't take sleeping pills last night or,
20 you know...
21     A.  No.
22     Q.  Just want to make sure that you're here and
23 cognizant.
24         Okay.  And so I'm going to go through and
25 ask you some questions mostly about some of the

1  documents that you guys have provided to us but also
2  some documents that we have already.  If I ask you
3  any questions that you don't know the answer to,
4  don't try to guess.  Just say that you don't know.
5  That's completely fine.
6          Please answer in yes or no format, because
7  it's easier for the court reporter, so don't nod your
8  head or say "uh-huh."  Yes or no or you don't know is
9  probably the best way to go.
10         Is there -- do you have any questions so
11 far?
12     A.  No.
13     Q.  Okay.  And if there's a question that I ask
14 you that you don't understand, just tell me that you
15 don't understand my question and I'll think of a
16 different way to say it.
17     A.  Okay.
18     Q.  Okay.  So let's start from the beginning.
19 How long have you worked for Nye County?
20     A.  A month short of 17 years.
21     Q.  A month short of 17 years.  And what was
22 your position when you started?
23     A.  Dispatcher.
24     Q.  What does a dispatcher do?
25     A.  Take 911 calls, help the public.

1      Q.  So a 911 dispatcher?
2      A.  Yeah.
3      Q.  And how long did you do that?
4      A.  It would have to be four years.
5      Q.  Okay.  What did you do after you were a 911
6  dispatcher with the county?
7      A.  Admin tech for the sheriff's office.
8      Q.  And what is an admin tech?
9      A.  So do you want my, like my whole job
10 description or what?  I mean, it's clerical.  It's a
11 little bit of everything, short of cleaning toilets.
12     Q.  Okay.  So you did clerical work for the
13 sheriff?  Is that kind of a fair synopsis?
14     A.  Yeah.
15     Q.  So what would your typical day-to-day job be
16 like in that role?
17     A.  Well, we had to do everything with the
18 public.  We had to do fingerprints, concealed weapon
19 permits, work cards.  I did the banking.  I did the
20 licensing.  I did, gosh, a majority of stuff.  Tons
21 of it.
22     Q.  Okay.  And how long did you work in that
23 role?
24     A.  Going to be -- I kind of switched roles
25 through the middle, so we're going to go -- I don't

1  even know the dates actually.
2      Q.  That's okay.
3      A.  I was an Admin Tech I and an Admin Tech II
4  where I took on a little more responsibility, but I
5  don't know what the dates were of that.  We did
6  basically the same thing, I was just able to oversee
7  other people if I needed to be their boss type of
8  thing.
9      Q.  Okay.
10     A.  But it would be the rest of my career
11 there --
12     Q.  Okay.
13     A.  -- for the 17 years I was an Admin Tech I
14 and an Admin Tech II.
15     Q.  Which admin tech are you now?
16     A.  II.
17     Q.  II.  And so the Admin Tech II is more of a
18 supervisory role?
19     A.  Yes.
20     Q.  But the job hasn't changed too much?
21     A.  Right.
22     Q.  Okay.  So what is your job like on a
23 day-to-day basis now?
24     A.  I'm not sure I understand that question.
25     Q.  On a typical workday, would you say that you

1  spend -- you get there at 9:00 and you spend some
2  time opening emails or going through Excel sheets?
3  Like, if you just had to give me a picture of what
4  your typical day was like, or is it just so different
5  every day?
6      A.   It's different.  I mean, you go through the
7  same thing, but it just depends on what comes in,
8  comes on.  A lot of it depends on the public as
9  well --
10     Q.   Okay.
11     A.   -- you know, what we're doing through the
12 day.  But every day you do emails, you do phone
13 calls, you do all your general stuff every day, and
14 then depending on what the public brings in to you.
15     Q.   Okay.  So you say it depends on what comes
16 in.  So would you describe your job as more reactive
17 or would you describe your job as it's a very planned
18 out and I know pretty much what I'm going to be doing
19 every day or are you --
20     A.   Definitely not planned.
21     Q.   Not planned?
22     A.   Huh-uh.
23     Q.   Okay.  So you're responding to what's
24 happening that day, what the public brings in to you?
25     A.   Yeah.

1      Q.   So it sounds like you're reacting to a lot
2  of emergencies; is it fair to characterize it that
3  way?
4      A.   Not emergencies, just depending on what the
5  public needs for the day.
6      Q.   So you'll have to forgive me, I've never
7  worked for government.  What type of thing would the
8  public need for the day?
9      A.   Fingerprints.
10     Q.   Fingerprints, okay.
11     A.   Work cards.
12     Q.   Uh-huh.
13     A.   Concealed weapon permits, sex offender
14 registries, brothel workers.
15     Q.   Okay.
16     A.   Records requests.
17     Q.   Okay.
18     A.   General information.
19     Q.   And are you in charge of all the records
20 requests here for the county?
21     A.   I don't do them all, but I oversee them all.
22     Q.   Okay.
23     A.   I have a coworker that has been there for a
24 year and she's the one that's doing most of the
25 record requests.

1      Q.   Okay.
2      A.   I do more of the subpoena side as custodian
3  of records.
4      Q.   Okay.  You said that you often deal with
5  some of the brothel workers, their needs of the day.
6  Could you tell what that would typically look like?
7      A.   Brothel workers themselves go through our
8  Pahrump office.
9      Q.   Okay.
10     A.   So unless there's questions on them, I don't
11 deal with them in particular, just questions from the
12 south.
13     Q.   What office do you typically work in?
14     A.   Tonopah.
15     Q.   Tonopah?
16     A.   Yeah.  Our brothel closed down quite some
17 time ago in Tonopah, so...
18     Q.   How long ago?
19     A.   Way before my career.
20     Q.   Okay.  So as long as you've lived there --
21     A.   Yes.
22     Q.   -- there hasn't been a brothel there?
23          So you said that sometimes you do deal with
24 sex workers who come in.  Do you sometimes work in
25 the Pahrump office?

1      A.   Once in a while.
2      Q.   Once in a while?
3      A.   Usually when I'm working in the Pahrump
4  office, I'm working in an office, not with the actual
5  public down in Pahrump, just in one of the offices
6  with either my supervisor or one of the workers.
7      Q.   So if you were working with the brothel
8  workers and you were working on the office side, what
9  does that mean?
10     A.   They come in for work cards.
11     Q.   Uh-huh.
12     A.   So we'd have to do their work cards for
13 them, but I don't usually do the public in Pahrump,
14 so I don't produce the workers' cards.
15     Q.   Okay.  So somebody at the front desk would
16 do that.  And since you have sort of a supervisory
17 role, would you review that work before the card was
18 produced?
19     A.   About the only thing I do right now is the
20 money side of it.  I take care of the banking.
21     Q.   Okay.  And you're referring to the actual
22 brothels, not working with the brothel workers?
23     A.   As far as banking, I take care of that too,
24 the banking for the workers' cards.
25     Q.   Could you tell me what that means?

1   A.   I have to provide monthly reports to the
2   treasurer at the end of the month with all of our
3   money and what accounts they need to go into.  So
4   that's my part of it is getting all the information,
5   how much money was deposited for which -- for what it
6   was for.
7        Q.   Okay.
8        A.   And putting it where it needs to be.
9        Q.   And is the treasurer your direct supervisor
10  or is this a report that you have to prepare for the
11  treasurer as part of your job?
12       A.   Report that I have to prepare for the
13  treasurer.
14       Q.   And do all of your financial reports go to
15  the treasurer or to other people?
16       A.   To the treasurer.
17       Q.   Okay.  And who's the treasurer?
18       A.   Right now it's Pam Webster.
19       Q.   So dealing only with the brothel workers and
20  not the brothels, just only because you brought it
21  up, so you said on a typical day a brothel worker
22  might come in, you wouldn't necessarily deal with the
23  brothel worker at the window, but you would deal with
24  the financial side, you would look at what money was
25  deposited and then prepare a report for the

1   treasurer.  Did I summarize that pretty accurately or
2   did I miss something?
3        A.   Did you say daily or monthly?  We do a
4   report monthly.
5        Q.   Well, I meant on a typical day if you were
6   dealing with a brothel worker, but, yes, so you said
7   your reports were monthly?
8        A.   Yeah.
9        Q.   What else goes into your monthly reports?
10       A.   All money collected would be for anything.
11       Q.   Okay.
12       A.   It would be any money collected at all
13  through the front offices.
14       Q.   And how many people at the front office deal
15  with collecting money?
16       A.   There's probably three or four in the
17  Pahrump office, and then just myself and my coworker
18  in the northern office.
19       Q.   Okay.  But you said that you don't ever
20  collect money, it's the people at the front desk, you
21  just handle the accounting; is that correct?
22       A.   No.  If I'm there by myself, I collect the
23  money.
24       Q.   Okay.
25       A.   If I do fingerprints and work cards, they've

1   got to pay me.  I'm the only one there if my coworker
2   is gone.
3        Q.   It's a small town.  I understand.
4             Okay.  So you said your monthly reports,
5   it's any money that comes in from the public.  So it
6   could be for fingerprints, brothel workers, people
7   who come in and need to register as a sex offender,
8   those are the examples that popped into your mind.
9   It sounds like those are the most common.  And then
10  you also deal with the accounting for the brothels;
11  is that correct?
12       A.   That's some of them.  I mean, I do liquor, I
13  do gaming --
14       Q.   Okay.
15       A.   -- money.  I'm trying to think what else
16  there is.  I'm sure there's a lot more.  Concealed
17  weapon permits.
18       Q.   Okay.  When did you start doing the
19  accounting for the brothels?
20       A.   I took over the licensing side in 2010.
21       Q.   And when you say you took over the licensing
22  side in 2010, does that mean that you did accounting
23  for a different aspect of the brothels before that?
24       A.   No.  I had nothing to do with it before
25  that.

1        Q.   Okay.  And who would you say is your direct
2   supervisor, or do you answer to several different
3   people depending on what type of work you're doing?
4        A.   I have a direct supervisor.
5        Q.   Okay.
6        A.   Her name is Janice Maurizio --
7        Q.   Okay.
8        A.   -- in the Pahrump office.
9        Q.   So when you prepare these monthly reports,
10  you turn them in to both the treasurer and to Janice?
11       A.   Just the treasurer.
12       Q.   Just the treasurer?
13       A.   Yeah.  And they get receipts.  They get
14  copies of receipts from the treasurer's office of
15  what was turned it.
16       Q.   So you give it to the treasurer, and then
17  the treasurer's office gives it to Janice, your
18  supervisor?
19       A.   She emails us a copy of the receipt, all of
20  us.
21       Q.   Who's "she"?
22       A.   The treasurer.
23       Q.   And then Janice would be CC'd on that email,
24  or does she email it to Janice and you're included?
25       A.   I know I get it, and I know the sheriff

1  does.  I'm not for positive whether Janice is on
2  there or not.  I think she is but I'd have to go back
3  and look.
4      **Q.   Okay.  But you know the sheriff is --**
5      A.   Yeah.
6      **Q.   -- on those emails, and the sheriff looks at**
7  **those receipts every month?**
8      A.   I can't answer that for you.
9      **Q.   But you know that she gets the emails every**
10 **month?**
11     A.   Yeah.  Yes, I know.
12     **Q.   Sure, you can't answer if she actually reads**
13 **her emails?**
14     A.   No.
15     **Q.   Okay.  So when you are preparing your**
16 **reports, are you only preparing how much money has**
17 **been collected or are you at all familiar with -- how**
18 **do I phrase this?  Do you make any sort of an**
19 **analysis when you review the reports for the money**
20 **that comes in?**
21     So you're doing your report on the brothel
22 **licensing that month, and you see that X amount of**
23 **dollars has come in, do you have to also submit some**
24 **sort of an analysis to your supervisor, to the**
25 **treasurer that says "this isn't the correct amount of**

1  money," or do you make any sort of analysis or do you
2  just input the numbers and send it off?
3      A.   No, no analysis.  Just what we've actually
4  received.
5      **Q.   Okay.  So let's go ahead and go through some**
6  **of the paperwork that we have.  And I will, at**
7  **Ms. Bruch's request, start off with the paperwork**
8  **that we already had, and then I'll make it clear when**
9  **we're switching over to what's been produced, if that**
10 **works for everybody.**
11     MS. BRUCH:  Sure.
12     THE WITNESS:  Okay.
13     MS. BRUCH:  And you're talking about the
14 records that we provided, I think that Callie sent in
15 response to the public records request initially,
16 correct?
17     MS. CAHILL:  Well...
18     MS. BRUCH:  That first batch that she sent
19 you was I think in response to the public records
20 request.
21     MS. CAHILL:  We can look at that letter now.
22 Let's start off with that letter.  So this is already
23 an exhibit, however we will go ahead and mark it as
24 an exhibit for the deposition.  So we're going to
25 mark this as Plaintiffs' Exhibit A.

1          (Thereupon Plaintiffs' Exhibit A
2          was marked for identification.)
3  BY MS. CAHILL:
4      **Q.   And I'm handing to your attorney a copy of a**
5  **letter that we received from you dated August 17th.**
6  **Do you recognize this letter?**
7      A.   Yes.
8      **Q.   So I take it that you received a copy of the**
9  **public records request that we sent in; is that**
10 **correct?**
11     A.   Yes.
12     **Q.   And is this letter a response to that public**
13 **records request that we sent in?**
14     A.   Yes.
15     **Q.   Okay.  Did you talk to -- well, we'll leave**
16 **it at that.**
17     You say in your letter that you enclosed
18 **copies of your department records pertaining to the**
19 **brothel licenses.  And I have a copy of the records**
20 **that were attached, and I will include that as part**
21 **of Exhibit A.**
22     So is it fair to say that these charts that
23 **were attached to your letter, these charts were in**
24 **response to the public records request?**
25     A.   Yes.

1      **Q.   Okay.  In your letter you say that your**
2  **licensing system generates everything.  Could you**
3  **explain to me what you mean by "your licensing system**
4  **generates"?**
5      A.   We use a licensing module out of Eden, is
6  the name of the company.
7      **Q.   Okay.**
8      A.   So it does automatic generation of the
9  renewals and such.  So, like, the stuff that's put in
10 the system, we can't change.  It automatically prints
11 out what like the first day of the quarter is, like
12 that letter states.
13     **Q.   So would you say that you -- so you enter**
14 **your software system and you pulled up a report**
15 **essentially, or did the -- did the system, because it**
16 **says "our licensing system generates everything," did**
17 **the licensing system generate this automatically or**
18 **did you plug in and pull a report from the system?**
19     A.   Are you asking about these?
20     **Q.   I'm asking about the licensing system.  So**
21 **you said it's a software called Eden.**
22     A.   So the letter that was provided was an
23 answer to questions on the records request.
24     **Q.   Uh-huh.**
25     A.   These are the reports.  This is the answers

1  to what we couldn't provide.
2      Q.   Okay.  So these are the reports from Eden then?
3      A.   Yes.
4      Q.   Okay.  And this letter, are these reports
5  also in response to the public records request?
6      A.   Yes.
7      Q.   Okay.  So if a member of the public has
8  requested this exact same thing, this is what you
9  would have provided to the member of the public?
10     A.   Yes.
11     Q.   Were you aware of the litigation at the time
12 that you generated this report?
13     A.   Hearsay.  I would have been just listening
14 to the sheriff.
15     Q.   So people in your offices were talking about
16 it?
17     A.   Uh-huh.
18     Q.   But nobody had talked to you about it
19 basically?
20     A.   Huh-uh.
21          MS. BRUCH:  You need to say yes or no.
22          THE WITNESS:  No.  Sorry.
23          MS. BRUCH:  That's okay.
24 BY MS. CAHILL:
25     Q.   So it says that your licensing system

1  generates everything using the first day of the
2  quarter that you were working in.  So and just please
3  correct me if I'm wrong, if I'm misinterpreting your
4  letter here, when you say the first date of the
5  quarter that you were working in, are you referring
6  to the activity date --
7      A.   Yes.
8      Q.   -- on this chart?
9      A.   Yes.
10     Q.   Okay.  So these are the dates that came from
11 the Eden software system?
12     A.   Correct.
13     Q.   Okay.  And you said that you have no way of
14 editing these dates?  This is just what comes out of
15 the system when you pull a report?
16     A.   Yes.
17     Q.   Okay.
18          MS. BRUCH:  Just for the record, so we make
19 sure we're clear, what you're pointing to when you're
20 saying "this," you're talking about the page that's
21 got the Love Ranch, the Love Ranch information,
22 correct?
23          MS. CAHILL:  Correct.  However, I will
24 clarify that all of the reports have the activity
25 date in the same place.

1  BY MS. CAHILL:
2      Q.   In your letter you say that you do not have
3  a record of actual dates that you received the
4  brothel renewal payments.  So is it your statement
5  that you don't have any sort of a record of when you
6  received brothel renewal payments?
7      A.   Yes.
8      Q.   Okay.  So when you -- when the brothel
9  renewal payments come in to your office, you're the
10 one that does all the -- inputs all the records?
11 There's nowhere else where you keep notes?  There's
12 no Excel sheet that you keep where you keep any sort
13 of data on when you collect the money that comes in?
14     A.   No, nothing else.
15     Q.   Okay.
16     A.   Goes right into our licensing module.
17     Q.   And it's called Eden software, right?
18     A.   Uh-huh.
19     Q.   Okay.  So you say that the renewal -- we're
20 just moving through your letter.  So whenever you
21 input it into the Eden software, the activity date,
22 am I correct that saying that this activity date is
23 the quarter that you are in or is it referring to the
24 next quarter?  So if on 4-1-2017, which is the second
25 date from the top, did you enter this payment in

1  before April 1st or after April 1st?
2      A.   I couldn't answer that for you --
3      Q.   Okay.
4      A.   -- because I have no idea when we received
5  the payments.
6      Q.   Well, how does the --
7      A.   That's just the first day of the quarter.
8      Q.   How does the Eden software translate those
9  dates?  Like, where does this -- what does this date
10 mean?
11     A.   It's just the first date of every quarter
12 where the licenses are due.
13     Q.   So the way that the -- so the way that the
14 system is programmed is if you entered it in before
15 April 1st, 2017, it would come up April 1st, 2017.
16 But if you entered it after April 1st, 2017, it would
17 have that same date, or would it go to the next
18 quarter?
19     A.   It would have the same date.
20     Q.   Okay.  So it's irrelevant when you enter it
21 in?
22     A.   Yes.
23     Q.   Okay.  So somebody could have paid this six
24 months after April 1st and it would have still showed
25 April 1st as the activity date?

1    A.   Probably not six months after because your
2  quarter is only three months long, so then it's going
3  to go to the next quarter.
4    Q.   Okay.  So how does Eden, the software, which
5  probably has a pretty simple program, how does it
6  know which quarter that you're entering the payment
7  information for?  Do you have to physically tell the
8  software system that this payment is being applied
9  toward the first quarter or do you have to physically
10  tell the software system to apply it to the next
11  quarter?
12    A.   When you do renewals out of the system, you
13  put in your dates of what the next quarter is.  It
14  automatically sets up the date of the activity date
15  of the next quarter.
16    Q.   So you have to manually enter that
17  information?
18    A.   During the renewal process, yes.
19    Q.   During the renewal process?
20    A.   Yes.
21    Q.   Okay.  So your next sentence you say that
22  "the renewal paperwork comes to us with the payment."
23  When you attached these reports to this letter, you
24  were not referring to these reports; is that correct?
25    A.   Correct.

1    Q.   Okay.  So what did you mean by "renewal
2  paperwork"?
3    A.   I believe question number two on the records
4  request --
5    Q.   Okay.
6    A.   -- asked about renewal sheets, when we
7  received renewal paperwork.  And then, like, the
8  third question was when we received renewal payment.
9    Q.   Yes.
10    A.   We receive them together, if they send them.
11  Sometimes they only send the checks.
12    Q.   Okay.  So sometimes they send checks and
13  sometimes they send renewal paperwork?
14    A.   They don't always include the paperwork in
15  there.
16    Q.   Okay.  And do you alert your supervisor or
17  the treasurer or anybody when you receive a check or
18  when you receive a check and the renewal paperwork?
19    A.   No.
20    Q.   You only input the data on the checks?
21    A.   I'm not sure what you mean.
22    Q.   So if somebody sends you a check by itself,
23  you wouldn't put that data into the Eden software
24  system?
25    A.   With just the check is what you're asking?

1    Q.   Uh-huh.
2    A.   Yes.
3    Q.   And if somebody sent you a check, and
4  whatever the renewal paperwork is, and hopefully
5  we'll get to that, what would you input into the
6  system?  Would you input only the check number or
7  would you input they also submitted renewal
8  paperwork?
9    A.   Just the check.
10    Q.   Just the check.
11    A.   It's the same.
12    Q.   What do you mean by "it's the same"?
13    A.   I mean, it doesn't matter whether they had
14  the renewal paper or not.  I don't need it.  I can
15  input it by the check.
16    Q.   Who doesn't need it?
17    A.   I don't.
18    Q.   You don't.  Does anybody need it?
19    A.   No.  Not in my department anyway.
20    Q.   Where does that renewal paperwork go?
21    A.   Right now as backup.  If they -- if we have
22  it, it goes as backup with our banking.
23    Q.   So you would submit a scanned copy of the
24  renewal paperwork to your bank?
25    A.   No.  We have it with our reports.  Like my

1  supervisor actually has all of the licensing files,
2  and she keeps all that stuff.
3    Q.   Janice?
4    A.   Uh-huh.
5    Q.   And what do you mean by "she keeps all of
6  that stuff"?
7    A.   They took the licensing away from me a year
8  ago.
9    Q.   Okay.  So in 2016 you were handling the
10  licensing?
11    A.   Correct.  And still currently today, even
12  though they took the stuff.  They have me help now
13  instead of being the sole person.
14    Q.   Okay.  When you say that they took it away
15  from you, or did they -- would you -- did they take
16  it away from you because you had too much work?
17    A.   I'm actually not sure what the reasoning is
18  on that.
19    Q.   Okay.  Did any supervisor ever give you any
20  kind of an explanation as to why they decided you
21  weren't going to be doing that type of work anymore?
22    A.   No.  It was thrown out a bunch of different
23  things, but no actual reasoning.
24    Q.   What were just a couple of the different
25  reasons?

1    A.   One of them would probably be too much work.

2    Q.   Okay.

3    A.   One of them being the sheriff didn't like

4  the way I did them.

5    Q.   Okay.  What would you say your relationship

6  is like with the sheriff?  Do you have a lot of

7  direct contact with her or is it mostly Janice?

8    A.   Mostly Janice.

9    Q.   Okay.  And when Janice took over the

10  licensing, did she make any significant changes to

11  the way that was done?

12    A.   You'd probably have to ask her on that.  I'm

13  not for positive.  I think she made some changes to

14  the application.

15    Q.   Okay.

16    A.   And I think the commissioners asked her to

17  make some changes, but I'm not for positive on that.

18  I wasn't part of that.

19    Q.   So you were doing the licensing up until

20  2016, and when did you begin -- when did you start

21  doing the licensing?  How many years did you do that?

22    A.   Seven years.

23    Q.   Seven years?

24    A.   2010 to 2017.

25    Q.   So let's travel back in time a little bit,

1  and could you tell me what you did when you were

2  running the licensing when it was your job?  What was

3  that process like?

4    A.   Well, we had two different licensing

5  systems.

6    Q.   Okay.

7    A.   So the first system obviously is different

8  than this one, but...

9    Q.   So you had an old system --

10    A.   Yeah.

11    Q.   -- you mean?

12    A.   Yeah.

13    Q.   Okay.  And then you improved and got a newer

14  software system?

15    A.   Right.

16    Q.   So what was the software system that you

17  used before?

18    A.   It was called AS400.

19    Q.   And is this a software system that a lot of

20  governments use or is it just an off-the-shelf like

21  you haven't -- you're not sure?

22    A.   No, I have no idea.

23    Q.   So this software system is where you used to

24  enter all the information for the licensing?

25    A.   Correct.

1    Q.   And at the time you entered more information

2  than just the numbers off of the checks; is that

3  correct?

4    A.   No.

5    Q.   Okay.  What did you enter when you used the

6  AS400?  What type of information did you have to

7  enter into the system for the licensing renewals?

8    A.   For the renewals we're just going to enter

9  like just the payments.

10    Q.   Okay.

11    A.   I mean, just put the payments in there.

12    Q.   Only the payments?

13    A.   Yeah.

14    Q.   And would people still send renewal

15  paperwork at that time?

16    A.   I can't remember.

17    Q.   Okay.  But if they did send renewal

18  paperwork, it was irrelevant to you?  You would only

19  enter the payments?

20    A.   Yes.

21    Q.   Okay.  Then you switched to the Eden

22  software, and what year was that?

23    A.   Approximately sometime in 2011.

24    Q.   So a while ago.  And when you were entering

25  information for the license renewals into the Eden

1  software, what did you enter into the system?

2    A.   I'm not sure what you're asking.  I mean,

3  there's different things that we enter into the

4  system, so what...

5    Q.   Can you tell me what those things are,

6  because I've never worked in this type of a system so

7  I don't know.

8    A.   Depends on what we're doing in the system.

9    Q.   For the brothel renewals.

10    A.   For renewals we're going to enter payments,

11  that's it.

12    Q.   Okay.  So the only thing you've ever entered

13  is payments, whether or not they made a payment and

14  what the amount was?

15    A.   That's not the only thing I've entered.  I

16  have to enter them in the system when they're brand

17  new brothels.  We have to enter all their information

18  in there.

19    Q.   Okay.

20    A.   But for renewals we enter nothing but

21  payments.

22    Q.   Okay.  So when they're a new applicant, you

23  enter in all of the --

24    A.   Addresses, people.

25    Q.   Setting up their account essentially?

1    A.    Yeah.

2    Q.    Okay.  And then after that, all you enter

3  into the system is the payments?

4    A.    Payment, uh-huh.

5    Q.    Okay.  And I'm assuming that if somebody

6  changes an address or something, you would also enter

7  that into the system?

8    A.    Yeah.

9    Q.    Okay.

10        MS. BRUCH:  Can we take a break for just a

11  minute?

12        MS. CAHILL:  Absolutely.

13        MS. BRUCH:  Thanks.

14        (A recess was taken.)

15  BY MS. CAHILL:

16    Q.    We can go back on the record.

17        So we will pick -- so just to clarify for

18  the record, the deponent and her counsel did take a

19  short break and we are back.

20        Just to pick back up where we left off, when

21  people would send you renewal forms and you entered

22  the amount of the check into the software system,

23  whether it was the AS400 or the Eden software system,

24  the renewal form, what happened with that form?  You

25  said that you would keep it in a file or that Janice

1  is the only one that kept it in a file?

2    A.    So there's been variances.

3    Q.    Okay.

4    A.    And up until just recently we didn't keep

5  any of it.

6    Q.    Okay.  And when you say you didn't keep any

7  of it, do you mean that you shredded it?

8    A.    Yes.

9    Q.    Okay.  And then in approximately what date

10  did Janice take over handling the licensing?  In 2017

11  you said, but, like, around what time?

12    A.    They took it away I'm going to say

13  approximately July.

14    Q.    Okay.

15    A.    But then it was all pretty much reverted

16  back to me, because they didn't know how to do any of

17  it, any of the entering and all of that.  So I'm

18  helping now.

19    Q.    Okay.  But you're still doing it?

20    A.    Yes.  I believe they tried for one quarter

21  to figure it out and then I ended up --

22    Q.    Okay.

23    A.    -- doing it anyway.

24    Q.    So you're still doing all the licensing,

25  just not formally, officially?

1    A.    Yes.

2    Q.    Okay.  And we'll just go back through your

3  letter just to keep it organized the way that we said

4  that we would keep it organized, but there are some

5  topics that I want to touch back on here.

6        So you said that the renewal paperwork comes

7  to you with a payment.  And then you say you only

8  have an approximate date of when the renewal forms

9  were mailed to each brothel.  So I'm going to turn

10  our attention back to the dates that you sent us.

11        And you previously said that the dates under

12  "activity date," which I am currently pointing to the

13  brothel license renewal form for Love Ranch, but this

14  also applies to the rest of them, to Chicken Ranch,

15  to Sheri's, the format is exactly the same.  There's

16  an activity date with dates that are generated by the

17  Eden software, all of -- it looks like the name is

18  generated by the Eden software; is that correct?

19    A.    Yes.

20    Q.    And the description, is that also generated

21  by the Eden software?

22    A.    Yes.

23    Q.    The fee amount, you input that information

24  into the Eden software --

25    A.    Yes.

1    Q.    -- is that correct?

2        And then when you generated this report,

3  that fee amount came up automatically?

4    A.    Yes.

5    Q.    Do you have any way of going in and changing

6  those fees amounts once you input it?

7    A.    Yes.

8    Q.    You do?

9    A.    Yes.

10    Q.    What types of situation would you do that?

11    A.    When they have more brothel workers on the

12  floor, they have to pay different amounts.

13    Q.    Okay.  And are you able to change that

14  amount once the quarter is over?  So this fee amount,

15  is this what they actually paid or is this what they

16  owed?

17    A.    That's what they paid.

18    Q.    That's what they paid?

19    A.    Yes.  I don't change it until they pay me,

20  because they're the ones that know how many workers

21  they have on the floor.

22    Q.    So if you had a brothel that only paid half,

23  and then made another payment, the other half, but

24  made that payment say in the next quarter, would that

25  payment revert to the correct quarter or would you

Page 38

1  have to correct that in the system?
2      A.   It doesn't allow half payments.  It has to
3  be paid in full --
4      Q.   Okay.
5      A.   -- for however many workers they have.  It
6  can change, I mean, depending on their workers, but
7  it has to be paid in full.
8      Q.   And how does the county know how much each
9  brothel has to pay?
10     A.   It's going to be based on what the brothel
11  actually pays us.  We're relying on the brothel to
12  pay us what they owe.  They change them themselves.
13          MS. BRUCH:  The honor system.
14  BY MS. CAHILL:
15     Q.   What do you mean by that?
16     A.   There's a set fee --
17     Q.   Okay.
18     A.   -- for so many workers.  So however many
19  workers they have, they provide us that amount.
20     Q.   But you know how many workers they have
21  because you said earlier that the people who worked
22  there come in to get licensed here --
23     A.   No.
24     Q.   -- is that correct?
25     A.   No.

Page 39

1      Q.   No?
2      A.   I have no idea.
3      Q.   You have no idea how many workers they have?
4      A.   I only work on the banking side, so I got a
5  total amount of money.  That's all I have.
6      Q.   How do you know the total amount of money
7  then?  The brothel owners tell you?
8      A.   I'm banking on the total amount of money
9  that we have.
10     Q.   Sorry, could you explain that?  I don't
11  understand it.
12     A.   So right now the brothel workers all come
13  into Pahrump.
14     Q.   Uh-huh.
15     A.   So my supervisor handles the money down
16  there and provides me with a total amount for how
17  much money the brothel workers have paid.
18     Q.   Okay.  So because you're in Tonopah, you're
19  relying on a coworker here to tell you how many
20  brothel workers came in and paid their licensing
21  fees.  Is that -- do I have that correct?
22     A.   I'm not relying on anything because I'm just
23  doing the banking for how much money the sheriff's
24  office has received.
25     Q.   Okay.

Page 40

1      A.   I'm not spot checking how many brothel
2  workers are in the brothels.  I have no control of
3  that.
4      Q.   So literally all you do is somebody hands
5  you a check for a thousand dollars and then you enter
6  that information; is that correct?  The thousand
7  dollars I made up as an example, but they hand you a
8  check for an amount of money, you look at the check,
9  you enter what the amount is.  Are those all the
10  steps?
11     A.   Are you still talking the brothel workers
12  though?
13     Q.   Let me clarify.  I apologize.  When you're
14  doing your job, when you're taking -- when you're
15  calculating the brothel renewal fees, all you do is
16  look at the check?
17     A.   So the brothel renewal fees are
18  automatically generated out of the Eden system.
19     Q.   Okay.
20     A.   They're going to be generated with the
21  amount that was for the previous quarter that they
22  paid.  It's automatically going to revert to what
23  they paid from the quarter before.
24     Q.   Okay.
25     A.   Once the brothel -- once I got the check

Page 41

1  back, depending on what that check is, the amount of
2  that check is, that tells me how many they're paying
3  for.
4      Q.   Okay.  So there's absolutely no connection
5  in your software system between how many brothel
6  workers come in to get licensed and how much the
7  brothel has to pay each quarter?
8      A.   Correct.  There's nothing in there at all.
9  It's just strictly a licensing system for brothel,
10  liquor and gaming; brothel being the building, the
11  actual business.
12     Q.   Okay.
13     A.   Not the workers.
14     Q.   And I understand that you might not know the
15  answer to this, because it sounds like it's a little
16  bit outside of your responsibility now, but since you
17  did work on this side in the past, you previously
18  said that you would sometimes work at the front desk,
19  and brothel work -- people like brothel workers,
20  members of the public would come in to get their
21  licenses.  Do you have any idea where that
22  information goes when brothel workers come in to get
23  a license just based on your past experience working
24  with the public and at the front desk?
25     A.   What information are you asking about?

1    Q.    A brothel worker comes in, they want a
2  license.
3    A.    A work card?
4    Q.    A work card to be licensed to work at the
5  brothel.
6    A.    Okay.
7    Q.    The Eden software doesn't track that at all?
8    A.    No.
9    Q.    Nobody enters that information in?
10   A.    It would go in a different system than our
11 Eden system.
12   Q.    What system?
13   A.    Spillman is what we're working with right
14 now.
15   Q.    What kind of system is that?
16   A.    It's a system we use for everything.  The
17 dispatchers use it, records uses it, deputies do
18 their reports in it.
19   Q.    Okay.  So it's something that a lot of law
20 enforcement agencies use?
21   A.    Yes.
22   Q.    Okay.  And the Eden system is accounting?
23   A.    Correct.  And basically the county just uses
24 it, that I'm aware of.
25   Q.    The county uses it.  So when brothel workers

1  come in to get their permit, they also have to pay
2  money for that as well; is that correct?
3    A.    Yes.
4    Q.    Does the accounting for the workers go into
5  Spillman?
6    A.    I'm not sure.
7    Q.    But you know it doesn't go into --
8    A.    They put information in there.  I just don't
9  know what they put in there.
10   Q.    Okay.  But you know that the information
11 doesn't go into Eden?
12   A.    Correct.
13   Q.    Okay.  So this fee amount is automatically
14 generated by what the brothel owner paid previously?
15   A.    Yes.
16   Q.    And you rely on the brothel owner to update
17 you to let you know --
18   A.    Yes.
19   Q.    -- we have new workers and we're paying more
20 this time?
21   A.    Yes.
22   Q.    Okay.  So this last one where it says
23 approximate date renewal was mailed, did Eden
24 generate this?
25   A.    No.

1    Q.    Okay.  Did you create this?
2    A.    Yes.
3    Q.    When did you create this part of the
4  spreadsheet?
5    A.    When I got the records request.
6    Q.    Okay.  And is that common practice for you
7  if somebody sent you a records request and wanted to
8  know information that you didn't have, you would
9  create a spreadsheet for that member of the public?
10   A.    No.
11   Q.    No, okay.
12   A.    We don't normally do any type of creating of
13 anything.
14   Q.    Okay.
15   A.    However, we have the option to --
16   Q.    Okay.
17   A.    -- create by policy, if we feel it will help
18 or answer some questions.  We are not -- we don't
19 have it.
20   Q.    Okay.
21   A.    But we can.  So our Eden system did not
22 provide that date anywhere in there.  I couldn't
23 print it out from there at all.
24   Q.    So when you pulled the report from the Eden
25 system, did you copy and paste the first four

1  portions of the report into like a Word document?
2    A.    Into Excel.
3    Q.    Into Excel.  And then you created a new
4  table with the approximate dates?
5    A.    Yes.
6    Q.    Okay.  And since you said that you do not
7  keep -- that you didn't have any records to provide,
8  how did you come up with those approximate dates?
9  Was it from memory?
10   A.    Standard practice from when I was trained
11 was that we sent out renewals by the end of the
12 second week, no later than the end of the second week
13 of the month that they're due.
14   Q.    By the end of the second month?
15   A.    Or that they're going to expire I guess I
16 should say.  So the end of the second week of the
17 month they're going to expire.
18   Q.    So standard practice you never sent them out
19 earlier?  It was always by the end of the second week
20 of the month that they were going to expire?
21   A.    Those dates are just approximately.
22 Sometimes it would be before, sometimes it would be
23 after.
24   Q.    Okay.
25   A.    We tried to stick with no later than the

1   last of the second -- the end of the second week.
2   Daily events didn't always let that happen.
3       Q.   Okay.  I understand.  And you say that it
4   was standard practice the way that you were trained.
5   Is there a policy within the office or was it the
6   person who was training you to take over their job?
7   Like, what do you mean by that?
8       A.   It was the person training me that I took
9   over her job.
10      Q.   Okay.  So that was the way that that
11  particular person did it?
12      A.   Yes.
13      Q.   And she trained you how to do it?
14      A.   Yes.
15      Q.   What did that person end up doing?  Were
16  they leaving the sheriff's office or did that person --
17      A.   She retired after 30 years.
18      Q.   After 30 years?
19      A.   And she did them for 30 years.
20      Q.   She was an Admin Tech II as well?
21      A.   She was the assistant sheriff.
22           MS. BRUCH:  Off the record.
23             (Discussion off the record.)
24  BY MS. CAHILL:
25      Q.   So I'm now pulling out the forms so that we

1   can look at Sheri's Ranch, Chicken Ranch, Love Ranch,
2   and Alien Cathouse.  When you were preparing these
3   dates, it looks like all of the dates match for
4   Sheri's Ranch, Chicken Ranch, and Love Ranch, but not
5   for Alien Cathouse, is that correct, or is there all
6   of the dates for the approximate date the renewal was
7   mailed?
8       A.   The Alien Cathouse matches for the two
9   quarters that they were in business.
10      Q.   They're at the end there.  Okay, I see that.
11  And you always sent it out on the exact same day, the
12  renewal?
13      A.   Can you clarify what exact day?  The day
14  that's on the paperwork?
15      Q.   So I see here this is the approximate date
16  and I see that all the dates match.  Was it your
17  standard practice that you would always send them out
18  on the same date or are you giving me more of an
19  average?
20           MS. BRUCH:  So object as to form.  Are you
21  asking on the same date meaning that the renewals
22  went out to each of the brothels on the same day?  Is
23  that what your question is, or are you asking --
24           MS. CAHILL:  I'll rephrase it.
25           MS. BRUCH:  Okay.  Thanks.

1   BY MS. CAHILL:
2       Q.   So you have an approximate date here.  Is
3   this date, does this mean that this is about the date
4   where maybe -- so say, for example, around
5   December 15th, 2016, which is the first date there, I
6   sent out a bunch of renewals, but I sent them out the
7   week of the 15th, or whatever date that you actually
8   mailed it out, did you always send -- did you send
9   out the renewals for all the brothels on that same
10  day or were they scattered throughout the week?
11      A.   Everything was sent the same day.
12      Q.   Okay.
13      A.   I just can't answer which day that was.
14      Q.   That's fine.  So this is not an average?
15  This is not, "the week of the 15th I sent out one
16  renewal to Love Ranch, another, and then later that
17  week I sent it to Chicken Ranch?"  Everything was
18  sent out the same day?
19      A.   Same day.
20      Q.   Okay.  So those are the forms that you
21  turned over as part of the public records request.
22  And I will go ahead and put those aside, and we'll
23  continue moving through the paperwork.  And like we
24  said, we would stick with what we already had and
25  then we'll move to the paperwork that you guys

1   provided today.
2       A.   Okay.
3            MS. CAHILL:  So what I have here I'm going
4   to go ahead and mark as Plaintiffs' Exhibit B.
5              (Thereupon Plaintiffs' Exhibit B
6               was marked for identification.)
7   BY MS. CAHILL:
8       Q.   We'll go ahead and hand this to your
9   attorney.
10           Miss Stark, do you recognize that form?
11      A.   Yes.
12      Q.   Could you tell me what that form is?
13      A.   That is our automatic renewal notice that
14  prints out of our Eden system.
15      Q.   Who created that form before it was input
16  into the Eden system?
17      A.   The company?  The Tyler Eden company,
18  like --
19      Q.   Did the Eden system create that form or did
20  somebody in this office create the form?
21      A.   The Eden system.
22      Q.   Okay.  So the Eden system created that
23  invoice, or that renewal form?
24      A.   Yes.
25           MS. BRUCH:  So objection to form.  I just

1   need to make sure that she understands the question.
2   So are you talking about the template for the form,
3   who created that template, or are you talking about
4   who input the data that's on the form?  If you could
5   clarify please.
6   BY MS. CAHILL:
7        Q.   I will clarify.  Absolutely.
8             So I understand that this form is automatic,
9   you enter a report and that form then prints out from
10  the Eden system.  And I believe that you just said it
11  was owned by Tyler, which is not really relevant, but
12  just I want to be able to -- so did, to your
13  knowledge when you bought the Eden system off the
14  shelf, did Tyler create this form for your company to
15  use or did somebody in this office input the
16  information that they needed into the system?
17       A.   So Tyler is the one that put the information
18  in.
19       Q.   Okay.
20       A.   Based on information that I gave them.
21       Q.   Okay.
22       A.   As far as what would be -- I mean, I had no
23  idea when we were going through the licensing system
24  what the renewal would look like, but they would ask
25  me questions.

1        Q.   So you went through a wizard where a box
2   would come up and you would say, yes, I need the name
3   of the Nye County sheriff and I need this, you went
4   through and created the system by going through a
5   series of questions?
6        A.   Verbally though.
7        Q.   Verbally?
8        A.   Yes.
9        Q.   Okay.  So a representative met with you --
10       A.   Yes.  Yes.
11       Q.   -- and asked you what you wanted the form to
12  look like?
13       A.   Yes.
14       Q.   And you're the person that met with that
15  representative?
16       A.   Yes.
17       Q.   When was that?
18       A.   Don't remember.
19       Q.   Okay.  It was --
20       A.   2011.
21       Q.   Is it fair to guess that it was around the
22  time --
23       A.   Yes.
24       Q.   -- you adopted the Eden system?
25       A.   Yeah.

1        Q.   So this is the same renewal notice that you
2   guys have always used since 2011?
3        A.   Yes.
4        Q.   So you met with the Tyler representative and
5   you told him or her what you needed the renewal
6   notice to look like, or did somebody else in the room
7   also?
8        A.   Nobody told him what it needed to look like.
9        Q.   Okay.
10       A.   That is what they had in the system.  So all
11  we provided was, like, our address.
12       Q.   Okay.
13       A.   And basically they asked us what we needed
14  for payment information, you know, like what to put
15  in the system for payment information.  Like, if our
16  payments change, we can't -- we can't change -- we
17  can physically overwrite them to change them, but,
18  like, what prints out on the renewal --
19       Q.   Okay.
20       A.   -- that we have to go through them.  They
21  have to go in and actually make the changes for us.
22  So the form wasn't necessarily picked by me, and they
23  just said here's our renewal, you know, this will be
24  our renewal form, and we'll put your address on it
25  and do you want the seal on it.  And that's basically

1   it as far as the renewal form and here's what you're
2   going to get.  You have no other options.
3        Q.   So you didn't tell them this is what the
4   county needs?
5        A.   No.
6        Q.   They told you this is what we're giving you?
7        A.   This is what you get.
8        Q.   And at no point did you say, well -- at any
9   point during that interview, to your memory, did you
10  say the county needs X and the salesperson said
11  that's not possible?  Was there anything you
12  requested that they couldn't provide for you on this
13  form?
14       A.   No.
15       Q.   Okay.  All right.  So at the top of the form
16  there's the license number.  Is that the brothel
17  license number?
18       A.   Yes.
19       Q.   And the license description describes that
20  this is for a brothel license.  And the expiration
21  date, would you tell me what that is?
22       A.   The last day of the quarter.
23       Q.   Okay.  That's the last day of the quarter?
24       A.   Yes.
25       Q.   Okay.  And what does "activity number" mean?

1    A.   That's the number that generates when we
2  print out the renewals.  It gives it a number.  We do
3  a batch generation.  The computer generates a number,
4  that activity number.
5    Q.   Okay.  And is the activity number calculated
6  per brothel or is it random?  So 5701, would the
7  Chicken Ranch be activity number 5702 or would the
8  next renewal be 5702?
9    A.   I don't actually know.
10   Q.   Okay.  Something that you had never thought
11 about before?
12   A.   No.
13   Q.   Okay.  So the payment due date, that's when
14 the brothel payment is due right after that,
15 underneath expiration date where it says payment due
16 date?
17   A.   That's the date on the renewal.
18   Q.   Okay.  And that's automatically generated by
19 the quarter?
20   A.   Yes.
21   Q.   Okay.  And the total due, you said that's
22 generated based on what they paid the last time?
23   A.   Correct.
24   Q.   And the customer number I'm assuming is
25 unique to the Love Ranch brothel?

1    A.   Correct.
2    Q.   Okay.
3    A.   Computer generated when they first are
4  processed.
5    Q.   Now, the supplemental information where it
6  says 6 to 10 prostitutes, 11 to 25 prostitutes, now
7  you said that you have, on your end you have no way
8  of knowing how many sex workers are working at the
9  brothel at one time, that you are reliant on the
10 brothel owners to tell you how many workers are
11 working there?
12   A.   Yes.
13   Q.   Is that correct?
14   A.   Yes.
15   Q.   Okay.  But there's somebody at the county
16 that does know how many people have permits to work
17 there, but it's not entered into your system, it's
18 entered into this Spillman database, or you think
19 that it might be?
20        MS. BRUCH:  Objection, compound.  If you can
21 break that question down please.
22 BY MS. CAHILL:
23   Q.   Sure.  So the number of prostitutes here on
24 this supplemental information, that's generated based
25 off of the past report; is that correct?

1    A.   The past payment.
2    Q.   The past payment.  How does this information
3  get updated?
4    A.   By the brothel payment the following
5  quarter.
6    Q.   Okay.  So if they sent you a payment for
7  more money than the last time, you would then assume
8  that that meant they had more prostitutes working
9  there?
10   A.   Yes.
11   Q.   Would you go into the system and change this
12 information?
13   A.   Yes.  There's a checkbox that I can click to
14 change it.
15   Q.   Okay.  And you think that it could -- that
16 it's possible that somebody in Pahrump, when they're
17 licensing the sex workers here or they're giving them
18 the permits, that they're entering that information
19 into Spillman, so they're entering it into different
20 software?
21   A.   For the workers or?
22   Q.   For the workers.
23   A.   Yes.  Yes.
24   Q.   Okay.  And you have no access to Spillman or
25 do you have access to Spillman?

1    A.   I do.
2    Q.   Do you ever cross reference what's in
3  Spillman with what's in Eden?
4    A.   No, because all that's in Eden is the
5  brothels, not the workers.
6    Q.   Okay.  But do you use Eden for other types
7  of accounting or only the brothels?
8    A.   Only licensing.
9    Q.   Only licensing.  So liquor licensing?
10   A.   Yes.
11   Q.   Okay.  And the space underneath where it
12 says contacts, name, role, title, address, is that
13 for you to fill in or is that for the -- could you
14 just tell me what that is?
15   A.   It's for the individual that we mail it to
16 to fill in, but it's not required to be filled in.
17 It's just --
18   Q.   It's not required?
19   A.   No.
20   Q.   Okay.  So at the bottom of the form where it
21 says, "I am no longer conducting business in the city
22 as of" blank, could you tell me what this portion of
23 the form is for?
24   A.   If their business closed, they're supposed
25 to fill that out and sign it.

1  Q.  But only if the business closed?
2  A.  Correct.
3  Q.  Okay.  Have you ever -- okay.  That's fine.
4  So we are going to move forward with the next piece
5  of information that we already had.  So what I'm
6  giving you now will be marked as exhibit, Plaintiffs'
7  Exhibit C.
8          (Thereupon Plaintiffs' Exhibit C
9          was marked for identification.)
10 BY MS. CAHILL:
11 Q.  Okay.  Could you tell me what this form is?
12 A.  I can tell you what it is, but I didn't
13 generate it.
14 Q.  Okay.  And we'll get to that.  Could you
15 just tell me what it is?
16 A.  So it is an agenda form --
17 Q.  Okay.
18 A.  -- that is given to the county admin
19 department to put -- I can't even think of the word,
20 but a listing on for the meeting to put -- I can't
21 think of the word I want to use for it.  To put it on
22 the agenda, but there's a word, to put -- like place
23 a hold on a spot for us for an agenda item.
24 Q.  Okay.  So here it's checked off "action."
25 Would it be something like an action item?

1  A.  Yeah.
2  Q.  Okay.
3  A.  Basically we send in usually the form, and
4  then we have a week to send any backup that goes with
5  that, so it just kind of gives the admin heads up,
6  hey, we need to place it on the next meeting for this
7  action or this discussion.
8  Q.  Okay.  And so you were quick to say that you
9  didn't create this agenda information form.  Do you
10 know who did?
11 A.  I can tell you it's one of two people.
12 Q.  Okay.
13 A.  It's either going to be my supervisor, which
14 is Janice Maurizio, or Samantha Tackett, because she
15 was going to redo the agenda form that I gave her.
16 Q.  Samantha Packet?
17 A.  Tackett.
18 Q.  Could you spell that name for the --
19 A.  T-a-c-k-e-t-t.
20 Q.  Okay.  Thank you.  Have you seen --
21 A.  Actually, I could -- if I can go back, I
22 could tell you by the contact person who did it.  I
23 didn't realize that was on there.
24 Q.  Go ahead.
25 A.  So the contact person is Janice Maurizio, so

1  she did it.
2  Q.  Okay.  So whenever somebody fills in this
3  agenda form, the person that filled it out is listed
4  as the contact person?
5  A.  Yes.
6  Q.  Okay.  So let's go backwards a little bit
7  before we go through this form.  You did mention that
8  you used to have responsibilities that you do not
9  have at the moment.  Was it ever your responsibility
10 to create this agenda information form?
11 A.  Yes.
12 Q.  Okay.  And how long did you do that?
13 A.  Same amount of time.  Seven years.
14 Q.  Okay.  And this was one of the things that
15 Janice took over last year?
16 A.  Correct.
17 Q.  You did -- you did say earlier that even
18 though officially this responsibility has been taken
19 from you, that you are still, in fact, doing most of
20 the work.  Is this something -- is this one of the
21 things that you are no longer doing?
22 A.  So are you referring just to the licensing
23 side, because we do agenda forms for other things
24 besides licensing.
25 Q.  Okay.  So you do agenda forms for other

1  licensing but not for the brothels?
2  A.  No.  Right now Janice is doing most of the
3  forms, the agenda forms.
4  Q.  Okay.
5  A.  However, this particular one that she did,
6  they were provided an agenda form from me prior to
7  her redoing it.
8  Q.  So typically you create the agenda form?
9  A.  (Nods head.)
10 Q.  And but --
11     MS. BRUCH:  Is that "yes"?
12     THE WITNESS:  Yes.
13 BY MS. CAHILL:
14 Q.  This particular time you did the agenda form
15 but somebody else recreated it?
16 A.  Yes.
17 Q.  And that person was Janice?
18 A.  Yes.
19 Q.  Okay.  Had Janice ever done that before?
20 A.  No.  Recreated it?
21 Q.  Yes.
22 A.  No.
23 Q.  Looking at this form today, are there any
24 differences from what you created and from what
25 Janice changed it to?

1    A.  Yeah, she added stuff to it.

2    Q.  Okay.  So she added to the form, but she

3  didn't -- did she take anything away from the form?

4    A.  I couldn't answer that unless I had it in

5  front of me.

6    Q.  Okay.  Do you know what happened to the

7  original agenda form that you created?

8    A.  It would have been given to the admin

9  department --

10    Q.  Okay.

11    A.  -- when the stuff was turned in.

12    Q.  And is that something that you would

13  physically give to the admin department or that you

14  would email a scanned copy of?

15    A.  Email.

16    Q.  Okay.  So you sent it to the agenda

17  department and Janice added some stuff to the agenda

18  form?

19    A.  Yes.

20    Q.  What did she add?

21    A.  Looks like she added the last three lines.

22    Q.  So where -- so underneath where it says,

23  "complete description of requested action," is it

24  your testimony today that you drafted this first

25  part, "Attached, please find the list of existing

1  brothel renewals," is that what you wrote on the

2  form?

3    A.  Unless I was looking at it, I couldn't tell

4  you if she took something out or --

5    Q.  Okay.  That's fine.  But you know -- you

6  think that she definitely added the last three lines,

7  "per ordinance 5.4.190"?

8    A.  Yes.

9    Q.  Okay.  And then "these facilities have been

10  inspected"?

11    A.  Yes.

12    Q.  "It is the recommendation of NCSO staff"?

13    A.  Yes.

14    Q.  She added that?

15    A.  Yes.

16    MS. BRUCH:  Can we have a bathroom break?

17    MS. CAHILL:  Absolutely.

18    MS. BRUCH:  Thank you.

19         (A recess was taken.)

20              EXAMINATION

21  BY MR. RANDAZZA:

22    Q.  So you've previously testified that you sent

23  out the renewal form about two weeks before the

24  expiration period?

25    A.  Yes.

1    Q.  And just I'm looking at this.  I want to

2  flip to the most recent one.

3    So this -- do you want to mark that?  I'm

4  going to tear this out of this whole packet.

5    MS. CAHILL:  We'll leave it in.

6    MR. RANDAZZA:  Leave it in, okay.  So this

7  whole packet here, which you previously produced, and

8  we'll mark that as Exhibit D.

9         (Thereupon Plaintiffs' Exhibit D

10          was marked for identification.)

11  BY MR. RANDAZZA:

12    Q.  And I will put a bookmark in here for you to

13  flip to the most recent one.  So this is all of the

14  renewal notices that have been sent out.  Do you

15  recognize this?

16    A.  Yes.

17    Q.  And if we flip to this one, this is the most

18  recent one that you sent out; is that right?

19    A.  Does it say 7-1?

20    Q.  It does.

21    A.  Yes.

22    Q.  Do the brothels typically turn these forms

23  back in to you?

24    A.  No.

25    Q.  So it says at the bottom there's a signature

1  line on it, right?

2    A.  Yes.

3    Q.  And then there's a checkbox that says, "I'm

4  no longer conducting business in the city as of"

5  date, and then they would sign it?

6    A.  Correct.  Yes.

7    Q.  Now, this is just how I'm reading this, and

8  I want to know if you read it the same way, would I

9  turn this in only if I were ceasing to do business?

10    A.  The bottom part definitely would just be

11  filled out if you were going to be out of business.

12    Q.  Okay.

13    A.  As far as how I look at it.  But there

14  really is nothing on that sheet to tell you what to

15  do with it.

16    Q.  Okay.  So the brothels just send a check?

17    A.  Most of them.

18    MS. CAHILL:  You say "most."

19    THE WITNESS:  It's sporadic.  Sometimes

20  they'll include a copy, sometimes not.

21    MS. CAHILL:  Of that form?

22    THE WITNESS:  Yeah.  Just like -- just like

23  a photocopy of it.

24    MS. CAHILL:  But they only sign it if

25  they're going out of business?

1    THE WITNESS:  That's what it should be used
2  for.  I know I have some, not just maybe on the
3  brothel side, but I've seen signatures down there for
4  on the liquor and gaming side as well here and there.
5    MS. CAHILL:  Okay.
6    THE WITNESS:  Not consistently.
7  BY MR. RANDAZZA:
8    Q.   There's a number of other printouts here
9  that came with this and I...
10    A.   You can't...
11    MS. BRUCH:  Oh, come on, man.  You can't
12  read that?
13  BY MR. RANDAZZA:
14    Q.   I thought it was my age and my eyes, given
15  that we have some young ladies here that probably
16  have better vision.  Can you tell me what that is?
17    A.   So what that is is I provided a screen
18  shot --
19    Q.   Okay.
20    A.   -- of the Eden screen where I receipt the
21  payment.
22    Q.   Okay.
23    A.   Basically the two -- the one side just has
24  the brothel name, the address, the owner's name, the
25  contact name, the licensee, the actual licensee.  And

1  the first side over there has just the activity, I
2  guess, the screen shot of the activity where it is
3  only really going to show on this how much they paid.
4  And then it provides on the top, or halfway through
5  it provides the activity date and the payment due
6  date, the 7-1, 7-1.  But because it was a screen
7  shot, it would not allow me to enlarge it.
8    Q.   Okay.
9    A.   And I was just trying to provide whatever I
10  could.
11    Q.   Okay.
12    A.   It's really hard to read.
13    Q.   Yeah.  I'm just trying to figure out what
14  information is in it.  Is the date the check is
15  received in this?
16    A.   No.
17    Q.   Okay.  So this you've said is the form.
18  You've authenticated this is the form that you sent
19  out?
20    A.   Yes.
21    Q.   Nobody sends those in; once in a while
22  somebody does?
23    A.   Right.
24    Q.   So does the office consider them to be
25  relevant to the renewal or irrelevant?

1    A.   Irrelevant.
2    Q.   Okay.  And if I skip forward in this packet,
3  I have a number of deposit slips.  Do you fill these
4  out?
5    A.   Yes.  I should say some of them.  Some of
6  them are probably Janice down in my southern office.
7    Q.   So the last one here -- these come in
8  quarterly?
9    A.   Yes.
10    Q.   So every quarter you send out one of those
11  notices?
12    A.   Yes.
13    Q.   This one here says for -- can you read what
14  it says on there?
15    A.   Yes.  "For activity date 7-1 of '18."
16    Q.   Is that your writing?
17    A.   Yes.
18    Q.   So this is for July 1st?
19    A.   Yes.
20    MS. BRUCH:  I don't know if -- I don't think
21  you were sitting here when LaTeigra and I went
22  through this, but this right here, those are the four
23  checks for this quarter, because you said there's no
24  check --
25    MR. RANDAZZA:  Right.

1    MS. BRUCH:  -- attached and there was no
2  check to the packet, but those are the four checks
3  for this quarter.
4    MR. RANDAZZA:  Okay.  So I have here the
5  check for this quarter.  Let us --
6    MS. CAHILL:  We can mark that as Exhibit E.
7    MR. RANDAZZA:  Yeah, we'll mark that.  Are
8  there two from the Cherry Patch?  Or these are --
9    MS. BRUCH:  No, it's two copies.
10    MR. RANDAZZA:  Two copies, okay.  So the
11  relevant one I've got here is for the Cherry Patch.
12  Mark that.
13    (Thereupon Plaintiffs' Exhibit E
14    was marked for identification.)
15  BY MR. RANDAZZA:
16    Q.   So what's the date on that check?
17    A.   June 28th, 2018.
18    Q.   Okay.  So we have a June 28th check.  We
19  have a July 1st activity date?
20    A.   Correct.
21    Q.   So do we have --
22    MS. CAHILL:  No, I apologize, Ms. Bruch, but
23  did you give us two copies of these?
24    MS. BRUCH:  Yes.  They're right here.  So
25  here's one copy, and that's the same thing right

1 there.

2        MS. CAHILL: Okay. So I want you to be able

3 to keep track of what we're giving, since we didn't

4 have them before.

5        MS. BRUCH: I've got it right here in front

6 of me. I have a copy.

7 BY MR. RANDAZZA:

8    Q. All right. So put that with that.

9       So do we have anything here that indicates

10 that the check came in after July 1st?

11    A. No.

12       MS. BRUCH: Are you -- I'm sorry, object to

13 form. Are you saying is there anything on these

14 papers that indicate that?

15 BY MR. RANDAZZA:

16    Q. Have you turned over anything that indicates

17 that, that it came in after July 1st?

18    A. No.

19    Q. To the best of your knowledge is there

20 anything left that hasn't been turned over that would

21 indicate that?

22    A. For all of them or --

23    Q. I'm only really concerned about the Cherry

24 Patch.

25    A. Yes.

1    Q. Okay. Is there a reason that hasn't been

2 turned over?

3    A. It was just a conversation that I had with

4 the accountant.

5    Q. Okay. Can you provide me a copy of that?

6    A. Not right this second, but I can.

7       MS. BRUCH: Well, you say it was a

8 conversation as if there was a document.

9       THE WITNESS: There's an email.

10       MS. BRUCH: Oh, okay. News to me.

11 BY MR. RANDAZZA:

12    Q. And, okay, so is that not responsive to our

13 document request?

14    A. Not really. I wouldn't have -- it was -- I

15 just had sent him an email asking if he was still

16 over the payments and questioned why we hadn't

17 received it yet.

18    Q. Okay. So it was --

19    A. It was just a general, "hey, I've receipted

20 all these and I don't see yours," and the courtesy of

21 "where is yours."

22    Q. Okay.

23    A. So...

24    Q. So the check dated 28th might have arrived

25 after the 1st?

1    A. Yes.

2    Q. And did any of the other checks arrive after

3 the 1st?

4    A. I can't honestly answer that. I can

5 estimate it, but just -- but I can't do by mail. I

6 mean, I can't say for sure. I mean, all I would be

7 doing is giving you like a week timeframe from the

8 date of the check, but that's very vague.

9    Q. Okay. So you could vaguely tell me that

10 every one of these checks took about a week to get

11 in?

12    A. Other than one. I can tell you the Sky

13 Services, the exact date of the check is the date

14 that it was in the sheriff's office front office in

15 our hands.

16    Q. Which one is Sky Services?

17    A. That's the only one I know for positive.

18    Q. The one above it?

19    A. Yeah.

20    Q. Okay. And why do you know that?

21    A. Because they called me while he was in the

22 office writing the check.

23    Q. Okay.

24    A. To make sure what amount he owed.

25    Q. Okay. And that's dated 6-25. I'm sorry,

1 June 28 or June 25th?

2    A. June 25th.

3    Q. Okay. So that's dated June 25th.

4       MS. BRUCH: Can I, just for a second? The

5 email that you're talking about, can you access that

6 here? Is it on a computer that you can access here

7 today or is it printed out somewhere? I'm just

8 wondering if you have access to it, if you can get it

9 for them.

10       THE WITNESS: I can see if I can use one of

11 their computers and see.

12       MS. BRUCH: Okay. Do you want to take a

13 break and see if she can do that?

14       MR. RANDAZZA: Sure.

15       MS. CAHILL: Yeah.

16       MS. BRUCH: Okay. Thanks.

17       (A recess was taken.)

18       MS. CAHILL: Let's go back on the record.

19 BY MR. RANDAZZA:

20    Q. So we went off the record because there's

21 apparently an email relevant to this discussion but

22 we don't have it, but we're going to try to get a

23 hold of that?

24    A. Yes.

25    Q. Okay. And but so in the records we have

1  here, everything says that it came in on time, but
2  this email says it didn't?
3     A.   The email was a courtesy email, because I
4  work well with the accountant.  And when I spot
5  checked on that particular day, I noticed I had all
6  the rest of the payments --
7     Q.   Okay.
8     A.   -- and didn't have that one.  So I -- it's
9  not a standard that we do that, I just called and
10  said -- or didn't call, I emailed and said, "hey, you
11  still over these, because I haven't got it yet."
12     Q.   Okay.  And so given that it was sent on the
13  28th, it would -- and what day was the email?
14     A.   That would have been the 3rd.  And in that
15  email I think there's three lines I asked him.  "Are
16  you still over the payments for Dennis Hof's
17  brothels," and he said yes.  "Is it still 4375, can
18  you provide me a copy of the liquor license and I
19  will mail payments today."  And it would be dated
20  7-3.
21     Q.   Okay.  But it's dated the 28th?
22     A.   The check's dated the 28th.  My email is
23  dated 7-3.
24     Q.   Okay.  So and the records here don't reflect
25  when it came in?

1     A.   And I didn't even -- I should have probably
2  wrote it down but we didn't -- we didn't have to keep
3  track of all that stuff at that point.  We didn't
4  really keep track of when they came in.
5     Q.   You didn't really keep track of when
6  payments came in?
7     A.   Correct.
8     Q.   Ever?
9     A.   Ever.
10     Q.   So has this happened with other brothels in
11  the past?
12     A.   What?
13          MS. BRUCH:  Thank you.
14          THE WITNESS:  Has what happened?
15  BY MR. RANDAZZA:
16     Q.   That you've emailed them and said, hey,
17  where's your check?
18     A.   Honestly, no.  And probably only because
19  I've always been close contact with Mr. Potter.
20     Q.   Mr. Potter being?
21     A.   Tom Potter, the accountant.
22     Q.   Oh, the accountant for my client?
23     A.   Yes.
24     Q.   Okay.  So when other checks have not been
25  there on time, you haven't emailed anybody?

1     A.   No.
2     Q.   Okay.  So you did him a solid by saying,
3  hey, your check's late?
4     A.   Yes.
5     Q.   Okay.
6          MS. CAHILL:  But other brothels have not
7  sent in their checks on time?
8          THE WITNESS:  Can I ask what you consider
9  "on time"?
10  BY MR. RANDAZZA:
11     Q.   Why don't you tell us what you consider on
12  time, because we don't know what's on time.  The
13  county knows what's on time.
14     A.   Okay.  So the proper way for me to answer
15  that is we don't have cutoff dates.  Never have had
16  cutoff dates on any of the licenses.  As far as,
17  like, going from how I was trained to the way we ran
18  business, if that's how you want to say it, we took
19  payments whenever the payments came in.
20          The system doesn't generate late fees.  We
21  don't have a system -- I'm not saying -- it's capable
22  of it, but we don't do that.  Haven't done it.  Still
23  don't do that.  So they're accepted whenever we get
24  them.  So I don't know how to answer it was on time
25  because I can go by the expiration date, but I can't

1  really give you an honest answer.
2          MS. BRUCH:  So I guess it's objection, calls
3  for a legal conclusion.
4          Go ahead.
5  BY MR. RANDAZZA:
6     Q.   I'm sorry, please finish your answer.
7     A.   I just can't give you, like, an absolute
8  answer of throughout the seven years I've done it
9  whether I've had them all prior to the expiration
10  date or whether some of them have been after, that
11  type of thing.
12     Q.   Okay.
13     A.   Because we've accepted them whenever they
14  came in.
15     Q.   Okay.  So what you're saying is your pattern
16  and practice has been --
17     A.   Yes.
18     Q.   -- that it doesn't matter when they get
19  there?
20     A.   Correct.
21     Q.   Except for this time?
22     A.   It didn't matter to me.
23     Q.   Okay.  Did it ever matter to the
24  commissioners?
25     A.   Not that I'm aware of.

1    Q.   Only this time?

2    A.   Correct.

3    Q.   Are you aware of the sheriff's office ever

4  recommending that a license not be renewed?

5    A.   Not that I can ever think of, unless it's

6  something Janice and the sheriff have done that I was

7  no part of, but not that I would have anything to do

8  with.

9         I personally go in with a list the whole

10 time I had it and ask for renewal of all of them.

11 They may have -- the commissioners may have

12 questions, you know, or say, hey, we want to check on

13 this one, but it was never not renewed.

14   Q.   Do you go to all the quarterly renewal

15 meetings?

16   A.   I did, prior to Janice taking them over.

17   Q.   Janice?

18   A.   Maurizio, my supervisor taking over the

19 licensing.

20   Q.   Okay.

21   A.   So for a short period when she thought she

22 was going to do them, I didn't go to the meetings;

23 however, I usually listen to them in my office.

24   Q.   Did you go to the last one?

25   A.   Yes, I did.

1    Q.   Was there anything unusual about it?

2    A.   I'm not quite sure how to answer that one.

3  I mean, unusual being I didn't -- I didn't know

4  anything that was -- that took place in that meeting,

5  if that's what you're asking.  I didn't know prior to

6  that meeting any of it that took place.

7    Q.   Well, how many meetings had you gone to or

8  listened to before this one?

9    A.   Almost all of them in the seven years that

10 I've been there, so two a month, so...

11   Q.   Two a month?

12   A.   There's two a month.  There's two a month

13 and 12 months in a year, so however many that is.

14 I'm not a mathematician.

15   Q.   Gosh, I'm not either.  Did you have to make

16 me look bad like that?

17   A.   I mean, I've -- I'm sure -- I know.

18   Q.   I'm going to take out the calculator.

19   A.   It might not be all of them.  I mean, I

20 might have been off for...

21   Q.   Seven years?

22   A.   Yes.

23   Q.   Times 12 months is 84 --

24   A.   Okay.

25   Q.   -- months.  Two a month?

1    A.   Two, yeah.

2    Q.   Times two.  So you've been to -- been to or

3  listened to about 168 meetings?

4    A.   Yes.

5    Q.   Is that renewal meetings?

6    A.   No, the renewals are only once a year.

7    Q.   Okay.  That's what I was trying to get at.

8    A.   Okay.  Sorry.

9    Q.   I meant these.  So they're not quarterly

10 renewal meetings?  I thought we said earlier they

11 were quarterly, not annual?

12   A.   The renewals are quarterly.

13   Q.   Okay.

14   A.   But I only approach the board one time a

15 year to do a whole listing of renewals, and it's like

16 an automatic renewal, because our fiscal year runs

17 from July to June.

18   Q.   Okay.

19   A.   So at the end of June we start a new fiscal

20 year.

21   Q.   Okay.

22   A.   And at the beginning of that year, I have to

23 provide a list of renewals that, automatic renewals

24 for people that I know have paid and they're still in

25 business and that sort, and then I have to provide

1  that list.

2    Q.   Okay.  So the checks come in every quarter?

3    A.   Yes.

4    Q.   Tell me if I'm wrong here, or if I'm right.

5  The checks come in every quarter?

6    A.   Yes.

7    Q.   The county doesn't really care when?

8    A.   Correct.

9    Q.   And then at the end of the year, you bring

10 all of that to an annual meeting to simply say

11 they've renewed these four quarters this year?

12   A.   Correct, because I provide them with a list

13 of fees on that renewal list --

14   Q.   Okay.

15   A.   -- of what I've collected for the fiscal

16 year.

17   Q.   Okay.  So there are quarterly renewals but

18 one annual renewal meeting?

19   A.   Yes.

20   Q.   Sort of a summary of what happened in the

21 year?

22   A.   Yes.  And I probably should say you could

23 ask if the county cared.  I don't know that I could

24 say the county cared or not cared.  The sheriff's

25 office, who accepts the payment, is would be the ones

1  that wouldn't care.  I mean, we've accepted the
2  payments all along.  So the county wouldn't know
3  through any of the -- each quarter when we actually
4  receive the check.
5      Q.   Okay.
6      A.   The actual county as whole I guess is where
7  I'm going with that.
8      Q.   So it's safe to say if the check comes in
9  before the end of the quarter, they're good?
10     A.   Yeah.
11     Q.   So you've been to seven of these annual
12  meetings?
13     A.   Yes.
14     Q.   Have you ever been to one where the brothel
15  owners attend?
16     A.   No.
17     Q.   The brothel owners never attend that annual
18  meeting?
19     A.   No.
20     Q.   There's no requirement that they do so?
21     A.   Not that I'm aware of.
22     Q.   So in your seven years of seeing these
23  meetings, did anything about this meeting seem
24  unusual as compared to the other six?
25     A.   Not knowing what was going to happen was

1  unusual.  I mean, usually when I provide my renewal
2  list, they all go through.  So they pulled two of
3  them at that particular meeting, and apparently the
4  sheriff knew about one of them, but I didn't know
5  about that one either.  So as far as them pulling
6  them, that would be unusual for any of the meetings
7  I've gone to in the past.
8      Q.   I'm sorry, pulling?  Pulling, what is
9  "them"?
10     A.   The two brothels that they actually pulled
11  during this last meeting, they shut down the Love
12  Ranch and had some stipulations on Sheri's.  I can't
13  remember what they all were.
14     Q.   Did you create agenda forms for this
15  meeting?
16     A.   Yes.
17     Q.   Were they the same as the agenda forms that
18  were used on the August 7th meeting?
19          MS. BRUCH:  I think that was what -- that
20  line of questioning LaTeigra asked.
21          THE WITNESS:  If this is the one that was
22  used, then no.
23  BY MR. RANDAZZA:
24     Q.   Okay.
25     A.   But I don't know which one they had.

1      Q.   Okay.  So this, Exhibit C, is the one that
2  you created or the one they used?
3      A.   It's not the one I created; however, I don't
4  know if they used this one and provided this one to
5  anybody.  I'm not sure on their end how they -- I
6  don't know who sees it.  I mean, when I give my
7  agenda form to the admin girls to put it on there, I
8  don't know if it goes any farther than that.  I don't
9  know if all the commissioners or whatever get it.  I
10 really don't know.
11     Q.   Okay.
12          MS. CAHILL:  Well, it's published on the
13 website.  Do you know when it's published on the website?
14          THE WITNESS:  No, I don't.
15          MS. CAHILL:  Okay.
16          THE WITNESS:  I don't.  I didn't even know
17 the forms were published on there either.  Just when
18 I thought I knew everything, right?
19 BY MR. RANDAZZA:
20     Q.   So you said that the forms were mailed to
21 the brothels on different dates; is that right?
22          MS. BRUCH:  I don't think that's what she
23 testified to.
24 BY MR. RANDAZZA:
25     Q.   Okay.  Is that true?

1      A.   No.
2      Q.   Okay.  So you mailed them all out on the
3  13th of June?
4      A.   Yes.  Well, I can't say exact date, that's
5  the problem.  But I mailed them all on the date, and
6  that approximate date, they all go together.  I go
7  in, I do a great big batch generation of every single
8  license for the county and I mail them all out that
9  same day.
10     Q.   Okay.  So it could have been the 13th?  It
11 could have been later?
12     A.   Yes.
13     Q.   But everybody got them sent out on the same
14 day?
15     A.   Yes.  Our mail goes out at 2:00, 2:30 in the
16 afternoon, so I do it first thing in the morning and
17 put them out as a whole batch.
18          EXAMINATION
19 BY MS. CAHILL:
20     Q.   I do have some follow-up questions on the
21 agenda form, since we were just on that topic.  If
22 you turn the page, the Nye County licensing board
23 with the amounts, who created -- who put in -- who
24 created this part of the agenda form?
25     A.   I did.

1    Q.   Okay.  So all of this you put in?
2    A.   Yes.
3    Q.   When did you create this?
4    A.   I don't have the actual cutoff date for when
5  the agendas go in --
6    Q.   Okay.
7    A.   -- in my head.  It would have been provided
8  to them --
9    Q.   Okay.
10   A.   -- the deadline before this date.  There's,
11 like, a two-week deadline.  I just don't remember
12 what it was.  I'm going to -- it's usually a couple
13 weeks before the meeting.
14   Q.   Okay.  So mid July?
15   A.   Yeah.
16   Q.   And turning to the next page on the exhibit
17 where it says "renewal procedure," did you also put
18 this into the form?
19   A.   No.
20   Q.   Do you know what this is?
21   A.   Yeah, that's the renewal procedures for the
22 liquor licenses.
23   Q.   Okay.  How did this get attached to this
24 agenda form?
25        MS. BRUCH:  Objection, calls for

1  speculation.
2  BY MS. CAHILL:
3    Q.   Okay.  So you did not include this.  Have
4  you ever seen this before?
5    A.   Yes.
6    Q.   When did you see it previously?
7    A.   It's our county codes, so we commonly look
8  at them for our licensing stuff.  There's a license
9  chapter in here.
10   Q.   Okay.  And this Nye County information, this
11 Nye County agenda information form is specifically
12 only for the brothels; is that correct?
13   A.   That's correct.
14   Q.   And this Nye County Code that refers to a
15 renewal procedure, you have -- it's your testimony
16 that you have absolutely no idea why this was
17 included with the agenda for the brothels?
18   A.   Correct.
19   Q.   And you don't know who included it?
20   A.   I don't.
21   Q.   Okay.
22        MR. RANDAZZA:  Let's take a break here for a
23 second.
24        MS. CAHILL:  Okay.
25            (A recess was taken.)

1  BY MS. CAHILL:
2    Q.   Let's go back on the record.  So I actually
3  just have a couple more topics that we want to cover
4  with you.
5        MS. BRUCH:  Topics or questions?  Come on,
6  man.
7  BY MS. CAHILL:
8    Q.   It actually won't take that much longer.  So
9  going back to that letter that you sent us, you said
10 you specifically referred to the renewal paperwork.
11 You said, "the renewal paperwork comes to us with the
12 payment."  Is it your testimony today that form, that
13 Exhibit B, that renewal notice, is that the renewal
14 paperwork you're referring to?
15   A.   Yes.
16   Q.   Is there any other renewal paperwork that
17 you didn't produce here today?
18   A.   No.
19   Q.   Okay.  So that's the only renewal form?
20   A.   Yes.
21   Q.   Okay.  So let's go ahead and take a look at,
22 because I promised your attorney we would go through
23 everything that you guys produced.
24        MS. BRUCH:  Oh, I just wanted to make a
25 record so the judge knows what I gave you.

1        MS. CAHILL:  Oh, I'm not going to go through
2  every page, but I at least want to touch on what we
3  actually have here.
4        So the first thing that we handed over to
5  you that we marked as exhibit -- I believe it was --
6  that whole packet was D.
7        MS. BRUCH:  D, and I don't know what
8  happened to it.
9  BY MS. CAHILL:
10   Q.   So it's Exhibit D, and this is for the Love
11 Ranch.  So this is a copy of the renewal form.  It
12 says from January 1st, 2017, and there's no signature
13 down there.  And to your knowledge you don't have a
14 copy of this with a signature on it?
15   A.   No.
16   Q.   Okay.
17   A.   Those were just copies generated from the
18 computer of what I actually sent.
19   Q.   These are copies generated from the
20 computer --
21   A.   Yes.
22   Q.   -- what you actually sent?
23   A.   That's a reprint.
24   Q.   Okay.  So if somebody had signed this and
25 sent it back to you, would the computer have a record

1  of that?

2      A.   No.

3      Q.   Okay.  If somebody signed this and sent it

4  back, what happens to that form now?

5      A.   It gets shredded.

6      Q.   It gets shredded, okay.  All right.  Then I

7  don't have additional follow-up questions on that.

8  The rest of what's in this packet, so there's copies

9  of the renewal form.  These are screen printouts from

10  the Eden system; is that correct?

11     A.   Yes.

12     Q.   And we all agree that they are very

13  difficult to read, so I will not scrutinize them

14  here.

15          The next part of the packet, these are all

16  deposit slips; is that correct?

17     A.   Yes.

18     Q.   And you said sometimes it's you that brings

19  in the deposit slip and sometime it's Janice?

20     A.   Janice, correct.

21     Q.   Okay.  And when it says here "for activity

22  date," whoever write that here always writes the

23  quarter?

24     A.   Correct.

25     Q.   When was this -- did you write this here?

1      A.   Yes.

2      Q.   And did you write it here while you were

3  making copies for us for the --

4      A.   Yes.

5      Q.   -- production?

6           Okay.  So this is not a copy somewhere in

7  the office.  What this is is a copy of the actual

8  slip?  Let me rephrase that question.  So this form

9  that you turned over, this copy that you turned over

10  to us that says "for activity date 4-1-17," that is

11  not a copy of a record where somebody wrote that,

12  this is a copy of this deposit slip and then you

13  wrote "activity date 4-1-17"?

14     A.   Yes.

15     Q.   Okay.  And is that true for all of these

16  deposit slips?

17     A.   Yes.

18     Q.   Okay.  So turning over to the Chicken Ranch

19  packet, which we will mark as Exhibit F.

20          (Thereupon Plaintiffs' Exhibit F

21           was marked for identification.)

22     MS. BRUCH:  You've got two copies there.

23  BY MS. CAHILL:

24     Q.   Okay.  This is the Sheri's and this is the

25  Love Ranch.  Oh, I see.  Thank you very much.

1           Okay.  So this is for the Chicken Ranch, and

2  again it's your testimony today that this is a copy

3  that you generated from the computer today?

4      A.   Correct.

5      Q.   This is not a copy of anything that the

6  Chicken Ranch submitted?

7      A.   Correct.

8      Q.   And the deposit slips and the screen

9  printouts, this is all -- these are all documents

10  that you generated today in response to the motion

11  for discovery, or the order for discovery?

12     A.   Okay.

13     MS. CAHILL:  Do we have a copy of the,

14  second copy of this check?

15     MS. BRUCH:  Yeah.  I think this one is -- I

16  think this is both pages right there, because it was

17  a two-page document but you all took it apart.

18     MS. CAHILL:  And you said that we had a copy

19  of this one?

20     MS. BRUCH:  Yeah.  I gave you two copies of

21  each thing.

22  BY MS. CAHILL:

23     Q.   Yes.  All right.  I'm going to turn to the

24  Sheri's Ranch packet.  This is going to be marked as

25  Exhibit G.

1           (Thereupon Plaintiffs' Exhibit G

2            was marked for identification.)

3  BY MS. CAHILL:

4      Q.   Okay.  So this same -- this is the Sheri's

5  Ranch.  Your testimony here is the same, that you

6  printed these renewal notices from the computer today

7  in response to the notice.  These are not records

8  that you keep at the office?

9      A.   Yes, that's right.

10     MS. CAHILL:  Okay.  And the last one will be

11  the Alien.

12          (Thereupon Plaintiffs' Exhibit H

13           was marked for identification.)

14  BY MS. CAHILL:

15     Q.   We're marking this as Exhibit H, the Alien

16  Cathouse.  Your testimony here is the same, there's

17  nothing different about how these copies were

18  generated?  These were all produced today?

19     A.   Correct.

20     MS. CAHILL:  Okay.  I don't have any other

21  questions.  Do you have any follow-up, Marc?

22     MR. RANDAZZA:  Can I go home?

23     MS. BRUCH:  Do you mind, because I gave you

24  a two-page document and you've only marked one page

25  of it, but can we make sure that -- I just want the

1  record to reflect that it was a two-page document.
2  So if you want to mark the whole thing with both
3  pages, and here's your second page.
4       MR. RANDAZZA:  Yeah, I only felt like that
5  page was relevant, but I don't have any problem.
6       MS. BRUCH:  I just want -- all I'm trying to
7  do is make sure there's a record of what I produced,
8  so wherever the top page is.
9       MS. CAHILL:  So we'll go ahead and mark that
10 as Exhibit I, even though it's a little out of order.
11 So Exhibit I is a reflection of the other two checks.
12            (Thereupon Plaintiffs' Exhibit I
13            was marked for identification.)
14       MS. CAHILL:  Okay.  Any follow-up, Marc?
15       MR. RANDAZZA:  No.
16                 EXAMINATION
17 BY MS. BRUCH:
18    Q.   I just want to clarify, and I apologize if
19 these are -- if these questions have already been
20 asked, but I just need to make sure I understand.
21       On July the 3rd you had a conversation --
22 you had an email exchange with Mr. Potter who's the
23 accountant for Love Ranch, correct?
24    A.   Yes.
25    Q.   And why is it that you contacted Mr. Potter

1  by email?
2     A.   Because while I was spot checking my license
3  payments, I noticed that I hadn't received his check
4  yet.
5     Q.   Okay.  So on July the 3rd you had not
6  received his check?
7     A.   Yes.
8     Q.   On July the 3rd, had you received the other
9  three checks?
10    A.   Yes, because I had -- that's -- I was spot
11 checking them and I had them all.
12    Q.   So you don't know if you got them before or
13 after 6-31, all you know is that on 7-3 you did not
14 have the Love Ranch check, but you had the others?
15    A.   Yes.
16       MS. BRUCH:  Okay.  That's all I have.
17                 EXAMINATION
18 BY MR. RANDAZZA:
19    Q.   Did you have the others on the 2nd of July?
20    A.   I'm not for sure, because I didn't even get
21 into the licensing system that day.  I was tied up on
22 a project that -- and that's why I didn't get to it
23 until the 3rd or I probably would have called on, or
24 emailed him on the 2nd at that point.
25    Q.   So for all you know they all came in on the

1  morning of the 3rd?
2     A.   No, they wouldn't have come the morning of
3  the 3rd because I already had them processed in the
4  computer --
5     Q.   Okay.
6     A.   -- when I was spot checking them.
7     Q.   Okay.
8     A.   So I would have already had them, and I
9  didn't get into the system on the 2nd.
10    Q.   So all you know is ours was last but you
11 don't know if ours was the only one that was late?
12    A.   As far as expiration date with being 6-30?
13    Q.   If that's -- I guess we established earlier
14 that --
15    A.   Right.
16    Q.   -- we're not even sure what that date is --
17    A.   Right.
18    Q.   -- is that right?
19    A.   Yeah.
20    Q.   Okay.
21    A.   So, yeah.
22       MS. CAHILL:  So you don't know if you
23 received any on the 1st?
24       THE WITNESS:  I don't, because it's a
25 weekend, so...

1        MR. RANDAZZA:  No further questions.
2        MS. CAHILL:  Thank you.
3        MS. BRUCH:  Thank you.
4        MR. RANDAZZA:  Can we get a -- how
5  quickly -- we have a hearing tomorrow.  It's probably
6  unrealistic to expect a transcript by tomorrow, or is
7  it?
8        MS. BRUCH:  The answer to that is "yes."
9            (Discussion off the record.)
10       MR. RANDAZZA:  Is it even physically
11 possible to get it overnight?
12       THE REPORTER:  Yeah.
13       MR. RANDAZZA:  Can we do that, please?
14       THE REPORTER:  I can have it to you by
15 morning.
16       MR. RANDAZZA:  Our hearing is at 10:00.
17       THE WITNESS:  I probably need to change that
18 last question.
19       MS. BRUCH:  Okay.  Okay.  Go ahead.
20       She wants to change her --
21       THE WITNESS:  Because it's not going to
22 match with what I previously said.  So the 30th is a
23 weekend.  I wouldn't normally know if I got them, but
24 then the 2nd I didn't get in the system at all, and
25 I'm the only one processing the payments.  So when I

1  got it in there on the 3rd, they were all processed
2  already.
3          MR. RANDAZZA:  Okay.
4          THE WITNESS:  Prior to the 30th.  So my
5  answer would be I can say I didn't get any on the
6  30th.
7          MS. BRUCH:  So we're talking about -- I just
8  want to make sure we're all on the same page with
9  what days of the week.  So we're talking about June
10 of 2018, right?
11         THE WITNESS:  Uh-huh.
12         MS. BRUCH:  Okay.
13         MR. RANDAZZA:  So you mean none came on the
14 30th?
15         THE WITNESS:  Right, because --
16         MS. BRUCH:  That was a Saturday.
17         THE WITNESS:  I had already had the three
18 brothel payments posted prior to me getting into the
19 system on the 3rd, 2nd being a Monday, and I did not
20 even get in the system on that Monday.
21         MR. RANDAZZA:  And you're the only one who
22 puts the checks in?
23         THE WITNESS:  Yes.  Yeah.  So and also I was
24 out on annual leave on the 29th, so I would have had
25 to process them even the day before that.

1          MR. RANDAZZA:  But you didn't keep a record
2  of that?
3          THE WITNESS:  No.
4          MS. CAHILL:  So nobody, when you're out,
5  nobody goes into the system and does the data entry?
6          THE WITNESS:  No.
7          MS. CAHILL:  So is it your testimony that
8  you -- when did you do the data entry for the checks
9  then?
10         THE WITNESS:  I couldn't give you those
11 dates, because I just do them as they come in.
12         MS. CAHILL:  Okay.
13         THE WITNESS:  And I have -- I don't know
14 when they came in.
15         MS. CAHILL:  Okay.
16         MS. BRUCH:  Is there a way to know -- can
17 you go into your computer, like, I can go into Word
18 and it will show me the day that I created the
19 document.  Will your computer, if you looked at it,
20 would it be able to tell you when you entered it?
21         THE WITNESS:  Unfortunately, no.
22         MS. BRUCH:  Okay.  That would be too easy.
23         THE WITNESS:  Right.
24         MR. RANDAZZA:  So really -- so you don't
25 have, like, envelopes that come in, you stamp

1  "received"?
2          THE WITNESS:  I do not.
3          MR. RANDAZZA:  So we have -- so it's your
4  testimony we have no record of when any of the checks
5  came in?
6          THE WITNESS:  Correct.
7          MS. BRUCH:  But can you clarify for me what
8  you just said about you were on annual leave the 29th
9  and that when you went in on the 3rd, all of that
10 data was entered?
11         MR. RANDAZZA:  Objection.  Who's testifying
12 here?
13         MS. BRUCH:  Well, I'm asking.
14         Is that what you testified to?
15         THE WITNESS:  Yes.
16         MS. BRUCH:  So --
17         THE WITNESS:  I just don't know which date
18 that I posted those three checks, but it would have
19 had to have been prior to the 29th.
20         MS. BRUCH:  Okay.  So prior -- so the
21 three -- okay.  So I think what you just said is the
22 other three, not the Love Ranch check, you would have
23 had to have posted those prior to the 29th?
24         THE WITNESS:  Correct.
25         MS. BRUCH:  Because you didn't enter

1  anything on the 2nd?
2          THE WITNESS:  Correct.
3          MS. BRUCH:  Okay.
4          THE WITNESS:  And I was out of the office
5  the 29th, 30th, and the 1st.
6          MR. RANDAZZA:  How do you know you didn't
7  enter anything on the 2nd?
8          THE WITNESS:  Because I was tied up on a
9  project and I was actually waiting to get back in
10 there and spot check a bunch of my other licenses.
11         MS. BRUCH:  Okay.
12         MR. RANDAZZA:  Do you keep a record of when
13 you log in?
14         THE WITNESS:  I don't.  I don't know if
15 there is any way to find a log.  Maybe the company
16 might be able to.
17         MR. RANDAZZA:  All right.  Thank you.
18         MS. BRUCH:  Thank you.  And I'll take the
19 original for signature.  My email address is on my
20 card, so when you send out the transcript in the
21 morning, if you would email it to me that would be
22 great.
23         THE REPORTER:  Okay.  So you want expedite
24 also?
25         MS. BRUCH:  Well, I need the transcript.

Page 102

1  Yes, please.

2       THE REPORTER:  That concludes the deposition

3  proceedings.  Transcript review by the witness will

4  be facilitated by the assistance of Ms. Bruch who has

5  assumed responsibility for handling the transcript

6  review process.

7       Any exhibit marked during the proceedings

8  will be attached to the original deposition

9  transcript, with copies attached to transcripts

10 timely ordered by counsel.

11       (Thereupon the taking of the

12       deposition was concluded at

13       5:37 p.m.)

14       *    *    *    *    *

15

16

17

18

19

20

21

22

23

24

25

---

Page 103

1                CERTIFICATE OF DEPONENT

2  PAGE   LINE   CHANGE              REASON

3  _____

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15       *    *    *    *    *

16       I, Callie Stark, deponent herein, do hereby

   certify and declare the within and foregoing

17 transcription to be my deposition in said action

   under penalty of perjury; that I have read, corrected

18 and do hereby affix my signature to said deposition.

19

20

        _____

21      Callie Stark, Deponent

22      _____

        Date

23

24

25

---

Page 104

1                CERTIFICATE OF REPORTER

2  STATE OF NEVADA  )

3                   )  SS:

4  COUNTY OF CLARK  )

5

6       I, Deborah Ann Hines, RPR, Nevada CCR No. 473,
   California CSR No. 11691, Certified Court Reporter,
   certify:

7

8       That I reported the taking of the deposition
   of the witness, Callie Stark, commencing on Tuesday,
   August 21, 2018, at 2:52 p.m.;

9

10      That prior to being examined, the witness
   was by me duly sworn to testify to the truth, the
   whole truth, and nothing but the truth;

11

12      That I thereafter transcribed my shorthand
   notes into typewriting and that the typewritten
   transcript of said deposition is a complete, true and

13 accurate record of testimony provided by the witness
   at said time to the best of my ability;

14

15      I further certify (1) that I am not a
   relative, employee or independent contractor of
   counsel of any of the parties; nor a relative,

16 employee or independent contractor of the parties
   involved in said action; nor a person financially

17 interested in the action; nor do I have any other
   relationship with any of the parties or with counsel

18 of any of the parties involved in the action that
   may reasonably cause my impartiality to be

19 questioned; and (2) that transcript review pursuant
   to FRCP 30(e) was requested.

20

21      IN WITNESS WHEREOF, I have hereunto set my
   hand in my office in the County of Clark, State of

22 Nevada, this 21st day of August, 2018.

23

        Deborah Ann Hines, CCR #473, RPR

24

25

















